# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

|  |  |
|---|---|
| ANDREW AXELROD and ELIOT BURK, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br>vs.<br><br>LENOVO (UNITED STATES) INC., a Delaware corporation,<br><br>       Defendant. | CASE NO. 4:21-cv-06770-JSW |

**EXPERT REPORT OF CLAUDIU V. DIMOFTE, PH.D.**

**June 4, 2024**

# TABLE OF CONTENTS
# EXPERT REPORT OF CLAUDIU V. DIMOFTE, PH.D.

I. INTRODUCTION ........................................................................................................ 3
  A. Qualifications ...................................................................................................... 4
  B. Background ........................................................................................................... 5
  C. Assignment .......................................................................................................... 6
  D. Summary of Conclusions ..................................................................................... 7
II. CONSUMER PERCEPTIONS STUDY ..................................................................... 8
  A. Design .................................................................................................................. 8
    i. Survey Methodology ...................................................................................... 9
    ii. Target Population and Sample ....................................................................... 9
    iii. Reliability and Validity Considerations ...................................................... 10
  B. Administration .................................................................................................... 12
    i. Screening Section ......................................................................................... 12
    ii. Main Questionnaire Section ........................................................................ 13
    iii. Final Section ............................................................................................... 14
  C. Data Analysis and Results ................................................................................. 15
    i. Respondent Statistics ................................................................................... 15
    ii. Findings ....................................................................................................... 15
    iii. Summary of Consumer Perceptions Study Results ..................................... 17
  D. Consumer Perceptions Study Summary ............................................................. 17
III. EQUIVALENT TRUE DISCOUNT STUDY 1A ..................................................... 17
  A. Design and Administration ................................................................................ 17
    i. Main Questionnaire Section ........................................................................ 18
    ii. Final Section ............................................................................................... 21
  B. Data Analysis and Results ................................................................................. 21
    i. Respondent Statistics ................................................................................... 21
    ii. Preliminary Findings ................................................................................... 22
    iii. Summary of Equivalent True Discount Study 1a Findings ......................... 23
  C. Equivalent True Discount Study 1a Summary .................................................. 24
IV. EQUIVALENT TRUE DISCOUNT STUDY 1B ..................................................... 24
  A. Design and Administration ................................................................................ 24
  B. Data Analysis and Results ................................................................................. 26
    i. Respondent Statistics ................................................................................... 26
    ii. Preliminary Findings ................................................................................... 26
    ii. Summary of Equivalent True Discount Study 1b Findings ......................... 26
  C. Equivalent True Discount Study 1b Summary .................................................. 28
V. ALTERNATIVE ASSESSMENTS OF CONSUMER RESPONSE TO PRICING ........ 29
VI. OVERALL CONCLUSIONS .................................................................................. 34
Appendix A .................................................................................................................. 35
Appendix B .................................................................................................................. 42

**Appendix C** ................................................................................................................ 45
**Appendix D** ................................................................................................................ 47
**Appendix E** ................................................................................................................ 48
**Appendix F** ................................................................................................................ 49
**Appendix G** ................................................................................................................ 72
**Appendix H** ................................................................................................................ 78
**Appendix I** ................................................................................................................ 79
**Appendix J** ................................................................................................................ 80
**Appendix K** ................................................................................................................ 81
**Appendix L** ................................................................................................................ 97
**Appendix M** ............................................................................................................. 104
**Appendix N** ............................................................................................................. 109
**Appendix P** ............................................................................................................. 111
**Appendix Q** ............................................................................................................. 118

2024 © Claudiu V. Dimofte, PhD

## EXPERT REPORT OF CLAUDIU V. DIMOFTE, PH.D.

### I.  INTRODUCTION

1. I understand that the Plaintiffs in this matter, *Andrew Axelrod* and *Eliot Burk*, individually and on behalf of all others similarly situated, have brought an action against Lenovo (United States) Inc. ("Lenovo" or "Defendant"), arising out of allegedly false representations and advertising on its website (lenovo.com). I understand that the Plaintiffs in these matters allege, among other things, that Defendant "creates an illusion of savings on its website by advertising false regular prices and false discounts based on those prices,"[1] an unlawful marketing practice known as *false reference pricing*. In particular, it is alleged that "Lenovo displays false regular prices on its website and advertises false discounts based on those prices. The regular prices are false because they do not represent the price at which Lenovo actually sells its products. The discounts are false because they do not represent the actual savings obtained by customers."[2]

2. The Plaintiffs also allege that "Lenovo's use of false regular prices and false discounts is pervasive throughout its website"[3] and that Lenovo advertises false regular prices and false discounts for hundreds of products on its website every day. "The pervasive, ongoing nature of its pricing scheme demonstrates that false reference pricing is central to its overall marketing strategy."[4]

3. I understand the Plaintiffs seek to certify a class of California consumers who purchased laptops, desktops, tablets, and workstations on or after May 31, 2017 ("class period").

4. I was asked by EDGE, A Professional Law Corporation and Capstone Law APC, representing the Plaintiffs, to provide an expert report in the above matter in order to assesses whether the alleged deceptive conduct of Lenovo[5] may be harmful to the relevant consumer population. To that end, I was asked to provide an expert opinion on what methods exist to determine economic damages on a class-wide basis and illustrate a methodological approach that could be used to quantify damages in a damages model after class certification.

---

[1] *See* Case No. 4:21-cv-06770-JSW-RMI, United States District Court, Northern District of California ("First Amended Complaint" or "FAC"), ¶ 23.
[2] FAC, ¶ 1.
[3] FAC, ¶ 1.
[4] FAC, ¶ 11.
[5] FAC, ¶ 35.

## A. Qualifications

5.  I am a tenured Professor of Marketing in the Fowler College of Business at San Diego State University and a Research Fellow at its Centre for Integrated Marketing Communications. I hold a doctoral degree in Marketing with a psychology minor from the Foster School of Business at the University of Washington in Seattle. My research interests span various areas of consumer psychology, with a focus on consumer response to marketing stimuli and its measurement via appropriate marketing metrics. My research has appeared in leading scholarly journals in the fields of marketing, consumer psychology, and management science.

6.  I have co-chaired major academic conferences in the marketing field and been a keynote speaker at practitioner/industry conferences. I have been invited to give research talks at numerous academic institutions across several continents and have served on the Editorial Boards of three of the leading academic journals in business: the *Journal of Consumer Psychology* (since 2012), the *Journal of the Academy of Marketing Science* (since 2017), and the *Journal of International Marketing* (since 2019).

7.  My consulting work has involved clients ranging from start-ups to non-profits and Fortune 500 companies, as well as expert witness research, reporting, deposition, and testimony in consumer-related litigation.

8.  Over more than two decades of academic and consulting research I have been involved in hundreds of research projects and I am well equipped to perform scholarly and applied work from both theoretical and methodological perspectives.

9.  In particular, my survey research experience includes performing and supervising hundreds of surveys at all stages, including the methodologically rigorous selection of appropriate samples from the population of interest. One of my research interests involves the appropriate use of methodological approaches in marketing research, including the development of rigorous scales and their associated psychometric properties.

10. My curriculum vitae, which provides more details about my background as well as a detailed list of my professional publications for at least the past ten years, is attached hereto as Appendix A. A list of cases where I provided expert deposition or testimony in the preceding five years is attached hereto as Appendix B.

2024 © Claudiu V. Dimofte, PhD

11. I was paid a flat fee as compensation for this assignment. Given the associated time commitment, my compensation averages $1,000 per hour and is not contingent upon the opinions I express or the outcome of the case.

## B. Background

12. Lenovo is the U.S. subsidiary of Lenovo Group Limited, a Chinese multinational technology company that is the largest computer manufacturer in the world and has operations in several U.S. states, including California. "Lenovo does not have any physical retail stores in the United States. Instead, Lenovo directly markets and sells its products and services directly to customers through its website, lenovo.com. In June 2021, Lenovo's website received over 100 million visits, of which approximately 18% originated from the United States."[6]

13. The Plaintiffs allege that "Lenovo's online success has in significant part resulted from its use of false regular prices, false discounts, and fake limited-time offers, which Lenovo advertises are "available exclusively online at Lenovo.com."[7] Lenovo creates an illusion of savings on its website by advertising false regular prices and false discounts based on those prices."[8]

14. The Plaintiffs also allege that "Lenovo perpetrated this scheme by advertising a **regular price**—i.e., the product's full, non-discounted price—which it typically displayed as the "Web Price," "Base Price," or simply as a price in strikethrough typeface (e.g., ~~$1,199.99~~). The Web Price, Base Price, and strikethrough price were used interchangeably on Lenovo's website."[9]

15. The Plaintiffs further allege that "[b]elow the regular price, Lenovo advertised a **sale price**, which was typically described as the "After Instant Savings" or "After eCoupon" price. This price (or the lower of the two prices when both were advertised) was the price at which Lenovo sold the product."[10]

16. Finally, the Plaintiffs allege that "[b]elow the sale price, Lenovo advertised a **discount** or **savings**, which was typically displayed as a dollar amount equal to the difference between the regular price and the sale price. Lenovo also advertised the discounts as a percentage equal to the amount of savings divided by the regular price. Lenovo prominently advertised the

---

[6] FAC, ¶ 21.
[7] FAC, ¶ 22.
[8] FAC, ¶ 23.
[9] FAC, ¶ 24.
[10] FAC, ¶ 25.

2024 © Claudiu V. Dimofte, PhD

purported savings on its website alongside words or phrases such as "Savings of," "Instant Saving," "SAVE ___%" "You're saving," and "Item Discount."[11]

17. In summary, the Plaintiffs allege that "the vast majority of regular prices are false because they do not represent the actual prices at which Lenovo formerly sold the products for a reasonably substantial period of time"[12] and therefore "the advertised "savings" do not represent the actual savings, as Plaintiffs and reasonable consumers understand that term."[13]

18. In the absence of the alleged deception from Lenovo, the Plaintiffs allege that they would not have made a purchase from the Defendant or would not have paid as much as they did. Thus, the alleged deception associated with the featured false discounts was material to the Plaintiffs' making a purchase and caused the Plaintiffs to suffer harm.

## C. Assignment

19. I was asked by EDGE, A Professional Law Corporation and Capstone Law APC, representing the Plaintiffs, to provide an expert report that assesses whether the alleged deceptive conduct of Lenovo[14] may be harmful to the relevant consumer population, provide an expert opinion on what methods exist to determine economic damages on a class-wide basis, and design and illustrate a methodological approach that can be used to measure and quantify damages which can be used in a damages model for calculating damages on a class-wide basis.

20. To achieve this objective, I designed, coded, conducted, and analyzed a consumer perceptions survey to determine whether and how the alleged conduct of Lenovo[15] would impact the welfare of its target population. This *Consumer Perceptions Study* is discussed in Section II below.

21. I also designed, coded, and tested an equivalent true discount survey to illustrate a methodological approach that can be used to quantify damages which can be used in a damages model for calculating damages on a class-wide basis. This *Equivalent True Discount Study* is discussed in Sections III and IV below.

22. In addition to the equivalent true discount methodology, a conjoint analysis is well-suited to the facts of this case and can be used to measure and quantify the impact that false price

---

[11] FAC, ¶ 26.
[12] FAC, ¶ 34.
[13] FAC, ¶ 35.
[14] FAC, ¶ 35.
[15] FAC, ¶ 35.

reductions have on consumer choice. The results from the conjoint analysis will be used to measure and quantify damages based on either a price premium theory or willingness-to-pay theory and can be incorporated into a damages model to calculate damages on a class-wide basis. These methods for measuring and quantifying damages are discussed in Section V below.

23. I conducted the *Consumer Perceptions Study* in a manner consistent with the scientific standards of my profession. In particular, studies should adhere to the factors cited in the Federal Judicial Center's *Manual for Complex Litigation*: choosing and defining the appropriate population while using a representative sample, asking clear and not leading questions, gathering, analyzing, and reporting the data accurately and according to accepted statistical principles, conducting the survey by qualified persons following proper procedures, and conducting the entire process in an objective manner.[16]

24. The methodology employed in designing, coding, conducting, and analyzing the *Consumer Perceptions Study* conducted for this case is reliable, valid, and representative of those used in marketing research science and practice. The results of this study can be relied upon to draw conclusions about the issues under consideration.

25. In performing this work and research, and in formulating my related opinions, I considered the items cited in the footnotes to this report as well as other relevant literature. All sources are listed in Appendix C.

## D. Summary of Conclusions

26. Based on the *Consumer Perceptions Study* performed according to the field's best practices, this research finds that the alleged deceptive conduct of Lenovo[17] can indeed negatively impact the welfare of the relevant consumer population and that this population perceives such conduct negatively.

27. The negative impact on consumers can be measured and quantified using an *Equivalent True Discount Study*, like the one designed and tested in Sections III and IV below. An *Equivalent True Discount Study* is well-suited to the facts of this case and will successfully isolate and quantify the economic damages associated with the alleged false reference prices. These results can be incorporated into a damages model to calculate damages on a class-wide basis.

---

[16] *Manual for Complex Litigation*, Federal Judicial Center, Fourth Edition, 2004, p. 103.
[17] FAC, ¶¶ 12, 15, 16, 18, 19.

28. The negative impact on consumers can also be measured and quantified using a choice-based conjoint analysis, like the one discussed in Section V below. A conjoint analysis is also well-suited to the facts of this case and will successfully isolate and quantify the economic damages associated with the alleged false price reductions. The results of the conjoint analysis can be used to calculate the price premium and the effect on consumers' willingness-to-pay associated with the alleged false price reductions.

29. In summary, I conclude that price reductions are material to consumer choice and false price reductions do in fact result in economic damages to consumers. I further conclude the resultant economic damages can be measured and quantified case using an equivalent true discount study or a choice-based conjoint analysis, and that both methodologies are well-suited for this case. The results from either the equivalent true discount study or conjoint analysis can then be incorporated into a damages model to calculate damages on a class-wide basis.

## II. CONSUMER PERCEPTIONS STUDY

30. The Consumer Perceptions Study was conducted in order to assess how consumers interpret representations of "save" or "savings," and whether the alleged conduct of Lenovo[18] is harmful to and perceived as harmful by the relevant consumer population, and whether this conduct would impact this population's purchase behavior. Using established and validated principles of survey design and administration, the study finds that consumers can be influenced significantly by actions taken by online consumer electronics retailers (e.g., the use of inflated reference prices) to create unwarranted perceptions of monetary savings among their buyers. Furthermore, consumers in the relevant population (who state that price discounts are material to their purchases) evaluate such actions as unethical and deceptive. The design, administration, and analyses associated with the study are presented below.

### A. Design

31. The following sections review the study design, including the target population, stimuli, and strategies employed to ensure the collection of valid and reliable data. They demonstrate how

---

[18] FAC, ¶¶ 12, 15, 16, 18, 19.

2024 © Claudiu V. Dimofte, PhD

the methodological approach employed adheres to best practices, both generally for marketing research and for research conducted for the purpose of litigation.[19]

  i.    *Survey Methodology*

32. Much of the applied social research enterprise employs survey research for the measurement of respondent perceptions, attitudes, and behaviors. Survey research in general involves any measurement procedures that entail asking questions of respondents.

33. In particular, my Consumer Perceptions survey research employed questionnaires developed, administered, and analyzed with careful and objective consideration of appropriate targeting, question formulation and data analysis procedures and techniques,[20] as detailed below.

  ii.    *Target Population and Sample*

34. The appropriate target population for the studies is actual or potential California individual buyers of computers and related products from online retailers such as Lenovo. In line with this classification, respondents were recruited to participate in the Consumer Perception Study if they either (i) had purchased in the previous two years or (ii) were planning to purchase in the next two years such products from an online retailer. Given the typical frequency associated with the purchase of interest, an overall time horizon of four years was deemed relevant and reasonable. To remove individuals with specialized knowledge or expertise, consumers were screened out of the sample if they have ever worked themselves or had family members who have ever worked in the following industries: advertising or market research, consumer electronics manufacturing, distribution, or sales, legal services, or website design, hosting, or e-commerce.

35. The survey employed start quotas based on relevant consumer age, gender, income, and geographical region.[21] By restricting survey starts such that potential respondents match the target population, a sampling group was obtained that was aimed to be representative of

---

[19] This research follows the standards established by the Federal Judicial Center in the "Reference Guide on Survey Research" and in the "Manual for Complex Litigation" for designing and conducting valid and reliable studies used in litigation. *See* Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, National Academies Press, 2011, pp. 359-423 ("Diamond"); *also see* "Manual for Complex Litigation."
[20] Manual for Complex Litigation, p. 103.
[21] The sampling was restricted to residents of the state of California.

consumers who purchased or are planning to purchase laptops, desktop computers, monitors, tablets, and similar items from online retailers.

36. To ensure that all potential study respondents had the opportunity to participate, the studies were made available to panel participants over multiple days and at competitive pay rates. This is an important consideration in order to avoid *non-response bias*[22] – that is the possibility that non-respondents are in some way different from respondents, thus undermining the sample's representativeness. To assess this, I analyzed the demographic profiles of the respondents who were screened out during two different stages in the survey. Results suggest that respondent profiles remained relatively stable across screening instances and in line with the targeting, producing a final sample that represents the target consumer well.

### iii.    Reliability and Validity Considerations

37. *Demand effects*. To avoid "demand effects" (i.e., instances wherein the survey "suggests" to respondents that they should provide a particular response that is "demanded" or desired by the researcher), the study was pretested, employed a "blind" approach, asked questions in a double-sided manner, used randomization whenever appropriate, and did not give respondents any indication that the survey was related to litigation involving an online consumer electronics seller.

38. *Comprehension assessment*. This is common practice methodology that aims to confirm that all survey questions are understood by respondents from the target population (i.e., consumers who would be eligible to take the survey),[23] in order to ensure the reliability of the data. The comprehension questions employed in the Consumer Perceptions Study were in accordance with best research practices to explore respondent understanding of the measure of interest.[24]

---

[22] Diamond, p. 383.

[23] Diamond, pp. 388-389.

[24] After the collection of the key measures in the Consumer Perceptions Study, respondent comprehension was assessed. On a scale anchored at $1 = very\ easy$ and $7 = very\ difficult$, respondents' scores on the comprehension check item "How easy or difficult to understand were the previous question regarding the online pricing of laptop computers?" averaged $M = 1.67$, significantly below the middle of the scale (i.e., 4) at $p < .001$. This is strong evidence that Consumer Perceptions Study respondents found the survey questions very easy to comprehend. Similarly, when asked whether they had any difficulty viewing the images of the featured website and products (on a scale anchored at $1 = no\ difficulty\ at\ all$ and $7 = extreme\ difficulty$), respondents found them easy to view ($M = 1.47$, $p < .001$ in the contrast against the middle of the scale.

39. *Blind methodology.* Respondents were at no time aware of the sponsor or purpose of the study, nor was this information identified to them at any time before, during or after their completion of their study.[25] This ensured that respondents would not craft their responses in line with what they perceived the survey sponsors wanted. Additionally, since the study was administered online by a computer program, it was not possible for the survey administrator to provide any cues indicating the sponsor or purpose of the study. Finally, the anonymous nature of the study ensured that respondents could feel at ease and provided truthful and valid responses.

40. *Double-sided questions.* In providing response options to survey questions, "balanced and explicit emphasis to the neutral as well as affirmative and negative positions"[26] was placed, while a "No opinion" or "Do not recall" option was included whenever appropriate, to reduce guessing.[27]

41. *Randomization.* The "Reference Guide on Survey Research" recommends that "the order of the questions and the order of the response choices in a survey should be rotated."[28] In line with this recommendation and best practices, the order in which answer options were presented to respondents was randomized for all relevant questions. The full questionnaire presented in Appendix F describes the Consumer Perceptions Study items and coding logic.

42. *Follow-up items to assess litigation awareness.* Standard best practice is for the respondent to be blind to the survey sponsor and its purpose.[29] At the end of the survey, all respondents were asked whether they were aware of any pending litigation involving an online consumer electronics retailer and, if so, to describe their related knowledge. The answers were used to confirm that the survey results were not driven by respondents' potential awareness of the current litigation.

---

[25] Diamond, pp. 410-411.
[26] Jacoby, Jacob, "Are Closed-Ended Questions Leading Questions?" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Shari S. Diamond and Jerre B. Swann, eds., American Bar Association, 2012, p. 275.
[27] Diamond, p. 390.
[28] Diamond, p. 396.
[29] Diamond, pp. 410-411.

## B. Administration

43. The Consumer Perceptions Study was administered online via the market-leading Qualtrics platform, using a PureSpectrum respondent panel.[30, 31] The survey administration consisted of the following steps:

### i. Screening Section

44. *Invitation and device check.* Potential respondents were invited to participate via multiple channels and were provided competitive participation incentives depending on recruitment method and demographic group in order to optimize response rates. The requested sample was largely representative of the California online consumer electronics buyer population with respect to demographics. Respondents who were not taking the survey on a desktop, laptop, or tablet were screened out of the study in order to ensure that everyone in the final sample could view the presented information and images properly and data quality was not negatively affected.[32]

45. *Representative population.* The survey began with a screening section wherein potential respondents were asked to provide their age, gender, ethnicity, marital and parenthood status, education level, employment status, annual household income, and state of residence. Next, respondents were terminated if they themselves or a household member might have specialized knowledge of industries including advertising/market research, consumer electronics manufacturing, distribution, or sales, legal services, or website design, hosting, or e-commerce.[33]

46. *Online consumer electronics purchase history or intent.* Respondents were then screened for having purchased "a laptop, desktop computer, monitor, tablet, or similar items from an online retailer" within the past "year or two," and were allowed to proceed if they indicated they had purchased within that time period.[34] Respondents who did not report having purchased were then screened for whether they would be likely to purchase in the next year or two, and

---

[30] The survey was in the field between May 3 and May 20, 2024.

[31] PureSpectrum consolidates respondent panels that number millions of participants in 60 countries around the world. The company developed the industry's first respondent-level scoring system to create a new standard of data quality.

[32] Struminskaya, Bella, Kai Weyandt, and Michael Bosnjak. "The effects of questionnaire completion using mobile devices on data quality. Evidence from a probability-based general population panel." *Methods, data, analyses, 9* (2), 2015, 261-292.

[33] See Appendix F for specific phrasing of the respective items.

[34] Respondents were asked, "In the past year or two, did you purchase…?" Several product options were presented in randomized order. See Appendix F.

allowed to proceed if they responded affirmatively.[35] Respondents who did not indicate that they had either purchased consumer electronics items online in the past year or two or would purchase them in the next year or two were terminated.

47. *Initial attention checks*. The screening questions also ensured that respondents were involved in the study at the outset. First, one of the products that respondents were asked about having purchased in recent years was French Mirabelle plums from their local grocery store. These fruits are of protected origin designation (they originate from Lorraine, France) and their import to the U.S. is restricted,[36] making them unavailable for purchase in any local grocery store. Any respondent who reported having bought them in the past two years was dropped from the survey. Respondents were also asked to report their ownership status relative to a few items presented in alphabetical order: a bicycle, a boat, a car, a dog, a graduate degree, a TV set, a smartphone, a telegraph, and a toothbrush. Only respondents who provided possible answers were permitted to continue to the main questionnaire section.[37]

### ii.    Main Questionnaire Section

48. *Introduction*. Qualified respondents were first told: "You have been assigned to answer questions about the following industry: consumer electronics manufacturing, distribution, or sales." The purpose of this statement was to have respondents believe that the specific industry was randomly selected among the various products presented in the screening section. This ensured that respondents would not adapt their responses to what they perceived the sponsors of the survey wanted (i.e., it prevented the emergence of demand effects).

49. *Focal items.* Respondents were asked to imagine shopping at the website of an "online retailer that sells a variety of laptops, desktop computers, monitors, tablets, and similar items" and encountering a particular product that they liked and could be a good choice for themselves or someone else they knew. The purpose of the latter part of the instruction was to ensure that respondents were open to considering the presented products of potential purchase interest.[38]

---

[35] Respondents were asked, "In the next year or two, do you plan to purchase…?" The same product options were presented in randomized order. See Appendix F.

[36] See https://www.bonappetit.com/trends/article/11-weird-food-bans-from-blood-to-bottled-water.

[37] The response options to the ownership questions were: (1) "Do not have one," (2) "Have at least one," and (3) "Not sure." Respondents who answered (3) to any of the items, as well as those who answered (2) to the telegraph item or (1) to the toothbrush item were terminated. See Appendix F.

[38] Nonetheless, respondents' actual interest in the product and its category were explicitly measured after exposure to each of the featured products.

They were presented with a realistic screen capture of either a Lenovo pre-cart webpage or a cart webpage for a ThinkPad notebook that was on sale (see Appendix G for images).

50. The product was characterized by three different possible designs that Lenovo used during the class period. For the pre-cart webpage, they included the use of "Web price," strike-through price, and "Est. Value" strike-through price as reference prices. For the cart webpage, two designs were featured on the lenovo.com website in 2021 and one in 2023; all highlighted presumed savings associated with the sale. Each survey respondent was randomly exposed to one out of the six product sales being evaluated in the study.

51. Respondents were asked (1) to type in the pre-tax price described in the stimulus, (2) to assess whether a price reduction was applied to the laptop, (3) to type in how large (in dollar terms) the price reduction was, and (4) to type in what the laptop price was before the price reduction was applied (i.e., the perceived reference price).[39]

52. *Discount importance.* Respondents also reported the importance they placed on the price discounts featured in the product scenarios (1 = *not important at all*, 7 = *extremely important*, 8 = *do not know / no opinion*).

53. *Memory check.* Respondents were asked to remember the type of laptop they had been exposed to. The options were: *Chromebook, ThinkPad, MacBook, or do not know / cannot remember*).

54. The purpose of the study was to evaluate if consumers perceived the various price presentation formats as price reductions off a Lenovo-provided reference price and whether savings are consequential in their decision to purchase such a product.[40]

    *iii.      Final Section*

55. *General lawsuit awareness and follow-up.* Close to the end of the survey, all respondents were asked: "Are you aware of any current litigation involving an online electronics seller?" (*no, yes*). Those answering affirmatively were asked an additional question: "Please briefly describe your knowledge about the litigation involving the online seller." In this question

---

[39] The last two assessments were only requested if respondents perceived that a price reduction had been applied.

[40] An item was also included that asked respondents to rank, in order of importance, a set of 10 attributes describing a typical notebook/laptop computer to be purchased. This was done to establish the key product attributes that will be used in an eventual conjoint analysis study. As this is not germane to the goal of this research, the item and related results are not discussed here.

respondents were provided with an option to type in their response or select "Cannot remember."

56. *Relationship with Lenovo.* Finally, respondents were asked whether they had heard of Lenovo (1 = *definitely not*, 7 = *definitely yes*), had ever purchased a consumer electronics item therefrom (*no, yes*), and were aware of any litigation involving it (*no, yes*).

57. The full questionnaire is presented in Appendix F.

## C. Data Analysis and Results

### i.    *Respondent Statistics*

58. A total of 307 consumers who completed the Consumer Perceptions Study comprised its final analytical sample. A complete description of the response and completion rates for the Consumer Perceptions Study sample is provided in Appendix D. The data in Appendix E presents demographic comparisons across dropped and retained respondents to demonstrate that the analytical sample was unbiased and largely in line with the desired targeting.

### ii.    *Findings*

59. The response distributions for the survey items discussed above are shown in Appendix H.

60. In terms of consumer understanding of the advertised laptop's pre-tax price, 63.2% of respondents correctly[41] identified it from the viewed stimulus (i.e., product webpage). A chi-square test of proportions across conditions was not statistically significant, suggesting that the proportion of correct responses did not vary across stimuli. Importantly, the proportion of respondents who correctly identified the laptop price (i.e., 63.2%) was significantly higher statistically than chance ($p < .001$).[42]

61. The analysis regarding consumer perceptions of whether savings were associated with the advertised product found that 91.5% of respondents believed that there was a price reduction applied to the viewed laptop (this was significantly higher statistically than chance, $p < .001$).

---

[41] To make for a conservative test, responses were coded as correct if they replicated (rather than merely approximated) the values shown in the stimulus.

[42] To clarify the issue of statistical significance, *p*-value represents the probability of obtaining an effect at least as extreme as the one in the sampled data, assuming the truth of the null hypothesis. In this case, let us assume that the null hypothesis is true such that the proportion of respondents who correctly identify the price in a product webpage is no different from random chance (i.e., 50%). If so, the observed results would be highly unusual or extreme. An observed *p*-value of .001 in this sample says that the chance of finding such an extreme result (or one even more extreme) is only .1%. In other words, if the study were to be done 1,000 different times, effects such as those observed here would only emerge once (i.e., this study happened to stumble upon the 1 in 1,000 samples that would incorrectly show that consumers can identify the price at rates higher than chance when in reality that is not the case).

2024 © Claudiu V. Dimofte, PhD

6.2% of respondents did not believe there was a price reduction and 2.3% were not sure. A chi-square test of proportions across conditions was not statistically significant, suggesting that the proportion of correct responses did not vary across stimuli.

62. In terms of consumer understanding of the advertised laptop savings,[43] 87.2% of respondents correctly identified their value from the stimulus (i.e., product webpage). A chi-square test of proportions across conditions was not statistically significant, suggesting that the proportion of correct responses did not vary across stimuli. Importantly, the proportion of respondents who correctly identified the savings (i.e., 87.2%) was significantly higher statistically than chance ($p < .001$).

63. In terms of consumer understanding of the advertised laptop's reference price (i.e., the baseline price off which savings were calculated),[44] 91.3% of respondents correctly retrieved it from the stimulus (i.e., the Web price, strike-through price, est. value strike-through price, etc. as shown on the product webpage). A chi-square test of proportions across conditions was not statistically significant, suggesting that the proportion of correct responses did not vary across stimuli. Importantly, the proportion of respondents who correctly identified the reference price (i.e., 91.3%) was significantly higher statistically than chance ($p < .001$).

64. When asked about the importance they placed on discounts when purchasing products such as those viewed, respondents found them overall to be between quite important and very important ($M = 5.53$, $t(302) = 5.97$, $p < .001$ in contrast vs. 5 on the 7-point scale; see Appendix H).

65. The item assessing respondent memory for the viewed brand found that 65.1% of respondents correctly recalled the laptop as a ThinkPad, 13.7% incorrectly recalled it to be a Chromebook, 7.5% incorrectly recalled it as a MacBook, and 13.7% reported not remembering the brand.[45]

66. Finally, respondents reported their personal awareness of any current litigation involving an online retailer of computers and related products. Only 7.5% of study respondents reported awareness of such litigation, though upon follow-up just 4.6% of the sample had any specific information to report and only one mentioned anything about Lenovo (though with no specifics related to the case at hand). 88.9% of respondents reported having heard of Lenovo

---

[43] As previously described, only those who believed that there was a laptop price reduction were shown this item.

[44] As previously described, only those who believed that there was a laptop price reduction were shown this item.

[45] When analyses are performed with just the respondents who correctly recalled Lenovo, results are not significantly different from those described here with the full analytical sample.

2024 © Claudiu V. Dimofte, PhD    16

prior to the study and 27.7% of the sample reported having purchased from it. 3.9% of respondents reported being aware of litigation involving Lenovo but upon further inquiry only 1.2% of respondents referred to litigation in general and one individual typed "offer discount" as the answer.

### iii.    Summary of Consumer Perceptions Study Results

67. The main findings of the Consumer Perceptions Study can be summarized as follows:

(a) when shopping for consumer electronics products online, reasonable consumers understand purported advertised savings to be meaningful price reductions off a listed baseline reference price (i.e., what the online retailer claims to be an item's price in the absence of a sale);

(b) reasonable consumers interpret the advertised savings as price reductions whether the reference price is listed as Web price, strike-through price, or Est. Value strike-through price.

(c) the discount associated with consumer electronics products sold online is an important and therefore material consideration in product purchase for reasonable consumers.

## D. Consumer Perceptions Study Summary

68.  The results of the Consumer Perceptions Study highlight that buyers in the online consumer electronics market are responsive to the presence of the "savings" they are promised, which are interpreted as meaningful price reductions, irrespective of the manner in which the baseline price is displayed. Therefore, an online retailer that artificially inflates its reference prices to create false perceptions of savings unduly increases the purchase likelihood for these products.

## III. EQUIVALENT TRUE DISCOUNT STUDY 1A

## A. Design and Administration

69. The Equivalent True Discount Studies were designed and conducted to demonstrate how the increase in consumers' purchase likelihood that results from false price reductions can be measured and quantified. These test studies were not intended to produce conclusive results regarding the economic damages associated with the alleged false reference prices. Rather, these studies are intended to show that economic damages can be reliably measured and quantified. The purpose of these studies it to illustrate one such methodology.

70. After class certification, a more extensive equivalent true discount study will be performed to reliably measure and quantify damages for laptops, desktops, tablets, and workstations offered on Lenovo's website during the class period. A more extensive study will be straightforward

to perform. Additional products will be studied to minimize coverage error associated with testing a single product. The additional products will be selected to ensure they are representative of the type, price, and discount offered for sale on Lenovo's website during the class period.[46] The sample size and test conditions will also be increased to minimize sampling and measurement error.

71. Although the Equivalent True Discount Test Studies are intended merely as exemplars, the survey methodology, sample selection, and administration were identical to those employed in the Consumer Perceptions Study and thus in line with the field's best practices both generally for marketing research and for research conducted for the purpose of litigation.[47, 48]

72. The Equivalent True Discount Test Studies were also administered online via the Qualtrics platform, using PureSpectrum and Lucid[49] respondent panels.[50]

    *i.       Main Questionnaire Section*

73. *Introduction.* Qualified respondents were first told: "You have been assigned to answer questions about the following industry: consumer electronics manufacturing, distribution, or sales." The purpose of this statement was to have respondents believe that the specific industry was randomly selected among the various products presented in the screening section. This ensured that respondents would not adapt their responses to what they perceived the sponsors of the survey wanted (i.e., it prevented the emergence of demand effects).

74. *Focal items.* Respondents were asked to imagine shopping at the website of an "online retailer that sells a variety of laptops, desktop computers, monitors, tablets, and similar items" and encountering a particular product that they liked and could be a good choice for themselves or someone else they knew. The purpose of the latter part of the instruction was to ensure that

---

[46] I understand Plaintiffs expect to obtain additional pricing and sales data from Lenovo.

[47] The standards were established by the Federal Judicial Center in *Diamond* and the *"Manual for Complex Litigation."*

[48] After the collection of the key measures in Equivalent True Discount Study 1a, respondent comprehension was assessed. On a scale anchored at 1 = *very easy* and 7 = *very difficult*, respondents' scores on the comprehension check item "How easy or difficult to understand were the question regarding the products you viewed in this survey?") averaged $M = 1.83$, significantly below the middle of the scale (i.e., 4) at $p < .001$. This is strong evidence that Equivalent True Discount Study 1a respondents found the survey questions very easy to comprehend. Similarly, when asked whether they had any difficulty viewing the images of the products and their specifications (on a scale anchored at 1 = *no difficulty at all* and 7 = *extreme difficulty*), respondents found them easy to view ($M = 1.42$, $p < .001$ in the contrast against the middle of the scale).

[49] The survey was tested in the field between May 23 and May 30, 2024. There was no overlap between the respondents from the Consumer Perceptions Study and those from the Equivalent True Discount Studies.

[50] Lucid is a reputable, leading market research data supplier that provides respondent panel access reaching millions of participants across more than 100 countries.

respondents were open to considering the presented products of potential purchase interest.[51] They were presented with a realistic screen capture of a Lenovo webpage featuring a Lenovo workstation product that was either on sale or not on sale. The screen capture featured an "add to cart" button, and the reference price, promotional price (if applicable), and savings (if applicable) substantially similar to the pricing that was displayed on Lenovo's website.

75. The product was characterized by six price points: a price (p1) that did not feature a discount (and was the artificially inflated Lenovo reference price), a price (p2) that featured a specific discount resulting from the comparison between p1 and the artificially inflated Lenovo reference price (described as the "Web price"), as well as four prices (p3, p4, p5, and p6) that featured decreasing discounts (in equal increments) using the true reference price[52] in the sale price (see Table 1 for an illustration of how these prices apply to a Lenovo workstation sold via inflated reference pricing during the class period). Each survey respondent was randomly exposed to one price point for the workstation product being evaluated.[53] After exposure, respondents reported their purchase probability (in percentage terms) for the item on a slider scale anchored at 0 and 100.

| Item (SKU)[54] | p1. False reference price no sale | p2. False reference price sale | p3. True reference price sale 1 | p4. True reference price sale 2 | p5. True reference price sale 3 | p6. True reference price sale 4 |
|---|---|---|---|---|---|---|
| Workstation (20T5S01900) | $2,729.00 | Web price $2,729.00 47% off $1,449.00 | Web price $1,449.00 45% off $797.00 | Web price $1,449.00 35% off $942.00 | Web price $1,449.00 25% off $1,087.00 | Web price $1,449.00 15% off $1,232.00 |

Table 1

---

[51] Nonetheless, respondents' actual interest in the product was explicitly measured after exposure.

[52] The true reference price was considered to be the one at which the item most commonly sold. For example, if an item sold most often at $794.99 during a 25% sale off a presumed full price of $1,059.00 but the item rarely (or never) sold at the $1,059.00 price point, then the true reference price in a true sale was $794.99 (rather than $1,059.00). In other words, the $1,059.00 Web price was an artificially inflated (i.e., not true) reference price point meant to induce false perceptions of savings among target customers. This product and its associated pricing information were provided by another expert of the Plaintiffs.

[53] To enhance external validity, the stimuli employed in this study (see Appendix L) replicate exactly the format depicted on Lenovo's site at various points during the class period (this applies to all studies in this report). To that end, note that although the tables associated with this study include percent savings information to illustrate the study's conditions, the savings were displayed to respondents in absolute terms (i.e., dollars) but not in relative terms (i.e., percent).

[54] The Lenovo product description was ThinkPad P15s Gen 1 Mobile Workstation (20T5S01900).

76. To account for (a) the fact that the product description associated with the workstation sold during the class period renders the product obsolete in today's marketplace and (b) the effect of inflation on current market prices, the product was replaced in the study with a similar proxy from current Lenovo inventory (see Table 2).

| Item (SKU)[55] | p1. False reference price no sale | p2. False reference price sale | p3. True reference price sale 1 | p4. True reference price sale 2 | p5. True reference price sale 3 | p6. True reference price sale 4 |
|---|---|---|---|---|---|---|
| Workstation (21FC001YUS) | $2,929.00 | Web price $2,929.00 After eCoupon $1,729.00 Savings $1,250.00 41% off | Web price $1,729.00 After eCoupon $1,039.00 Savings $690.00 40% off | Web price $1,729.00 After eCoupon $1,209.00 Savings $520.00 30% off | Web price $1,729.00 After eCoupon $1,379.00 Savings $350.00 20% off | Web price $1,729.00 After eCoupon $1,559.00 Savings $170.00 10% off |

Table 2

77. The purpose of the study was to compare the purchase probability that the workstation enjoyed as a result of Lenovo's use of the alleged false reference price in a sale versus the purchase probability that it would have enjoyed had Lenovo used the true reference price in a sale. Thus, the study identified the equivalent true discount based on a true reference price that would be required to induce the same product appeal as the false sale discount. This would occur when the purchase probability associated with an equivalent true discount based on a true reference price would be statistically no different from that associated with the false discount based on a false reference price.[56]

78. *Item interest.* Self-reported product relevance information was also collected in order to assess whether the item was indeed something the respondent would consider buying for themselves or someone else (scale: 1 = *definitely not*, 7 = *definitely yes*). Only those who answered above the middle of the scale (i.e., 4 = *not sure*) were considered in the analyses.

79. *Discount importance.* Respondents reported the importance they placed on the price discounts featured in the product scenario (1 = *not important at all*, 7 = *extremely important*, 8 = *do not know / no opinion*).

---

[55] The Lenovo product description was ThinkPad P16v Intel (16") Mobile Workstation (21FC001YUS).

[56] Note that the false sale may elicit purchase likelihoods similar to those associated with true sales of varying discount levels. In that case, to make for a conservative estimate, the lowest discount true sale is used as that eliciting equivalent consumer appeal.

80. *Perceptions of online seller behavior.* Respondents were asked for their opinions regarding an online retailer who would offer presumed sales (i.e., 50% off an inflated regular price[57] of $100, when the item normally sells for $50 to begin with). Perceptions were collected along eight evaluative attributes (4 positive and 4 negative, in order to avoid demand effects; the scales were anchored at 1 = *definitely not* and 7 = *definitely yes*, 8 = *no opinion*). The dimensions (presented in random order) on which these behaviors were assessed were: *acceptable, misleading, truthful, unethical, excusable, unacceptable appropriate*, and *deceptive*. Finally, respondents were asked whether the respective behavior would impact their decision to purchase from the respective retailer (scale: 1 = *definitely not*, 7 = *definitely yes*, 8 = *do not know / no opinion*).

   *ii.    Final Section*

81. *General lawsuit awareness and follow-up*. Close to the end of the survey, all respondents were asked: "Are you aware of any current litigation involving an online electronics seller?" (*no, yes*). Those answering affirmatively were asked an additional question: "Please briefly describe your knowledge about the litigation involving the online electronics seller." In this question respondents were provided with an option to type in their response or select "Cannot remember."

82. *Relationship with Lenovo*. Finally, respondents were asked whether they had heard of Lenovo (1 = *definitely not*, 7 = *definitely yes*), had ever purchased a consumer electronics item therefrom (*no, yes*), and were aware of any litigation involving it (*no, yes*).

83. The full questionnaire is presented in Appendix K.

## B. Data Analysis and Results

   *i.    Respondent Statistics*

84. A total of 371 consumers who completed the Equivalent True Discount Study 1a comprised its final analytical sample. A complete description of the response and completion rates for the Equivalent True Discount Study 1a sample is provided in Appendix I. The data in Appendix J presents demographic comparisons across dropped and retained respondents to demonstrate that the analytical sample was unbiased and largely in line with the desired targeting.

---

[57] The term "regular price" was used because Lenovo states on its website that the advertised savings are "referenced off regular Lenovo web prices." FAC, ¶ 29.

85. Analyses only include respondents who found the product relevant (i.e., target market consumers).[58] This decision is rooted in the basic assumption that pricing information extracted from individuals who find a product irrelevant provides no actual insights and merely brings noise into the data set.

*ii.    Preliminary Findings*

86. Workstation ($N = 174$): the mean values for the dependent variable are presented in Table 3.

| Workstation (21FC001YUS) | $2,929.00 | Web price $2,929.00 After eCoupon $1,729.00 Savings $1,250.00 41% off | Web price $1,729.00 After eCoupon $1,039.00 Savings $690.00 40% off | Web price $1,729.00 After eCoupon $1,209.00 Savings $520.00 30% off | Web price $1,729.00 After eCoupon $1,379.00 Savings $350.00 20% off | Web price $1,729.00 After eCoupon $1,559.00 Savings $170.00 10% off |
|---|---|---|---|---|---|---|
| Purchase likelihood | 60.58% | 78.35% | 79.26% | 76.52% | 74.45% | 66.39% |

Table 3

87. A univariate analysis of variance was performed on the dependent variable with the pricing scenario as a discrete, six-level predictor. The model was statistically significant: $F(5, 169) = 3.73$, $p < .01$, such that the use of sale pricing produced a clear increase in purchase probability compared to the use of non-sale pricing. In particular, a Lenovo sale using an inflated reference price (i.e., $1,729.00 with a presumed 41% discount off $2,929.00) created more consumer interest than the same price point lacking a discount (i.e., $2,929.00; in the statistical contrast, $M_1 = 60.58$, $M_2 = 78.35$, $t(169) = -3.25$, $p < .001$).

88. The use of a sale with an inflated regular price (i.e., $1,729.00 with a presumed 41% discount off $2,929.00) produced a statistically similar purchase probability to that associated with the use of a true sale at 20% off a true reference price of $1729.00 (in the statistical contrast, $M_2 = 78.35$, $M_5 = 74.45$, $t(169) = .75$, *ns*). Thus, but for the use of the inflated $2,929.00 regular price comparison anchor, consumers would have displayed similar product interest at a price point of $1,379.00 or lower as part of a sale using a true $1,729.00 regular price comparison anchor. This suggests that, if the $2,929.00 reference price point was not genuine (i.e., was

---

[58] These are respondents who scored above the middle of the scale (i.e., 4) for both the item interest question.

artificially inflated), any consumer purchasing the laptop at the "$1,729.00 with a presumed 41% discount off $2,929.00" sale overpaid by $350.00 (i.e., by 25.38%) relative to the case of a comparably attractive genuine sale.

89. In terms of the behavior of an online retailer using inflated regular prices in its sales, respondents perceived it to be misleading ($M = 5.62$), unacceptable ($M = 5.44$), unethical ($M = 5.43$), and deceptive ($M = 5.76$; each contrast against the middle of the scale was positive and significant at $p < .001$) as well as not to be acceptable ($M = 2.72$), truthful ($M = 2.55$), excusable ($M = 2.71$), or appropriate ($M = 2.68$; each contrast against the middle of the scale negative and significant at $p < .001$). This behavior was reported to very strongly influence respondents' willingness to purchase items from the respective seller ($M = 5.36$, significantly higher than the middle of the scale: $t(362) = 12.17, p < .001$).

90. The response distributions for the main survey items discussed above are shown in Appendix M.

91. The item assessing respondent memory for the viewed brand found that 78.7% of respondents correctly recalled the evaluated brand as Lenovo, 3.8% incorrectly recalled it to be Apple, 3.8% incorrectly recalled it as Dell, 5.7% as Hewlett-Packard, and 7.9% reported not remembering the brand.

92. Finally, respondents reported their personal awareness of any current litigation involving an online retailer of computers and related products. 6.8% of respondents reported awareness of such litigation, though upon follow-up just one of them had any specific information to report that mentioned deceptive pricing. 85.6% of respondents reported having heard of Lenovo prior to the study and 34.9% of respondents reported having purchased from it. 2.1% of respondents reported being aware of litigation involving Lenovo but upon further inquiry only one of them had any specific information to report and it did not mention anything relevant to the case at hand.

*iii.    Summary of Equivalent True Discount Study 1a Findings*

93. The preliminary findings of the Equivalent True Discount Study 1a can be summarized as follows:[59]

---

[59] The Equivalent True Discount Studies are intended to be illustrative only. Thus, any findings based thereon are preliminary in nature and are intended only to indicate the type of conclusions that can be drawn from such a survey.

(a) the price reduction from an advertised "Web Price" that is associated with the sale of workstation computers online is an important purchase consideration for consumers;

(b) the price reduction from an advertised "Web Price" for a workstation computer has a material effect on purchase behavior; and

(c) the use of artificially inflated regular prices is perceived negatively by consumers.

## C. Equivalent True Discount Study 1a Summary

94. The preliminary findings of the Equivalent True Discount Study 1a indicate that consumers shopping for workstation laptops are driven by both the presence and the magnitude of the discounts they are promised. Therefore, an online retailer that artificially inflates its reference prices creates a false perception of savings by increasing the difference between the reference price and sale price. This unduly increases the purchase likelihood for products advertised with artificially inflated reference prices and price reductions. In the absence of these false reference prices, consumers would display similar levels of purchase likelihood only at lower price points, a fact that renders the retailer's behavior misleading and produces financial harm to the buyer.

95. The methodological approach proposed here and illustrated with the Lenovo workstation product is capable of measuring and quantifying damages which can be used in a damages model that can be further calibrated after class certification.

## IV. EQUIVALENT TRUE DISCOUNT STUDY 1B

## A. Design and Administration

96. Like Equivalent True Discount Study 1a, Equivalent True Discount Study 1b is not intended to produce conclusive results regarding the economic damages associated with the alleged false reference prices. Rather, this study is intended to show that economic damages can be reliably measured and quantified, and the purpose of this study is to illustrate one such methodology.

97. The survey methodology, sample selection administration, and instrument (see Appendix K), were identical to those employed in the Equivalent True Discount Study 1a and thus in line with the field's best practices both generally for marketing research and for research conducted

2024 © Claudiu V. Dimofte, PhD

for the purpose of litigation.[60, 61]

98. The Equivalent True Discount Study 1b was also administered online via the Qualtrics platform, using the same PureSpectrum and Lucid respondent panels.[62]

99. The difference between Equivalent True Discount Study 1a and 1b is the presentation format for product's reference price: unlike the "Web price" descriptor used in the first study, the second study employed a standalone strikethrough price (see Appendix P for the product images employed as stimuli).[63]

100. In the study, the workstation product was characterized by the same six price points employed in Equivalent True Discount Study 1a: a price (p1) that did not feature a discount (and was the artificially inflated Lenovo reference price), a price (p2) that featured a specific discount resulting from the comparison between p1 and the artificially inflated Lenovo reference price (described as a strike-through dollar amount), as well as four prices (p3, p4, p5, and p6) that featured decreasing discounts (in equal increments) using the true reference price in the sale price (see Table 4). Each survey respondent was randomly exposed to one price point for the workstation product. Respondents reported their purchase probability (in percentage terms) on a slider scale anchored at 0 and 100.

| Item (SKU) | p1. False reference price no sale | p2. False reference price sale | p3. True reference price sale 1 | p4. True reference price sale 2 | p5. True reference price sale 3 | p6. True reference price sale 4 |
|---|---|---|---|---|---|---|
| Workstation (21FC001YUS) | $2,929.00 | $2,929.00 save $1,250.00 41% off $1,729.00 | $1,729.00 save $690.00 40% off $1,039.00 | $1,729.00 save $520.00 30% off $1,209.00 | $1,729.00 save $350.00 20% off $1,379.00 | $1,729.00 save $170.00 10% off $1,559.00 |

Table 4

---

[60] The standards were established by the Federal Judicial Center in *Diamond* and the *"Manual for Complex Litigation."*

[61] After the collection of the key measures in Equivalent True Discount Study 1b, respondent comprehension was assessed. On a scale anchored at $1 = $ *very easy* and $7 = $ *very difficult*, respondents' scores on the comprehension check item "How easy or difficult to understand were the question regarding the products you viewed in this survey?") averaged $M = 1.90$, significantly below the middle of the scale (i.e., 4) at $p < .001$. This is strong evidence that Equivalent True Discount Study 1b respondents found the survey questions very easy to comprehend. Similarly, when asked whether they had any difficulty viewing the images of the products and their specifications (on a scale anchored at $1 = $ *no difficulty at all* and $7 = $ *extreme difficulty*), respondents found them easy to view ($M = 1.42$, $p < .001$ in the contrast against the middle of the scale.

[62] The survey was in the field between May 23 and May 30, 2024. There was no overlap between the respondents from the Consumer Perceptions Study and those from the Equivalent True Discount Studies.

[63] The two approaches cover two commonly used reference price formats employed by Lenovo during the class period.

## B. Data Analysis and Results

### i.    *Respondent Statistics*

101. A total of 368 consumers who completed the Equivalent True Discount Study 1b comprised its final analytical sample. A complete description of the response and completion rates for the Equivalent True Discount Study 1b sample is provided in Appendix N. The data in Appendix O presents demographic comparisons across dropped and retained respondents to demonstrate that the analytical sample was unbiased and largely in line with the desired targeting.

102. For all products, analyses only include respondents who found the product relevant (i.e., target market consumers). This decision is rooted in the basic assumption that the pricing information extracted from individuals who find a product irrelevant provides no actual insights and merely brings noise into the data set.

### ii.    *Preliminary Findings*

103. Workstation ($N = 174$): the mean values for the dependent variable are presented in Table 5.

| Workstation (21FC001YUS) | $2,929.00 | ~~$2,929.00~~ save $1,250.00 41% off $1,729.00 | ~~$1,729.00~~ save $690.00 40% off $1,039.00 | ~~$1,729.00~~ save $520.00 30% off $1,209.00 | ~~$1,729.00~~ save $350.00 20% off $1,379.00 | ~~$1,729.00~~ save $170.00 10% off $1,559.00 |
|---|---|---|---|---|---|---|
| Purchase likelihood | 66.80% | 79.34% | 77.00% | 78.74% | 74.04% | 69.44% |

Table 5

104. A univariate analysis of variance was performed on the dependent variable with the pricing scenario as a discrete, six-level predictor. The model was statistically significant: $F(5, 168) = 2.31$, $p < .05$, such that the use of sale pricing produced a clear increase in purchase probability compared to the use of non-sale pricing. In particular, a Lenovo sale using an inflated reference price (i.e., $1,729.00 with a presumed 41% discount off $2,929.00) created more consumer interest than the same price point lacking a discount (i.e., $2,929.00; in the statistical contrast, $M_1 = 66.80$, $M_2 = 79.34$, $t(168) = -2.69$, $p < .01$).

105. The use of a sale with an inflated regular price (i.e., $1,729.00 with a presumed 41% discount off $2,929.00) produced a statistically similar purchase probability to that associated with the

2024 © Claudiu V. Dimofte, PhD

use of a true sale at 20% off a true reference price of $1,729.00 (in the statistical contrast, $M_2$ = 79.34, $M_5$ = 74.04, $t(168)$ = 1.09, $ns$). Thus, but for the use of the inflated $2,929.00 regular price comparison anchor, consumers would have displayed similar product interest at a price point of $1,379.00 or lower as part of a sale using a true $1,729.00 regular price comparison anchor. This suggests that, if the $2,929.00 reference price point was not genuine (i.e., was artificially inflated), any consumer purchasing the laptop at the "$1,729.00 with a presumed 41% discount off $2,929.00" sale overpaid by $350.00 (i.e., by 25.38%) relative to the case of a comparably attractive genuine sale.

106. In terms of the behavior of an online retailer using inflated regular prices in its sales, respondents perceived it to be misleading ($M$ = 5.44), unacceptable ($M$ = 5.09), unethical ($M$ = 5.23), and deceptive ($M$ = 5.51; each contrast against the middle of the scale positive and significant at $p < .001$) as well as not to be acceptable ($M$ = 2.83), truthful ($M$ = 2.66), excusable ($M$ = 2.65), or appropriate ($M$ = 2.78; each contrast against the middle of the scale negative and significant at $p < .001$). This behavior was reported to very strongly influence respondents' willingness to purchase items from the respective seller ($M$ = 5.56, significantly higher than the middle of the scale: $t(365)$ = 14.98, $p < .001$).

107. The response distributions for the main survey items discussed above are shown in Appendix Q.

108. The item assessing respondent memory for the viewed brand found that 79.8% of respondents correctly recalled the evaluated brand as Lenovo, 3.0% incorrectly recalled it to be Apple, 6.0% incorrectly recalled it as Dell, 3.8% as Hewlett-Packard, and 7.4% reported not remembering the brand.

109. Finally, respondents reported their personal awareness of any current litigation involving an online retailer of computers and related products. 6.0% of respondents reported awareness of such litigation, though upon follow-up just two of them had any specific information to report that was somewhat related to deceptive pricing. 88.0% of respondents reported having heard of Lenovo prior to the study and 37.0% of respondents reported having purchased from it. 3.3% of respondents reported being aware of litigation involving Lenovo but upon further inquiry only three of them had any specific information to report but did not mention anything relevant to the case at hand.

*iii.   Summary of Equivalent True Discount Study 1b Findings*

110. The preliminary findings of the Equivalent True Discount Study 1b are remarkably consistent with those of the Equivalent True Discount Study 1a and can be summarized as follows:

(a) the price reduction from an advertised standalone strikethrough price that is associated with the sale of workstation computers online is an important purchase consideration for consumers;

(b) the price reduction from an advertised standalone strikethrough price for a workstation computer has a material effect on purchase behavior; and

(c) the use of artificially inflated regular prices is perceived negatively by consumers.

## C. Equivalent True Discount Study 1b Summary

111. The preliminary findings of the Equivalent True Discount Study 1b reinforce that consumers in the online consumer electronics market are driven by the presence and magnitude of the discounts they are promised. Therefore, an online retailer that artificially inflates its reference prices creates a false perception of savings in the minds of consumers by increasing the difference between the reference price and sale price. This unduly increases the purchase likelihood for products advertised with artificially inflated reference prices and price reductions. The illustrative analysis of the workstation laptop shows that in the absence of false reference prices, consumers would display similar levels of product interest only at lower price points.

112. Overall, Equivalent True Discount Studies 1a and 1b illustrate one approach that can be employed to evaluate how pricing strategies such as those employed by Lenovo may impact consumer response. As discussed above, after class certification, the study can employ larger samples, more products at more price points, more test price conditions, and can test additional price display formats to enhance the illustrative approach presented here.[64]

113. Furthermore, the preliminary findings of Equivalent True Discount Studies 1a and 1b reinforce that the discount associated with a consumer electronics product sold online is an important purchase consideration for consumers. Consumers assume that these discounts are meaningful, and the reference price provided (i.e., what the online retailer claims to be an

---

[64] By testing these effects across multiple price ranges and product types one would be able to extrapolate to the entire Lenovo product portfolio without the need to perform an impractical number of equivalent true discount studies. Selecting which products to sample would require access to Lenovo sales data.

item's regular price, whether presented as "Web price" or a strikethrough price) is truthful. The use of artificially inflated reference prices is perceived negatively by consumers.

## V. ALTERNATIVE ASSESSMENTS OF CONSUMER RESPONSE TO PRICING

114. There are other survey-based methodologies that can be employed to evaluate how pricing strategies such as those employed by Lenovo impact consumer response. They include the Van Westendorp Price Sensitivity Meter, the Gabor-Granger approach, and conjoint analysis.

115. The Price Sensitivity Meter (Van Westendorp, 1976) asks respondents four questions about their perception of expected prices: the price at which a product would be so cheap that they would doubt its quality and not consider it, the price at which it would be a bargain, the price at which it would seem expensive but still acceptable, and the price at which it would be too expensive to consider. A resulting plot of the four curves (based on cumulative percent of study respondents) then describes the acceptable price range for the product, as well as its optimal and ideal price points (Orme and Chrzan, 2022).

116. The Gabor-Granger approach (Gabor and Granger, 1966) involves asking respondents if they would buy a product at a given price. If the answer is affirmative, then the question is asked again at a higher price. If the answer is negative, then the question is asked again at a lower price. Averaging across respondents allows the researcher to infer the market demand curve, in a manner largely similar to that of the Price Sensitivity Meter (Orme and Chrzan, 2022).

117. Conjoint analysis is a particularly well-suited and "widely applied marketing research tool for measuring buyers' multi-attribute utility functions "(Green, 1984; p. 155). In effect, it asks consumers to evaluate different product configurations (i.e., it construes products as bundles of attributes,[65] each entailing different levels) and forcing them to make trade-offs among these configurations. Respondents' reactions to repeated attribute changes allow researchers to infer measures such as their willingness to pay (WTP) and their price sensitivity (i.e., how demand changes with shifts in price; Orme and Chrzan, 2022). Conjoint surveys have been widely used and accepted by courts as being capable of measuring the price premium associated with challenged seller representations in false advertising class action proceedings.

---

[65] With this in mind, the Consumer Perceptions Study elicited a ranking of the most important attributes considered by consumers when purchasing a laptop. The top few attributes that emerged (and can be used in a conjoint analysis study) were price, operating system, processor, random access memory (RAM) and discount amount.

118. The methodology is based on the notion that consumer demand for a product emerges from and is a reflection of the various underlying features (or attributes) that comprise the respective product. These features are coupled together, or *conjoined*, such that the resulting bundle produces a certain utility when used or consumed. In essence, conjoint analysis allows the researcher to deconstruct this utility into its component features and to understand the importance and impact each of the features have on consumers' valuation of the product.

119. There are various methodologies for conducting conjoint analysis, including two-factor-at-a-time trade-off, full profile, adaptive conjoint, choice-based conjoint, self-explicated conjoint, hybrid conjoint, and Hierarchical Bayes. The Adaptive Choice-Based Conjoint Analysis (Adaptive CBCA) is a more advanced method that uses the full-profile method of presenting product concepts within surveys that are customized and thus more engaging for respondents. Rigorous comparison studies to traditional choice-based conjoint suggest that the adaptive form leads to data that are more accurate and predictive of choice behavior (Cunningham et al., 2010). It also captures more information at the individual level and may be used with smaller samples (Johnson and Orme, 2007).

120. A conjoint study thus involves quantifying the amount of utility (i.e., value) that buyers place on specific attribute levels of (for example) a laptop they purchase. This allows the estimation of the financial and market share impact that sale pricing and the perceptions they create on consumers have for the brand.

121. In conceptual terms, the technique relies on basic economic theory stating that individuals make choices in line with the desire to maximize the utility (i.e., benefits) they extract from the products they acquire (Kumar and Reinartz, 2016). In applied terms, conjoint surveys replicate consumers' routine task of marketplace shopping, wherein they evaluate, compare, and choose among products.

122. In a conjoint survey, respondents perform a series of choice tasks wherein they are presented with a set of hypothetical products (generally 4 or less) and are asked to choose which of them (if any) they would purchase. The hypothetical products are described along several attributes that reflect the key features that consumers consider when making purchases in the category. In the case of laptops, they would involve attributes such as processor, random access memory (RAM), price, and so on.

123. Each product attribute involves several "levels," for example 4GB, 8GB, 16GB, and 32GB in the case of RAM. The levels of each attribute are systematically randomized, resulting in hypothetical product choices featuring products with varying combinations of attribute levels. An example of such potential choice task is presented in Figure 1.

Among these three laptop options, please select the one product you would purchase, if any.

(Note that greyed out features are the same across each product.)

| | | | | |
|---|---|---|---|---|
| Processor | Intel Core i9 | Intel Core i5 | Intel Core i7 | |
| RAM | 8GB | 32GB | 16GB | |
| Operating system | Windows 11 | Windows 11 | Windows 11 | Would not choose any of these. |
| Price | $1,729.00 save $170.00 10% off $1,559.00 | $1,729.00 save $690.00 40% off $1,039.00 | $2,929.00 save $1,250.00 41% off $1,729.00 | |
| | ○ | ○ | ○ | ○ |

Figure 1

124. The argument for not including the brand as a product attribute is that it prevents respondents from relying on their brand loyalty and prior associations with the respective brand's products in answering the conjoint survey questions. The brand (e.g., Lenovo, Dell, HP etc.) would therefore not be a feature that varies in the conjoint analysis survey because all product configurations would be hypothetical Lenovo laptop profiles presented to a sample of actual or potential Lenovo laptop buyers.

125. To calculate the potential price premium attributable to the use of false discounts, an analysis of the choice-based conjoint survey data would be performed using the latest version of Sawtooth Software Lighthouse Studio. To calculate the price premium statistics, a "market simulation" analysis would test multiple real-world product configuration possibilities and allow the estimation of preferences across consumers. The conjoint study produces a set of utilities (i.e., "part-worths") that quantify the value placed by respondents on the levels of

each attribute. The conjoint survey results would be calculated using part-worth utilities produced with the Sawtooth Lighthouse Studio[66] employing Hierarchical Bayesian models.

126. Respondents' selection of a specific product (or none) across multiple choice tasks (each involving sets of products with systematically varied attribute levels) reveals their preferences for specific attributes and their levels.[67] A sample of sufficient size (usually around 300 or more, although Adaptive CBCA allows for fewer), would provide the necessary data points from which the market price premium attributable to a particular attribute can be calculated.[68]

127. Conjoint analysis thus provides the necessary consumer demand inputs required to measure economic damages through "its ability to answer various "what if" questions using market simulators […] based on […] hypothetical or real choice alternatives" Rao (2010). Here, the what-if scenario would involve replacing the false reference price sale with true reference price sales of different levels. To complement the conjoint survey, real-world, market supply-side elements relevant to the laptop product would also be collected in order to accurately measure the price premium attributable to the use of false discounts. This work would be performed by another Plaintiffs' expert through an analysis of marketplace and Lenovo sales data.

128. When performing a conjoint study, all steps described in the studies reported above would be similarly followed, thus adhering the factors cited in the Federal Judicial Center's *Manual for Complex Litigation*: choosing and defining the appropriate population while using a representative sample, asking clear and not leading questions, gathering, analyzing, and reporting the data accurately and according to accepted statistical principles, conducting the survey by qualified persons following proper procedures, and conducting the entire process in an objective manner.[69]

129. The specific steps involved in the proposed conjoint analysis study would ensure proper sampling, instrument design, and data analysis procedures, as described below.

---

[66] Sawtooth Software is the industry leader in market research software for conjoint data collection and analysis.

[67] Note that the specific prices employed in the conjoint survey need not exactly replicate what consumers paid (recall that the product configurations/attribute bundles are hypothetical). This is because the goal of the conjoint survey is simply assessing respondent sensitivity to different prices. However, when calculating damages, one would employ the prices actually paid by Class members.

[68] This work would be performed in conjunction with another Plaintiffs' expert.

[69] *Manual for Complex Litigation*, Federal Judicial Center, Fourth Edition, 2004, p. 103.

130. The target population (i.e., that to which the sample results are meant to generalize) represents consumers from California who have purchased or would purchase laptops for personal use. Class members would be identified as the subset of respondents sampled from this target population who are Lenovo laptop buyers.

131. The attributes to be employed in the conjoint study have already been established by surveying this population in the Consumer Perceptions Study included in this report. The specific levels associated with each attribute would be developed by analyzing typical laptop, desktop, tablet, and workstation specifications present on Lenovo's website.

132. Adaptive CBCA would be employed in a survey instrument designed to be a more interactive experience, customized to the preferences and opinions of each respondent. Prior to the product choices such as those presented in Figure 1, the Adaptive CBCA survey allows respondents to first form an ideal product within a BYO (Build-Your-Own) exercise where preferred levels are selected for each attribute. Based on answers to the BYO questionnaire, the software creates a pool of product configurations that includes every attribute level, but for which attribute levels are relatively concentrated around the respondent's preferred levels. The adaptive nature of the process resides in its ability to only display relevant products for respondents to consider, based on the preferred product that respondents specify in the BYO.[70] In the second section of the survey, a set of screening questions display product configurations that respondents must indicate as being either "a possibility" or "not a possibility." This step may produce attribute levels that are either "unacceptable" or "must haves," in which case all further products shown will either display or suppress them (thus again adapting to each respondent's stated preferences). Finally, a "choice tournament" step involves selecting the preferred option out of several product configuration, as illustrated in Figure 1.

133. In terms of data analysis, part-worth utilities would be estimated using Sawtooth Software's Adaptive CBCA Hierarchical Bayesian tool, as described above. It allows for the inclusion of first-order interaction effects (i.e., interactions between two attributes).

134. Each of the three methods reviewed above can be employed to supplement the findings of the Consumer Perceptions Study approach presented in this report.

---

[70] See *The Adaptive Choice-Based Conjoint (ACBC) Technical Paper* – Sawtooth Software, Inc. (2014).

## VI. OVERALL CONCLUSIONS

135. In conclusion, as stated and detailed above and based on the studies I conducted in this case, I have formed the following opinions:

(a) consumers in the relevant population are deal-prone, such that a discounted item price induces higher purchase likelihood by merely being framed as discounted;

(b) the profit motive encourages the use of price discounting in the manner that the Plaintiffs allege of Lenovo;

(c) consumers in the relevant population display higher purchase likelihood for items discounted in the manner that the Plaintiffs allege of Lenovo;

(d) consumers in the relevant population find the discounting behavior that the Plaintiffs allege of Lenovo to be misleading;

(e) the welfare of consumers in the relevant population is materially and negatively affected by the discounting behavior that the Plaintiffs allege of Lenovo;

(f) this report illustrates a specific approach to quantifying the extent of the damages experienced by consumers and offers additional approaches based on a choice-based conjoint analysis that can be employed after class certification for the same purpose;

(g) the methodological approaches proposed here are capable to ascertain damages in a model that can be further calibrated and supplemented after class certification.

136. I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  June 4, 2024 _____

Claudiu V. Dimofte, PhD

Appendix A

# CLAUDIU V. DIMOFTE

Fowler College of Business                                          Department of Marketing
San Diego State University                                                    619.594.0209
5500 Campanile Drive                                                     cdimofte@sdsu.edu
San Diego, CA 92182                                                        dimofte.sdsu.edu

## EDUCATION

| | |
|---|---|
| University of Washington – Philosophiae Doctor (Marketing) | Seattle, WA (2004) |
| University of South Carolina – Master of Business Administration (Intl. Business) | Columbia, SC (1998) |
| West University – Bachelor of Science (Economics) | Timisoara, Romania (1996) |

## ACADEMIC POSITIONS

| | |
|---|---|
| San Diego State University – Professor of Marketing | San Diego, CA (2011-present) |
| Université Jean Monnet – Visiting Professor of Marketing | Saint-Étienne, France (2023) |
| Université Paris-Dauphine – Visiting Professor of Marketing | Paris, France (2016-2023) |
| Rutgers University – Visiting Professor of Marketing | Camden, NJ (2016-2017) |
| Georgetown University – Assistant Professor of Marketing | Washington, DC (2004-2011) |

## RESEARCH

**Books and Book Chapters**

Dimofte, Claudiu V. (2024), "Advertising Threats to Consumer Self-Esteem." In Ruvio, Ayalla and Russell W. Belk (Eds.), *Handbook of Identity and Consumption*. New York, NY: Routledge.

Dimofte, Claudiu V. (2023), "Countering False Marketplace Information." In Florack, Arnd (Ed.), *Handbook of Social Cognition and Communication*. New York, NY: Routledge.

Dimofte, Claudiu V., Curtis P. Haugtvedt, and Richard F. Yalch (2015), *Consumer Psychology in a Social Media World*. New York, NY: Routledge.

Dimofte, Claudiu V. (2015), "Unconscious Cognition Effects in Consumer Research." In Jansson-Boyd, Cathrine, and Magdalena Zawisza (Eds.), *International Handbook of Consumer Psychology*. Abingdon, OX: Taylor & Francis.

Dimofte, Claudiu V. (2010), "Consumer Aspects of International Marketing." In Bagozzi, Richard P. and Ayalla Ruvio (Eds.), *Consumer Behavior*. New York, NY: Wiley & Sons.

Dimofte, Claudiu V. and Richard F. Yalch (2007), "The Use and Abuse of Polysemy." In Lowrey, Tina M. (Ed.), *Psycholinguistic Phenomena in Marketing Communications*. Mahwah, NJ: Erlbaum.

Dimofte, Claudiu V. and Richard F. Yalch (2005), "Consumer Disbelief and Attitudes: An Implicit Memory Explanation for Why Believability Is Not Necessary for Persuasion." In Kardes, Frank R., Paul M. Herr, Jaques Nantel. (Eds.), *Applying Social Cognition to Consumer-Focused Strategy*. Mahwah, NJ: Erlbaum.

**Refereed Journal Articles and Proceedings**

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch (2024), "Consumer Cosmopolitanism: a Meta-Analysis and New Applications," *Advances in Consumer Research* (ABS category 2 – "well regarded"), *forthcoming*.

Whaley, Reid C., Alyssa F Harlow, Evan A Kreuger, Matthew D. Stone, David R. Strong, Claudiu V. Dimofte, Jessica Barrington-Trimis (2024), "Importance of various e-cigarette device and e-liquid characteristics by smoking status among young adults who vape. *Substance Use and Misuse* (Q1 SJR, ranked 12th out of 35 journals in Addiction, Impact Factor: 2.362), *forthcoming*.

Dimofte, Claudiu V. (2023), "Brand Associations Can Produce Implicit Trademark Infringement," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 50.

Stone, Matthew D., Jessica L. Braymiller, David R. Strong, Sam N. Cwalina, , Claudiu V. Dimofte, and Jessica Barrington-Trimis (2023). "Differentiating Reasons for Young Adult E-cigarette Use Using Maximum Difference Choice Models," *Nicotine and Tobacco Research* (Q1 SJR, ranked 4th out of 21 journals in Substance Abuse, Impact Factor: 5.830), 25 (6), 1117-1124.

Dimofte, Claudiu V. (2022), "Subjective Scales Can Enhance Consumer Expectations and Lower Product Evaluations," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 49.

Stone, Matthew D., Claudiu V. Dimofte, David R. Strong, Kim Pulvers, Noe Crespo, and John P. Pierce (2022), "Evaluating US Smokers Willingness-to-Pay for Different Cigarette Packaging Designs Before and After Real-world Exposure in a Randomized Trial," *Tobacco Control* (Q1 SJR, ranked 8th out of 530 journals in Public Health, Impact Factor: 6.221).

Dimofte, Claudiu V. (2021), "Assessing the Relationship between Product Scarcity and Consumer Utility," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 48.

Strong David R., John P. Pierce, Kim Pulvers, Matthew D. Stone, Adriana Villaseñor, Pu, M., Claudiu V. Dimofte, Eric Leas, Jesica Oratowski, Elizabeth Brighton, Samantha Hurst, Sheila Kealey, Ruifeng Chen, and Karen Messer (2021), "The effect of graphic warning labels on cigarette packs on US Smokers' cognitions and smoking behavior after 3 months: a randomized clinical trial," *JAMA Network Open* (Q1 SJR, ranked 15th out of 172 journals in Medicine – General and Internal, Impact Factor: 13.800), 4(8), e2121387-e2121387.

Andriuzzi, Andria, Géraldine Michel, and Claudiu V. Dimofte (2020), "How Brand Conversations on Social Media Prompt Jealousy in Brand Relationships," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 47.

Pierce, John P., David R. Strong, Stone, Matthew D., Adriana Villaseñor, Claudiu V. Dimofte, Leas, Eric, Oratowski, Jesica, Elizabeth Brighton, Samantha Hurst, Kim Pulvers, Sheila Kealey, Ruifeng Chen, and Karen Messer (2020), "Real-World Exposure to Graphic Warning Labels on Cigarette Packs in U.S. Smokers: The CASA Randomized Trial Protocol," *Contemporary Clinical Trials* (Q1 SJR, 2.480), 98, 106152.

Stone, Matthew D., Claudiu V. Dimofte, David R. Strong, Adriana Villaseñor, Kim Pulvers, Karren Messer, and John P. Pierce (2020), "A Tool to Assess Appeal-Aversion Response to Graphic Warning Labels on Cigarette Packs among United States Smokers," *Tobacco Control* (Q1 SJR, ranked 8th out of 530 journals in Public Health, Impact Factor: 6.221), 30 (3), 312-319.

Dimofte, Claudiu V. (2019), "American Conservatives: Anti-Globalist Global Brand Consumers," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 46.

Leas, Eric C., John P. Pierce, Claudiu V. Dimofte, Dennis Trinidad, and David R. Strong (2018), "Standardized Cigarette Packaging May Decrease the Implied Safety of Natural American Spirit Cigarettes," *Tobacco Control* (Q1 SJR, ranked 8th out of 530 journals in Public Health, Impact Factor: 6.221), 27 (2), 118-123.

Latifi Kasani, Negin, and Claudiu V. Dimofte (2017), "The Dissimilarity Magnifying Bias," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 44.

Leas, Eric C., Claudiu V. Dimofte, and David R. Strong (2017), "Standardized Packaging May reduce the Perception that American Spirit Cigarettes Are Less Harmful," *Annals of Behavioral Medicine* (Q1 SJR, ranked 17th out of 137 journals in Psychology/Multidisciplinary, Impact Factor: 3.575), 51, S856-S857.

Leas, Eric C., John P. Pierce, Claudiu V. Dimofte, Adriana Villaseñor, and David R. Strong (2016), "US Adult Smokers' Perceptions of Australia's Cigarette Warning Labels: Variance by Warning Content and Consistency across Socio-Demographic Sub-Segments," *Tobacco Control* (Q1 SJR, ranked 8th out of 530 journals in Public Health, Impact Factor: 6.221), 25 (6), 485-496.

Dimofte, Claudiu V., and Negin Latifi Kasani (2016), "When Celebrity Ad Placements Backfire," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 43.

Dimofte, Claudiu V., Ronald C. Goodstein, and Anne M. Brumbaugh (2015), "A Social Identity Perspective on Aspirational Advertising: Implicit Threats to Collective Self-Esteem and Strategies to Overcome Them," *Journal of Consumer Psychology* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.385), 25 (3), 416-430.

Ivanic, Arti, Claudiu V. Dimofte, Rastislav Ivanic, and Maros Ivanic (2015), "The GroupSolver Method for Quantifying Qualitative Research," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 42.

Dimofte, Claudiu V., Kyra Wiggin, and Richard F. Yalch (2014), "To Wait or Not? Why Creating Curiosity May Increase Patience," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 41.

Dimofte, Claudiu V., and Katharina Zeugner-Roth (2013), "The Effects of Consumer Ethnocentrism and Cosmopolitanism on Consumers' Global/Local Brand Choice," *Advances in Consumer Research*, 40.

Dimofte, Claudiu V., and Chris Janiszewski (2013), "The Illusion of Lie Effect: The Suspicious Fluency of Round Numbers," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 40.

Johansson, Johny K., Claudiu V. Dimofte, and Sanal Mazvancheryl (2012), "The Performance of Global Brands in the 2008 Financial Crisis: A Test of Two Brand Value Measures," *International Journal of Research in Marketing* (Q1 SJR, ABS category 4 – "top journal," Impact Factor: 2.593), 29 (4), 235-245.

Ülkü, Sezer, Claudiu V. Dimofte, and Glen M. Schmidt (2012), "Consumer Valuation of Modularly Upgradeable Products," *Management Science* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 4.219), 58 (9), 1761-1776.

2024 © Claudiu V. Dimofte, PhD

Florack, Arnd, Claudiu V. Dimofte, Karin Rossler, and Susanne Leder (2012), "Brand-Related Background Music and Consumer Choice," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 39.

Cassab, Harold, and Claudiu V. Dimofte (2012), "Everyday Objects of Desire: Dimensions of Design Innovation and the Centrality of Product Aesthetics," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 39.

Dimofte, Claudiu V., Richard F. Yalch, and Kyra Wiggin (2012), "False but Persuasive Information: The Automatic Success of Infomercials," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 39.

Dimofte, Claudiu V. and Richard F. Yalch (2011), "The Mere Association Effect and Brand Evaluations," *Journal of Consumer Psychology* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.385), 21 (1), 24-37.

Dimofte, Claudiu V., Ronald C. Goodstein, and Ajay Kalra (2011), "Context-Sensitive Advertising: A Fitting Story," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 38.

Dimofte, Claudiu V. and Richard F. Yalch (2010), "The Role of Frequency of Experience with a Product Category and Temporal Orientation in Self-Referent Advertising," *Journal of Consumer Psychology* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.385), 20 (3), 343-354.

Dimofte, Claudiu V., Johny K. Johansson, and Richard P. Bagozzi (2010), "Global Brands in America: How Consumer Ethnicity Mediates the Global Brand Effect," *Journal of International Marketing* (Q1 SJR, ABS category 3 – "highly regarded," Impact Factor: 3.375), 18 (3), 82-106.

Dimofte, Claudiu V. (2010), "Implicit Measures of Consumer Cognition: A Review," *Psychology & Marketing* (Q1 SJR, ABS category 3 – "high quality," Impact Factor: 2.023), 27 (10), 921-937 (invited article).

Dimofte, Claudiu V. and Richard F. Yalch (2010), "Consumer Processing of Irrelevant Brand Associations," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 37.

Dimofte, Claudiu V. and Johny K. Johansson (2009), "Scale-Dependent Automatic Shifts in Brand Evaluation Standards," *Journal of Consumer Psychology* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.385), 19 (2), 158-170.

Dimofte, Claudiu V. and Johny K. Johansson (2009), "Consumer Expectations and The Automatic Shifting of Standards in Brand Evaluations," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 36.

Dimofte, Claudiu V., Johny K. Johansson, and Ilkka Ronkainen (2008), "Cognitive and Affective Reactions of American Consumers to Global Brands," *Journal of International Marketing* (Q1 SJR, ABS category 3 – "highly regarded," Impact Factor: 3.375), 16 (4), 115-137.

Dimofte, Claudiu V., Johny K. Johansson, and Ilkka Ronkainen (2008), "Spanning the Globe," *Marketing Management*, 17 (5), 40-43.

Dimofte, Claudiu V. and Richard F. Yalch (2008), "The Role of Product Category Familiarity in Self-Referent Advertising," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 35.

Dimofte, Claudiu V. and Richard F. Yalch (2007), "Consumer Response to Polysemous Brand Slogans," *Journal of Consumer Research* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.800), 33 (4), 515-522.

Dimofte, Claudiu V. and Richard F. Yalch (2007), "The SMAART Scale: A Measure of Individuals' Automatic Access to Secondary Meanings in Polysemous Statements," *Journal of Consumer Psychology* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.385), 17 (1), 49-58.

Dimofte, Claudiu V., Richard F. Yalch, and Anthony G. Greenwald (2006), "Brand Names and Transitive Implicit Associations," *European Advances in Consumer Research*, 7.

Dimofte, Claudiu V. and Richard F. Yalch (2005), "The SMAART Scale: Measure Development and Validation," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 32.

Dimofte, Claudiu V., Mark R. Forehand, and Rohit Deshpandé (2004), "Ad Schema Incongruity as Elicitor of Ethnic Self-Awareness and Differential Advertising Response," *Journal of Advertising* (Q1 SJR, ABS category 3 – "highly regarded," Impact Factor: 3.518), 32 (4), 7-18.

**Manuscripts Under Review**

Andriuzzi, Andria, Géraldine Michel, and Claudiu V. Dimofte, "How Brand Conversations on Social Media Prompt Jealousy in Brand Relationships," *International Journal of Research in Marketing* (Q1 SJR, ABS category 4 – "top journal," Impact Factor: 8.047).

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch, "Consumer Cosmopolitanism: a Meta-Analysis and New Applications." *Journal of International Business Studies* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 11.380).

## Conference Presentations

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch, "Consumer Cosmopolitanism: a Meta-Analysis and New Applications," ACR Conference in Paris, 2024.

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch, "Consumer Cosmopolitanism: a Meta-Analysis and New Applications," EMAC Conference in Bucharest, 2024.

Dimofte, Claudiu V., "Brand Associations Can Produce Implicit Trademark Infringement," ACR Conference in Seattle, 2023.

Whaley, Reid C., Cwalina, Sam N., Krueger, Evan A., Harlow, Alyssa F., Stone, Matthew D., Strong, David R., Dimofte, Claudiu V., Barrington-Trimis, Jessica L. E-cigarette device and e-liquid product characteristics that differentially appeal to young adults who never, former, and currently smoke cigarettes. Society for Research on Nicotine and Tobacco Annual Meeting in San Antonio, 2023.

Dimofte, Claudiu V., "Subjective Scales Can Enhance Consumer Expectations and Lower Product Evaluations," ACR Conference in Denver, 2022.

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch, "*The Brand Choices of Cosmopolitan Globetrotting Consumers.*" SCP Conference in Singapore, 2022.

Braymiller, Jessica. L., Matthew D. Stone, Reid C. Whaley., Yi Zhang, David R Strong, Claudiu V. Dimofte, & Jessica L. Barrington-Trimis. *Relative importance of e-cigarette characteristics among young adults who vape: Findings from a novel maximum difference choice task.* Annual Meeting of the Society for Research on Nicotine and Tobacco, 2021.

Ngo Christie, Cwalina Sam N., Yi Zhang, Matthew D. Stone, David R. Strong, Claudiu V. Dimofte, and Jessica L. Barrington-Trimis. *Comparison of Five Online Data Collection Platforms for Recruitment of Young Adult Vapers.* 27th Annual Meeting of the Society for Research on Nicotine and Tobacco, 2021.

Dimofte, Claudiu V., "Assessing the Relationship between Product Scarcity and Consumer Utility," ACR Conference in Seattle, 2021.

Whaley, Reid C., Cwalina, S.N., E.A. Kreuger, Jessica L. Braymiller, Matthew D. Stone, Christie Ngo, David R. Strong, Claudiu V. Dimofte, and Jessica L. Barrington-Trimis. *The importance of e-cigarette device and e-liquid product characteristics among young adults who vape.* Society for Research on Nicotine and Tobacco Annual Meeting, 2021.

Andriuzzi, Andria, Géraldine Michel, and Claudiu V. Dimofte, "How Brand Conversations on Social Media Prompt Jealousy in Brand Relationships," ACR Conference in Paris, 2020.

Dimofte, Claudiu V., "American Conservatives: Anti-Globalist Global Brand Consumers," ACR Conference in Atlanta, 2019.

Dimofte, Claudiu V., "When Anti-Globalization Stance and Global Brand Preference Coexist: The Curious Case of Conservative-Leaning U.S. Consumers," AMA Global Marketing SIG Conference in Buenos Aires, 2019.

Dimofte, Claudiu V., "Affective Debriefing in Experimental Consumer Psychology Research Employing Deception," ICPS Conference in Paris, 2019.

Dimofte, Claudiu V., "Dissimilarities Loom Larger than Similarities in Social Perception," SCP Conference in Savannah, 2019.

Dimofte, Claudiu V., "Affective Debriefing in Experimental Consumer Psychology Research Employing Deception," SCP Conference in Savannah, 2019.

Stone, Matthew, Claudiu V. Dimofte, Adrianna Villaseñor, Jessica Oratowski, Eliza Jeong, John P. Pierce, David R. Strong. "The Effect of Graphic Warning Labels on the Sensitivity to Cigarettes Pack Prices," Annual Conference of the Society for Research on Nicotine and Tobacco in San Francisco, 2019.

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch, "The Role of Consumer Nationality and Product Country-of-Origin for Brand Choice in Countries of Low Product Ethnicity," AMA Global Marketing SIG Conference in Santorini, 2018.

Dimofte, Claudiu V. and Chris Janiszewski, "Round Numbers Produce Unwarranted Skepticism," La Londe Consumer Behavior Conference in La Londe Les Maures, 2017.

Dimofte, Claudiu V. and Richard F. Yalch, "Developing Effective Counter Messages to False Marketplace Information," Consumer Behavior Conference in La Londe Les Maures, 2017.

Dimofte, Claudiu V., and Negin Latifi Kasani, "When Celebrity Ad Placements Backfire," ACR Conference in Berlin, 2016.

Strong, David R., Claudiu V. Dimofte, Eric Leas, Samantha Hurst, Adrianna Villaseñor, Jessica Oratowski, Eliza Jeong, John P. Pierce, *Appeal of Tobacco Product Packaging: Influences of Removing Brand Imagery.* Annual Conference of the Society for Research on Nicotine and Tobacco in Chicago, 2016.

Ivanic, Arti, Claudiu V. Dimofte, Rastislav Ivanic, and Maros Ivanic, "The GroupSolver Method for Quantifying Qualitative Research," ACR Conference in New Orleans, 2015.

Dimofte, Claudiu V., Richard F. Yalch, and Kyra Wiggin, "To Wait or Not? Why Creating Curiosity May Increase Patience," ACR Conference in Baltimore, 2014.

Zeugner-Roth, Katharina, and Claudiu V. Dimofte, "Consumers' Global vs. Local Brand Choice in Foreign Contexts," EMAC Conference in Valencia, 2014.

Dimofte, Claudiu V, and Arnd Florack, "The Effect of Background Music on Consumer Response," EMAC Conference in Valencia, 2014.

Dimofte, Claudiu V., and Katharina Zeugner-Roth, "The Effects of Consumer Ethnocentrism and Cosmo-politanism on Consumers' Global vs. Local Brand Choice," ACR Conference in Chicago, 2013.

Dimofte, Claudiu V, and Chris Janiszewski, "The Illusion of Lie Effect: The Suspicious Fluency of Round Numbers," ACR Conference in Chicago, 2013.

Dimofte, Claudiu V, Ronald C. Goodstein, and Ajay Kalra, "Context-Sensitive Advertising: A Fitting Story," SCP Conference in San Antonio, 2013.

Dimofte, Claudiu V., Richard F. Yalch, and Kyra Wiggin, "False but Persuasive Information: The Automatic Success of Infomercials," ACR Conference in Vancouver, 2012.

Florack, Arnd, Claudiu V. Dimofte, Karin Rossler, and Susanne Leder, "Brand-Related Background Music and Consumer Choice," ACR Conference in Vancouver, 2012.

Cassab, Harold, and Claudiu V. Dimofte, "Everyday Objects of Desire: Dimensions of Design Innovation and the Centrality of Product Aesthetics," ACR Conference in Vancouver, 2012.

Florack, Arnd, Susanne Leder, and Claudiu V, Dimofte, "Brand-Related Background Music and Consumer Choice," EIRASS Conference in Vienna, 2012.

Florack, Arnd, Susanne Leder, and Claudiu V, Dimofte, "Brand-Related Background Music and Consumer Choice," AMA/ACRA Conference in Seattle, 2012.

Florack, Arnd, Susanne Leder, and Claudiu V, Dimofte, "Brand-Related Background Music and Consumer Choice," SCP Conference in Las Vegas, 2012.

Dimofte, Claudiu V, Ronald C. Goodstein, and Ajay Kalra, "Context-Sensitive Advertising: A Fitting Story," ACR Conference in St. Louis, 2011.

Johansson, Johny K. and Claudiu V. Dimofte, "Brand Value Effects on Stock Market Performance," Global Branding Conference in Istanbul, 2010.

Johansson, Johny K. and Claudiu V. Dimofte, "Brand Value Effects on Stock Market Performance," AIB Conference in Rio de Janeiro, 2010.

Dimofte, Claudiu V., Johny Johansson, and Katharina Zeugner-Roth, "Global and Local Brands in the Beer Market: A Dual-Nation Analysis," Global Branding Conference in Istanbul, 2010.

Dimofte, Claudiu V., Anne Brumbaugh, and Ronald C. Goodstein, "Consumer Comparison to the Product User Prototype Affects Brand Attitudes," SCP Conference in St. Petersburg, 2010.

Dimofte, Claudiu V. and Richard F. Yalch, "Consumer Processing of Irrelevant Brand Associations," ACR Conference in Pittsburgh, 2009.

Dimofte, Claudiu V. and Johny K. Johansson, "The Automatic Shifting of Standards in Brand Evaluations," ACR Conference in San Francisco, 2008 and the La Londe Consumer Behavior Conference in La Londe Les Maures, 2009.

Dimofte, Claudiu V. and Richard F. Yalch, "Brand Rumors: Cognitive Mechanisms for Acceptance and Strategies for Quelling," SCP Conference in Las Vegas, 2007.

Dimofte, Claudiu V. and Richard F. Yalch, "The Role of Consumer Familiarity with the Product Category in Self-Referent Persuasion," ACR Conference in Memphis, 2007.

Dimofte, Claudiu V., Richard F. Yalch, and Anthony G. Greenwald, "Brand Names as Sources and Targets of Tangential Implicit Associations," APA Conference in New Orleans, 2006.

Dimofte, Claudiu V., Johny K. Johansson, and Ilkka Ronkainen, "Measuring Brand Globality," AIB Conference in Beijing, 2006.

Dimofte, Claudiu V. and Ronald C. Goodstein: "Explaining the Negative Spillover Effect in Target Marketing," ACR Conference in San Antonio, 2006.

Dimofte, Claudiu V. and Johny K. Johansson, "Brand Stereotypes and Consumer Judgments: The Automatic Shifting of Standards in Brand Evaluations," EMAC Conference in Athens, 2006.

Dimofte, Claudiu V. and Johny K. Johansson, "Brand Stereotypes and Consumer Judgments: The Automatic Shifting of Standards in Brand Evaluations," ACR Conference in San Antonio, 2006.

Dimofte, Claudiu V. "Brand Names and Transitive Implicit Associations," European ACR Conference in Göteborg, 2005.

Dimofte, Claudiu V. and Richard F. Yalch, "The SMAART Scale: Measure Development and Validation," ACR Conference in Portland, 2004.

Dimofte, Claudiu V. and Richard F. Yalch, "Consumer Disbelief and Attitudes: Implicit Memory Explanations for Why Believability Is Not Necessary for Persuasion," SCP Conference in Montréal, 2004.

Dimofte, Claudiu V., Richard F. Yalch, and Anthony G. Greenwald, "Brand Names as Sources and Targets of Tangential Implicit Associations," ACR Conference in Toronto, 2003.

Dimofte, Claudiu V. and Richard F. Yalch, "The Role of Advertisement Copy in Prompting Consumer Access to Slogan Meaning," ACR Conference in Atlanta, 2002.

**Invited Research Presentations**

| | |
|---|---|
| Berlin School of Economics and Law, Germany | ESSEC Paris, France |
| Indiana University | HEC Paris, France |
| George Mason University | IÉSEG School of Management Lille, France |
| Georgetown University | IÉSEG School of Management Paris, France |
| Rutgers University | Sorbonne Business School Paris, France |
| San Diego State University | Technische Universität Dortmund, Germany |
| University of British Columbia | Universidad Católica Portuguesa Lisbon, Portugal |
| University of Central Florida | Université Paris-Dauphine Paris, France |
| University of San Diego | University of Auckland, New Zealand |
| University of South Carolina | University of Basel, Switzerland |
| University of Washington | University of Vienna, Austria |
| Université Jean Monnet, France | Université Louis Lumière Lyon 2, France |
| Zeppelin University, Germany | |

**Scholarly Awards and Funded Research Grants**

| | |
|---|---|
| Society for Consumer Psychology: | Best Working Paper Award, Annual Conference (2019) |
| Erasmus+ Grant: | Berlin School of Economics and Law (2016) |
| National Institutes of Health: | Tobacco Packaging Research Grant (with UCSD researchers, 2015) |
| San Diego State University: | Fowler College of Business Research Grant (2013, 2015, 2020) |
| | Most Influential MBA Marketing Faculty Award (2014) |
| | Outstanding Faculty Award: Research, Teaching, Service (2014) |
| Society for Consumer Psychology: | Nominee, C.W. Park Award for Outstanding Contribution to JCP |
| National Institutes of Health: | Tobacco Packaging Research Grant (with UCSD researchers, 2015) |
| Academy of International Business: | Best International Mktg. Paper Award, Annual Conference (2010) |
| American Marketing Association: | Student Fellow, Sheth Doctoral Consortium (2004) |
| | Nominee, Howard Award (2005) |
| | Faculty Fellow, Sheth Doctoral Consortium (2012) |
| San Diego State University: | University Research Grant (2011) |
| | Fowler College of Business Graduate Fee Grant (2012, 2017, 2021) |
| | University Mid-Career Research Grant (2020) |
| | Outstanding Faculty Contribution Award (2014) |
| Georgetown University: | University Competitive Grant (2005) |
| | University Research Infrastructure Award (2005) |
| | International Collaborative Research Grant (2007) |
| | MSB Capital Markets Research Center Grant (2008) |
| University of Washington: | Boeing Fellowship for Academic Excellence (2002) |
| | Dean's Award for Outstanding Academic Achievement (2002) |
| | Evert McCabe Endowed Fellowship (2003) |
| | CIBER Research Award (2004) |
| | Magna Cum Laude PhD (2004) |
| University of South Carolina: | Graduate Fellowship Grant (1996 – 1998) |
| | Magna Cum Laude MBA (1998) |
| West University: | National Merit Scholarship (1991 – 1996) |
| | Summa Cum Laude BS (1996) |

| | |
|---|---|
| University of Auckland: | Research Development Program Award (with H. Cassab, 2007) |
| University of Basel: | Research Award (with A. Florack, 2008) |
| Vlerick Leuven Management School: | Research Award (with K. Zeugner-Roth, 2010) |

## TEACHING

Interests: Marketing Management, Consumer Behavior, Marketing Strategy, Marketing Research
Evaluations: *Georgetown University* (7 years)
  - Principles of Marketing (MARK 220): 4.14 out of 5
  - Consumer Behavior (MARK 222): 4.39 out of 5
  *San Diego State University* (13 years)
  - Marketing Management (BA 627): 4.60 out of 5
SDSU Outstanding Faculty Award – Most Influential MBA Professor (2014, 2021)
Fowler College of Business Teaching Excellence Award (2019)

## SERVICE

| | |
|---|---|
| Member – Fowler College of Business Faculty Development Committee | (since 2013) |
| Member – Fowler College of Business Rank, Tenure, and Promotion Committee | (since 2022) |
| Graduate Student Advisor for Marketing Area | (since 2013) |
| Member – University Senate | (2012-2018) |
| Editorial Board member for: *Journal of Consumer Psychology* (ABS 4*, world leading) | (since 2012) |
| *Journal of the Academy of Marketing Science* (ABS 4*, world leading) | (since 2017) |
| *Journal of International Marketing* (ABS 3, highly regarded) | (since 2019) |
| Committee Member, *Journal of Consumer Psychology Young Contributor Award* | (since 2018) |
| Committee Member, *American Marketing Association Dissertation Award* | (since 2022) |

Conference Co-Chair, *SCP Advertising and Consumer Psychology Conference – San Diego, 2013*
Working Paper Track Co-Chair, *Association for Consumer Research Conference – New Orleans, 2015*
Consumer Behavior Track Co-Chair, *Academy of Marketing Science Conference – Baltimore, 2009*
Media Coverage: *Newsweek, Wall Street Journal, PBS, Wallethub.com, Prnewswire.com, Newneuromarketing.com*

**Appendix B**

**Claudiu V. Dimofte, PhD – Expert Depositions / Testimony Provided Since 2018**

- UNITED STATES DISTRICT COURT
  NORTHERN DISTRICT OF CALIFORNIA
  LAURA MARKS, GAYLIA PICKLES and DONNA VANDIVER individually and on behalf
  of all others similarly situated
  Plaintiffs,
  v.
  KATE SPADE AND COMPANY, A DELAWARE CORPORATION; and DOES 1-50,
  INCLUSIVE,
  Defendants.
  Case No. 4:15-CV-05329-VC

- SUPERIOR COURT OF THE STATE OF CALIFORNIA
  COUNTY OF ORANGE
  CHELSEA VANCLEVE, CHELSEA VESELY, and ROSITA SHOUSE
  Plaintiffs,
  v.
  CHIEN ET CHAT. INC. d/b/a BARKWORKS PET STORES, and DOES 1-10, INCLUSIVE,
  Defendants.
  Case No. 30-2014-00747275-CU-BT-CJC

- UNITED STATES DISTRICT COURT
  SOUTHERN DISTRICT OF FLORIDA
  JOSHUA WASSER, ILA GOLD, and ROBERTO ISRAEL J. BARAJAS-RAMOS,
  on behalf of themselves and all others similarly situated,
  Plaintiffs,
  v.
  ALL MARKET INC.,
  Defendant.
  Case No. 1:16-CV-21238

- SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
  ANIMAL LEGAL DEFENSE FUND
  on behalf of the general public,
  Plaintiff,
  v.
  HORMEL FOODS CORPORATION,
  Defendant.
  Case No. 2016CA-004744

- SUPERIOR COURT OF THE STATE OF ARIZONA
  COUNTY OF MARICOPA

DEBORAH BRITT, MELISSA CHRISTIAN, WARREN DUNN, MARTIN GARCIA, KELLIE LANGER, ERICA MARXMANN, WALTER SHIFFLETT, RICKY TUCKER, JAQUELINE VILLEGAS, MELISSA WAGSTAFF; and DOES I-X,
Plaintiffs,
v.
PUPPIES.COM, LLC, an Arizona Limited Liability Company d/b/a PUPPYFIND.COM; JOHN and JANE DOES I-X; BLACK and WHITE CORPORATIONS I-X,
Defendants.
Case No. CV2016-016116

- UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
FRIENDS OF THE EARTH and CENTER FOR FOOD SAFETY
Plaintiffs,
v.
SANDERSON FARMS, INC., a Mississippi corporation,
Defendant.
Case No. 3:17-CV-03592-RS

- SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
RAMON TINOCO LOPEZ, ANDRES TINOCO LOPEZ, PEDRO TINOCO LOPEZ, and JAVIER TINOCO LOPEZ, individually and as Surviving Heirs and Successors in Interest of Jose Lopez Marin, Deceased, and Guadalupe Tinoco Docil, Deceased; CONCEPTION TINOCO LOPEZ, CIRIA TINOCO LOPES, ROSALINA TINOCO LOPEZ, MARISELA TINOCO LOPEZ, TINOCO LOPEZ and NORMA TETOCO LOPEZ, as Surviving Heirs and Successors in Interest of Jose Lopez Marin, Deceased, and Guadalupe Tinoco Docil, Deceased;
Plaintiffs,
vs.
LAURO LEAL and MARIA C. LEAL d/b/a L&L TIRES, and MICHELIN NORTH AMERICA, INC., FORD MOTOR
COMPANY, DOE Defendants 1-50,
Defendants.
CASE NO. 19STCV21650

- UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
FARID KHAN, an individual, on behalf of himself and all others similarly situated,
Plaintiff,
v.
BOOHOO.COM USA, INC., a Delaware corporation, BOOHOO.COM UK LIMITED, a United Kingdom private limited company, BOOHOO GROUP PLC, a Jersey public limited company, and DOES 1-10, inclusive.
Defendants.
Case No. 2:20-cv-03332-GW-JEM

- UNITED STATES DISTRICT COURT
  FOR THE CENTRAL DISTRICT OF CALIFORNIA
  AUDIO-TECHNICA CORPORATION and AUDIO-TECHNICA U.S., INC.
  Plaintiffs,
  v.
  MUSIC TRIBE COMMERCIAL MY SDN. BHD
  Defendant.
  Case No. 2:21-cv-09009-ODW-AS

- UNITED STATES DISTRICT COURT
  FOR THE DISTRICT OF COLUMBIA
  RANCHERS-CATTLEMEN ACTION LEGAL FUND, UNITED STOCKGROWERS OF
  AMERICA,
  Plaintiff,
  v.
  UNITED STATES DEPARTMENT OF AGRICULTURE, and
  SONNY PERDUE, in his official capacity as Secretary of the United States Department of
  Agriculture,
  Defendants.
  Case No. 20-2552

- AMERICAN ARBITRATION ASSOCIATION
  CYNTHIA KOBEL, an individual, and SHALANDA HOUSTON, an individual, on behalf
  of themselves and all others similarly situated,
  Claimants,
  v.
  JPAY, INC.,
  Respondent.
  Case No.: 01-15-0005-3477

- UNITED STATES DISTRICT COURT
  FOR THE NORTHERN DISTRICT OF CALIFORNIA
  SAN JOSE DIVISION
  CARL BARRETT, MICHEL POLSTON, NANCY MARTIN, MICHAEL RODRIGUEZ,
  MARIA RODRIGUEZ, and ANDREW HAGENE
  Individually, and on Behalf of All Others Similarly Situated,
  Plaintiffs,
  v.
  APPLE INC., a California Corporation; APPLE VALUE SERVICES LLC; and DOES 1
  Through 10, Inclusive,
  Defendants.
  Case No.: 5:20-cv-04812-EJD

# Appendix C

## Works Considered

Center, Judicial. *Manual for Complex Litigation* (2004).

Complaint, Second Amended Class Action. *ANDREW AXELROD and ELIOT BURK, individually and on behalf of all others similarly situated, Plaintiffs, vs. LENOVO (UNITED STATES) INC., a Delaware corporation, Defendant.* Case No. 4:21-cv-06770-JSW, United States District Court for the Central District of California (2021).

Cunningham, C. E., Deal, K., and Chen, Y. "Adaptive choice-based conjoint analysis. *The Patient: Patient-Centered Outcomes Research* 3, no. 4 (2010): 257-273.

Diamond, Shari S. "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, National Academies Press (2011): 359-423.

Gabor, Andre, and Clive W. J. Granger. "Price as an Indicator of Quality: Report on an Enquiry." *Economica* (1966): 43-70.

Green, Paul E. "Hybrid models for conjoint analysis: An expository review." *Journal of Marketing Research* 21, no. 2 (1984): 155-169.

Hulland, John, Hans Baumgartner, and Keith Marion Smith. "Marketing survey research best practices: evidence and recommendations from a review of JAMS articles." *Journal of the Academy of Marketing Science* 46, no. 1 (2018): 92-108.

Jacoby, Jacob. "Are Closed-Ended Questions Leading Questions?" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Shari S. Diamond and Jerre B. Swann, eds., American Bar Association (2012): 261-285.

Johnson, Richard M., and Bryan K. Orme. A new approach to adaptive CBC (2007). In *Sawtooth Software Conference Proceedings, Sequim, WA*.

Kumar, Viswanathan, and Werner Reinartz. "Creating enduring customer value." *Journal of Marketing* 80, no. 6 (2016): 36-68.

Orme, Bryan, and Keith Chrzan. "Survey-Based Methods for Pricing Research." *Sawtooth Software Research Paper Series* (2022): 1-10.

Rao, Vithala R. "Conjoint Analysis." (2010). *Wiley International Encyclopedia of Marketing*.

Struminskaya, Bella, Kai Weyandt, and Michael Bosnjak. "The effects of questionnaire completion using mobile devices on data quality. Evidence from a probability-based general population panel." *Methods, Data, Analyses* 9, no. 2 (2015): 261-292.

Van Westendorp, Peter H. NSS-Price sensitivity meter: A new approach to study consumer perceptions of prices. The 29th ESOMAR (European Society for Opinion and Marketing Research) Congress, Venice, Italy (1976): 139-167.

2024 © Claudiu V. Dimofte, PhD

## Appendix D

### Consumer Perceptions Study – Response Statistics

| | N | % |
|---|---|---|
| **Full Prospective Sample [1]** | **518** | **100.00** |
| **Screened out of Survey** | **211** | **40.73** |
| At item *device* [2] | 0 | 0.00 |
| At item *employment* [3] | 24 | 4.63 |
| At item *history* [4] | 82 | 15.83 |
| At item *did.plums* [5] | 21 | 4.05 |
| At item *will.tech* [6] | 117 | 22.59 |
| **Completed Survey** | **307** | **59.27** |
| **Final Analytical Sample [7]** | **307** | **59.27** |

[1]  Respondents who started the survey. Note that some failed multiple selection filters.

[2]  Respondents who reported taking the survey on something other than a computer, laptop, or tablet.

[3]  Respondents who reported having been employed (themselves or their family members) in one of the following industries: Advertising or marketing research; Consumer electronics manufacturing, distribution, or sales; Legal services; Website design, hosting, or e-commerce.

[4]  Respondents who answered "Not sure" to having any of the presented items (*bicycle, boat, car, dog, graduate degree, TV set, smartphone, telegraph,* and *toothbrush*), answered "Do not have one" to the item *toothbrush*, or answered "Have at least one" to the item *telegrap*h.

[5]  Respondents who reported having purchased French Mirabelle plums from their local grocery store in the last year.

[6]  Respondents who reported not having bought consumer electronics (described as "laptop, desktop computer, monitor, tablet, or similar items") online in the last one to two years and not planning to buy any online in the next one to two years.

[7]  Data used in the analyses.

2024 © Claudiu V. Dimofte, PhD

**Appendix E**

**Consumer Perceptions Study – Sample Demographics by Retention Status**

| Sample | Dropped ineligible | Completed retained[1] |
|---|---|---|
| **Sample Size** | **211** | **307** |
| **Gender** | | |
| Male | 47.9% | 56.0% |
| Female | 51.6% | 44.0% |
| Other | .0% | .0% |
| Prefer not to respond | .5% | .0% |
| **Mean Age** | 53.52 | 50.00 |
| **Ethnicity** | | |
| Asian | 16.6% | 17.3% |
| Black | 8.1% | 11.4% |
| Hispanic | 13.3% | 15.6% |
| Native American | 2.8% | 2.0% |
| Pacific Islander | .0% | .0% |
| White | 64.5% | 60.9% |
| Other | 2.8% | 2.0% |
| **Marital Status** | | |
| Single (not in a relationship) | 42.2% | 45.3% |
| In a relationship (not married) | 10.0% | 12.1% |
| Married | 43.1% | 40.1% |
| Other | 4.7% | 2.6% |
| **Children** | | |
| No | 50.2% | 49.2% |
| Yes | 49.8% | 50.8% |
| **Education** | | |
| High-school or less | 12.8% | 10.4% |
| Some college/technical school | 23.7% | 26.1% |
| 2-year college | 12.8% | 13.0% |
| 4-year college | 30.3% | 36.5% |
| Graduate school degree | 20.4% | 14.0% |
| **Employment Status** | | |
| Student (full-time) | 3.3% | 5.9% |
| Unemployed (not a student) | 20.9% | 17.9% |
| Employed part-time | 14.2% | 17.3% |
| Employed full-time | 40.3% | 44.3% |
| Other | 21.3% | 14.7% |
| **Median Annual Household Income** | $60,000 | $74,000 |

[1] Respondents in the final analytical sample.

**Appendix F**

**Consumer Perceptions Study – Survey Items**

---

Start of Block: Start

intro Thank you for your interest in this marketing research study that addresses some of your personal perceptions about products in the marketplace. It should only take a few minutes to complete. In responding to the questions, please pay attention and read the information carefully before selecting the response that best reflects your thoughts and feelings. There are no right or wrong answers and your responses are completely anonymous.

Due to the nature of the stimuli you will be shown, we ask that you take this survey on a desktop computer, laptop, or tablet rather than a smartphone or similar mobile device.

Please click below to continue.

${e://Field/transaction_id}

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ─────────────────────────────────────────

vision Do you normally wear glasses or contact lenses when you read?

○ Yes  (1)

○ No  (2)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| Display This Question: |
|---|
| *If Do you normally wear glasses or contact lenses when you read? = 1* |

puton If you normally wear glasses or contact lenses when you read, please use them while completing this survey.
Thank you.

End of Block: Start

Start of Block: Screening

Page Break ─────────────────────────────────────────

device What type of device are you using to answer these questions?

○ Desktop or Laptop  (1)

○ Tablet  (2)

○ Smart phone  (3)

○ Other  (4)

> Skip To: End of Block If What type of device are you using to answer these questions? = 3
> Skip To: End of Block If What type of device are you using to answer these questions? = 4

Page Break ————————————————————————————

gender What is your gender?

○ Male  (1)

○ Female  (2)

○ Other  (3)

○ Prefer not to answer  (4)

[ * ]

age What is your age?

(please enter number below)

_____

Page Break ————————————————————————————

ethnicity What is your racial background?

(please check all that apply)

☐ Asian  (1)

☐ Black  (2)

☐ Hispanic  (3)

☐ Native American  (4)

☐ Pacific Islander  (5)

☐ White  (6)

☐ Other  (7) _____

---

Page Break

marital What is your marital status?

○ Single (not in a relationship)  (1)

○ In a relationship (not married)  (2)

○ Married  (3)

○ Other  (4) _____

kids  Do you have children?

○ No  (1)

○ Yes  (2)

---

Page Break

edu What is your highest completed education level?

○ High school or less  (1)

○ Some college/technical school  (2)

○ 2-yr college degree  (3)

○ 4-yr college degree  (4)

○ Graduate school degree  (5)

_____

Page Break

employ What best describes your current employment status?

○ Student (full-time)  (1)

○ Unemployed (not a student)  (2)

○ Employed part-time  (3)

○ Employed full-time  (4)

○ Other  (5) _____

_____

Page Break

[✱]

income What is your total annual household (i.e., not personal) income, before taxes?    (in U.S. dollars, please insert numbers only)

_____

_____

Page Break

state Where do you currently reside?

▼ I do not reside in the United States (53) ... Wyoming (52)

_____

Page Break

work Have you or any member of your household ever worked in the following industries?

(please check all that apply)

☐ Advertising or market research  (1)

☐ Animal care or veterinarian services  (2)

☐ Book publishing, distribution, or sales  (3)

☐ Clothing / shoe manufacturing, distribution, or sales  (4)

☐ Consumer electronics manufacturing, distribution, or sales  (5)

☐ Entertainment content production, distribution, or sales  (7)

☐ Food / beverage manufacturing, distribution, or sales  (8)

☐ Legal services  (9)

☐ Newspaper / magazine publishing, distribution, or sales  (10)

☐ Pet breeding, grooming, distribution, or sales  (11)

☐ Travel, tourism, or hospitality  (12)

☐ Website design, hosting, or e-commerce  (13)

☐ None of the above  (14)

*Skip To: End of Block If Have you or any member of your household ever worked in the following industries?  (please check... = 1*

*Skip To: End of Block If Have you or any member of your household ever worked in the following industries?  (please check... = 5*

*Skip To: End of Block If Have you or any member of your household ever worked in the following industries?  (please check... = 9*

*Skip To: End of Block If Have you or any member of your household ever worked in the following industries?  (please check... = 13*

---

Page Break ─────────────────────────────────────────

history Please select carefully the option that best describes your status relative to having each of the following items:

|  | Do not have one (1) | Have at least one (2) | Not sure (3) |
|---|:---:|:---:|:---:|
| Bicycle (1) | ○ | ○ | ○ |
| Boat (2) | ○ | ○ | ○ |
| Car (3) | ○ | ○ | ○ |
| Dog (4) | ○ | ○ | ○ |
| Graduate degree (5) | ○ | ○ | ○ |
| Smartphone (6) | ○ | ○ | ○ |
| Telegraph (7) | ○ | ○ | ○ |
| Toothbrush (8) | ○ | ○ | ○ |
| TV set (9) | ○ | ○ | ○ |

*Skip To: End of Block If Please select carefully the option that best describes your status relative to having each of the... = 1 [ 3 ]*
*Skip To: End of Block If Please select carefully the option that best describes your status relative to having each of the... = 2 [ 3 ]*
*Skip To: End of Block If Please select carefully the option that best describes your status relative to having each of the... = 3 [ 3 ]*
*Skip To: End of Block If Please select carefully the option that best describes your status relative to having each of the... = 4 [ 3 ]*
*Skip To: End of Block If Please select carefully the option that best describes your status relative to having each of the... = 5 [ 3 ]*
*Skip To: End of Block If Please select carefully the option that best describes your status relative to having each of the... = 6 [ 3 ]*
*Skip To: End of Block If Please select carefully the option that best describes your status relative to having each of the... = 7 [ 3 ]*
*Skip To: End of Block If Please select carefully the option that best describes your status relative to having each of the... = 8 [ 3 ]*
*Skip To: End of Block If Please select carefully the option that best describes your status relative to having each of the... = 9 [ 3 ]*
*Skip To: End of Block If Please select carefully the option that best describes your status relative to having each of the... = 7 [ 2 ]*
*Skip To: End of Block If Please select carefully the option that best describes your status relative to having each of the... = 8 [ 1 ]*

Page Break —————————————————————————

did.car In the last year or two, did you purchase or lease a new vehicle from a car dealership?

○ No  (1)

○ Yes  (2)

Page Break —————————————————————————

did.shoes In the last year or two, did you purchase running shoes from a brick-and-mortar shoe store?

○ No  (1)

○ Yes  (2)

Page Break —————————————————————————

did.plums In the last year or two, did you purchase French Mirabelle plums from a local grocery store?

○ No  (1)

○ Yes  (2)

Skip To: End of Block If In the last year or two, did you purchase French Mirabelle plums from a local grocery store? = 2

Page Break —————————————————————————

did.tech In the last year or two, did you purchase a laptop, desktop computer, monitor, tablet, or similar items from an online retailer?

○ No  (1)

○ Yes  (2)

Page Break —————————————————————————

Display This Question:

If In the last year or two, did you purchase a laptop, desktop computer, monitor, tablet, or similar... = 1

will.tech In the next year or two, do you plan to purchase a laptop, desktop computer, monitor, tablet, or similar items from an online retailer?

○ No  (1)

○ Yes  (2)

Skip To: End of Block If In the next year or two, do you plan to purchase a laptop, desktop computer, monitor, tablet, or... = 1

--------------------------------------------------

Page Break ─────────────────────────────────────

will.car In the next year or two, do you plan to purchase or lease a new vehicle from a car dealership?

○ No  (1)

○ Yes  (2)

─────────────────────────────────────────────────

Page Break ─────────────────────────────────────

will.shoes In the next year or two, do you plan to purchase running shoes from a brick-and-mortar shoe store?

○ No  (1)

○ Yes  (2)

Page Break ─────────────────────────────────────

will.plums In the next year or two, do you plan to purchase French Mirabelle plums from a local grocery store?

○ No  (1)

○ Yes  (2)

--------------------------------------------------

Page Break ─────────────────────────────────────

shopStoresPast Which of the following online retailers have you shopped at in the last 24 months?

☐ amazon.com (Amazon)  (1)

☐ apple.com (Apple)  (2)

☐ acer.com (Acer)  (3)

☐ asus.com (Asus)  (4)

☐ bestbuy.com (Best Buy)  (5)

☐ dell.com (Dell)  (6)

☐ hp.com (HP)  (7)

☐ lenovo.com (Lenovo)  (8)

☐ microsoft.com (Microsoft)  (9)

☐ newegg.com (Newegg)  (10)

☐ officedepot.com (Office Depot)  (11)

☐ staples.com (Staples)  (12)

☐ tigerdirect.com (Tiger Direct)  (13)

☐ ⊗None  (14)

**End of Block: Screening**

---

**Start of Block: Ineligible**

ineligible Unfortunately, you are not eligible for this survey.

Thank you nonetheless for your interest.

Please click below to continue.

**End of Block: Ineligible**

---

**Start of Block: Eligible**

eligible You are eligible to participate in this survey - thank you for your interest.

Please click below to continue.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

welcome You are one of many consumers across the U.S. taking this survey and you have been assigned to answer questions about the following industry: Consumer electronics manufacturing, distribution, or sales.

The survey will involve products that are sold on the website of an online retailer in the U.S.

We just want your first impressions of what you see here, so please spend as much time as you would spend if you saw these items on a seller's website. Different respondents in this survey will be reviewing different products that they might find on an online retailer's website.

Once again, there are no right or wrong answers but we do ask that you be truthful and pay attention in order to be retained in the study and paid.

Please click below to continue.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ————————————————————————

End of Block: Eligible

Start of Block: 23.40

focal2340 For the next questions, we want you to imagine that you are shopping at the website of an online retailer that sells a variety of laptops, desktop computers, monitors, tablets, and similar items. Imagine that while shopping there, you find a laptop that you really like and think it would be a great choice for yourself or someone you know.
Please look at your shopping cart in this scenario and answer the subsequent related questions.

Page Break ————————————————————————

2340.1a

✱

2340.1b

Looking at your shopping cart, what is the price you will pay for the laptop, before taxes?

(please enter numbers only)

_____

Page Break ————————————————————————

2340.2a

X→

2340.2b

Was there a price reduction applied to the laptop?

○ No  (1)

○ Unsure  (2)

○ Yes  (3)

Page Break ————————————————————————

Display This Question:

If Was there a price reduction applied to the laptop?   != 1

2340.3a

> *Display This Question:*
>
> *If Was there a price reduction applied to the laptop?   != 1*

**\***

2340.3b

How large is the price reduction, in dollar terms?

(please enter numbers only)

_____

---

Page Break ————————————————————————————————————

---

> *Display This Question:*
>
> *If Was there a price reduction applied to the laptop?   != 1*

2340.4a

---

> *Display This Question:*
>
> *If Was there a price reduction applied to the laptop?   != 1*

**\***

2340.4b

What was the laptop price before the price reduction was applied?

(please enter numbers only)

_____

---

End of Block: 23.40

Start of Block: 21a.40

focal.21a40 For the next questions, we want you to imagine that you are shopping at the website of an online retailer that sells a variety of laptops, desktop computers, monitors, tablets, and similar items. Imagine that while shopping there, you find a laptop that you really like and think it would be a great choice for yourself or someone you know.
Please look at your shopping cart in this scenario and answer the subsequent related questions.

---

Page Break ————————————————————————————————————

21a40.1a

---

**⁕**

21a40.1b

Looking at your shopping cart, what is the price you will pay for the laptop, before taxes?

(please enter numbers only)

_____

—— Page Break ——————————————————————————————————————————————

21a40.2a

**x→**

21a40.2b

Was there a price reduction applied to the laptop?

○ No  (1)

○ Unsure  (2)

○ Yes  (3)

—— Page Break ——————————————————————————————————————————————

Display This Question:

> *If Was there a price reduction applied to the laptop?   != 1*

21a40.3a

> *Display This Question:*
> *If Was there a price reduction applied to the laptop?   != 1*

**⁕**

21a40.3b

How large is the price reduction, in dollar terms?

(please enter numbers only)

_____

—— Page Break ——————————————————————————————————————————————

*Display This Question:*

*If Was there a price reduction applied to the laptop?   != 1*

21a40.4a

*Display This Question:*

*If Was there a price reduction applied to the laptop?   != 1*

[ * ]

21a40.4b

What was the laptop price before the price reduction was applied?

(please enter numbers only)

_____

End of Block: 21a.40

Start of Block: 21b.40

focal.21b40 For the next questions, we want you to imagine that you are shopping at the website of an online retailer that sells a variety of laptops, desktop computers, monitors, tablets, and similar items. Imagine that while shopping there, you find a laptop that you really like and think it would be a great choice for yourself or someone you know.

Please look at your shopping cart in this scenario and answer the subsequent related questions.

Page Break

21b40.1a

[ * ]

21b40.1b

Looking at your shopping cart, what is the price you will pay for the laptop, before taxes?

(please enter numbers only)

_____

Page Break

21b40.2a

`X→`

21b40.2b

Was there a price reduction applied to the laptop?

○ No  (1)

○ Unsure  (2)

○ Yes  (3)

---

Page Break —————————————————————————————

Display This Question:

| *If Was there a price reduction applied to the laptop?  != 1* |
|---|

21b40.3a

---

| Display This Question: |
|---|
| *If Was there a price reduction applied to the laptop?  != 1* |

`*`

21b40.3b

How large is the price reduction, in dollar terms?

(please enter numbers only)

_____

---

Page Break —————————————————————————————

| Display This Question: |
|---|
| *If Was there a price reduction applied to the laptop?  != 1* |

21b40.4a

---

| Display This Question: |
|---|
| *If Was there a price reduction applied to the laptop?  != 1* |

`*`

21b40.4b

What was the laptop price before the price reduction was applied?

(please enter numbers only)

_____

---

End of Block: 21b.40

---

Start of Block: Web Price

focal.wp For the next questions, we want you to imagine that you are shopping at the website of an online retailer that sells a variety of laptops, desktop computers, monitors, tablets, and similar items. Imagine that while shopping there, you find a laptop that you really like and think it would be a great choice for yourself or someone you know.

Please look at the product page in this scenario and answer the subsequent related questions.

---

Page Break —————————————————————————————

wp.1a

---

✳

wp.1b

Looking at this product page, what is the price you will pay for the laptop, before taxes?

(please enter numbers only)

_____

---

Page Break —————————————————————————————

wp.2a

---

X→

wp.2b

Is there a price reduction applied to the laptop?

○ No  (1)

○ Unsure  (2)

○ Yes  (3)

---

Page Break —————————————————————————————

> *Display This Question:*
>
> *If Is there a price reduction applied to the laptop?   != 1*

wp.3a

> *Display This Question:*
>
> *If Is there a price reduction applied to the laptop?   != 1*

✱

wp.3b

How large is the price reduction, in dollar terms?

(please enter numbers only)

_____

Page Break —————————————————————————————————————

> *Display This Question:*
>
> *If Is there a price reduction applied to the laptop?   != 1*

wp.4a

> *Display This Question:*
>
> *If Is there a price reduction applied to the laptop?   != 1*

✱

wp.4b

What is the laptop price before the price reduction is applied?

(please enter numbers only)

_____

End of Block: Web Price

Start of Block: Strike-Through Price

focal.st For the next questions, we want you to imagine that you are shopping at the website of an online retailer that sells a variety of laptops, desktop computers, monitors, tablets, and similar items. Imagine that while shopping there, you find a laptop that you really like and think it would be a great choice for yourself or someone you know.

Please look at the product page in this scenario and answer the subsequent related questions.

Page Break

st.1a

⊛

st.1b

Looking at this product page, what is the price you will pay for the laptop, before taxes?

(please enter numbers only)

_____

Page Break

st.2a

X→

st.2b

Is there a price reduction applied to the laptop?

○ No  (1)

○ Unsure  (2)

○ Yes  (3)

Page Break

Display This Question:

> *If Is there a price reduction applied to the laptop?  != 1*

st.3a

Display This Question:

> *If Is there a price reduction applied to the laptop?  != 1*

⊛

st.3b

How large is the price reduction, in dollar terms?

(please enter numbers only)

_____

---

Page Break

st.4a

---

Display This Question:

If Is there a price reduction applied to the laptop?   != 1

✳

st.4b

What is the laptop price before the price reduction is applied?

(please enter numbers only)

_____

---

End of Block: Strike-Through Price

Start of Block: Estimated Value

focal.ev For the next questions, we want you to imagine that you are shopping at the website of an online retailer that sells a variety of laptops, desktop computers, monitors, tablets, and similar items. Imagine that while shopping there, you find a laptop that you really like and think it would be a great choice for yourself or someone you know.
Please look at the product page in this scenario and answer the subsequent related questions.

---

Page Break

ev.1a

---

✳

ev.1b

Looking at this product page, what is the price you will pay for the laptop, before taxes?

(please enter numbers only)

_____

---

Page Break

ev.2a

---

X→

ev.2b

Is there a price reduction applied to the laptop?

○ No  (1)

○ Unsure  (2)

○ Yes  (3)

---

Page Break

Display This Question:

> *If Is there a price reduction applied to the laptop?   != 1*

ev.3a

---

> Display This Question:
>
> *If Is there a price reduction applied to the laptop?   != 1*

✱

ev.3b

How large is the price reduction, in dollar terms?

(please enter numbers only)

_____

---

Page Break

> Display This Question:
>
> *If Is there a price reduction applied to the laptop?   != 1*

ev.4a

---

> Display This Question:
>
> *If Is there a price reduction applied to the laptop?   != 1*

✱

ev.4b

What is the laptop price before the price reduction is applied?

(please enter numbers only)

_____

End of Block: Estimated Value

Start of Block: Follow-ups

`X→`

w.discount How important is a price reduction (i.e., dollars off) in determining your likelihood of purchasing a laptop like the one you just saw?

○ Not important at all  (1)

○ Slightly important  (2)

○ Somewhat important  (3)

○ Moderately important  (4)

○ Quite important  (5)

○ Very important  (6)

○ Extremely important  (7)

○ Do not know / no opinion  (8)

---

Page Break

check Please try to remember the type of laptop you were previously shown:

○ Chromebook  (1)

○ ThinkPad  (2)

○ MacBook  (3)

○ Do not know / Cannot remember  (4)

---

Page Break

`⤨` `X→`

rank.attributes Please consider your next purchase of a laptop computer and rank its following attributes from *most important* (1) to *least important* (10).

_____ Camera (1)
_____ Display (2)
_____ Graphics card (3)
_____ Operating system (4)
_____ Price (5)
_____ Price reduction (discount/savings) (6)
_____ Processor (7)
_____ RAM (random access memory) (8)

_____ Storage (hard disk drive capacity) (9)
_____ Warranty (10)

**End of Block: Follow-ups**

**Start of Block: Finals**

X→

ease1 How easy to understand were the previous questions regarding the online pricing of laptop computers?

○ Very easy  (1)

○ Easy  (2)

○ Somewhat easy  (3)

○ Neither easy nor difficult  (4)

○ Somewhat difficult  (5)

○ Difficult  (6)

○ Very difficult  (7)

Page Break ─────────────────────────────────────

X→

ease2 Did you have any difficulty viewing the earlier laptop webpage screenshot?

○ No difficulty at all  (1)

○   (2)

○   (3)

○ Some difficulty  (4)

○   (5)

○   (6)

○ Extreme difficulty  (7)

Page Break ─────────────────────────────────────

aware1 Are you aware of any current litigation involving an online electronics retailer?

○ No  (1)

◯ Yes  (2)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ─────────────────────────────────────────────────────────

*Display This Question:*

*If Are you aware of any current litigation involving an online electronics retailer? = 2*

what1 Please briefly describe your knowledge about the litigation involving the online electronics retailer.

◯ (please use text box below) _____ (1)

◯ Cannot remember  (2)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ─────────────────────────────────────────────────────────

b.ever1 Have you heard of lenovo.com or Lenovo before today?

◯ No  (1)

◯ Yes  (2)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ─────────────────────────────────────────────────────────

*Display This Question:*

*If Have you heard of lenovo.com or Lenovo before today? = 2*

b.ever2 Have you ever had any interaction with lenovo.com or Lenovo?

◯ No  (1)

◯ Yes  (2)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ─────────────────────────────────────────────────────────

*Display This Question:*

*If Have you ever had any interaction with lenovo.com or Lenovo? = 2*

b.what2 Please briefly describe what your interaction with lenovo.com or Lenovo involved.

◯ (please use text box below) _____ (1)

◯ Cannot remember  (2)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ─────────────────────────────────────────────────────────

**Display This Question:**

*If Have you heard of lenovo.com or Lenovo before today? = 2*

b.ever3 Have you ever purchased electronics from lenovo.com or Lenovo?

○ No  (1)

○ Yes  (2)

---

Page Break

**Display This Question:**

*If Have you heard of lenovo.com or Lenovo before today? = 2*

b.aware2 Are you aware of any current litigation involving lenovo.com or Lenovo?

○ No  (1)

○ Yes  (2)

---

Page Break

**Display This Question:**

*If Are you aware of any current litigation involving lenovo.com or Lenovo? = 2*

b.what3 Please briefly describe your knowledge about the litigation involving lenovo.com or Lenovo.

○ (please use text box below) _____ (1)

○ Cannot remember  (2)

---

Page Break

**End of Block: Finals**

**Start of Block: End**

thx Thank you for your participation.

Please click below to submit your data.

**End of Block: End**

# Appendix G

# Images Used in Consumer Perceptions Study





2024 © Claudiu V. Dimofte, PhD





**ThinkPad X1 Carbon Gen 11 Intel (14") – Black**

Save $1,175.01  45% off

Est Value ⓘ $2,609.00

$1,433.99

Use eCoupon **THINKPADDEAL**

**Add To Cart**

🖥 **Delivery FREE** Standard Delivery

🎁 Earn $28 in Rewards + Free expedited



### ThinkPad X1 Carbon Gen 11 Intel (14") – Black

~~$2,609.00~~

## $1,433.99

Savings of $1,175.01
Use eCoupon: **THINKPADDEAL**

**ADD TO CART**

Earn **$28** in Rewards

Ships FREE Next Business Day



# ThinkPad X1 Carbon
# Gen 11 Intel (14") – Black

Web Price:              $2,609.00
**After eCoupon:**
## $1,433.99
Savings:                $1,175.01

Use eCoupon:
**THINKPADDEAL**

Ships in 1-3 business days.



🛒  **ADD TO CART**

 Double Rewards = **$28**

## Appendix H

## Consumer Perceptions Survey 1 – Response Distributions for Main Quantitative Item

How important is a price reduction (i.e., dollars off) in determining your likelihood of purchasing a laptop like the one you just saw?

|  | N | % |
|---|---|---|
| Not important at all | 7 | 2.3% |
| Slightly important | 10 | 3.3% |
| Somewhat important | 19 | 6.2% |
| Moderately important | 32 | 10.4% |
| Quite important | 52 | 16.9% |
| Very important | 77 | 25.1% |
| Extremely important | 106 | 34.5% |
| Do not know / no opinion | 4 | 1.3% |
| Total | 307 | 100.0% |

## Appendix I

### Equivalent True Discount 1a – Response Statistics

N%

| | N | % |
|---|---|---|
| **Full Prospective Sample [1]** | **792** | **100.00** |
| **Screened out of Survey** | **421** | **53.16** |
| At item *device* [2] | 46 | 5.81 |
| At item *state* [3] | 16 | 2.02 |
| At item *employment* [4] | 69 | 8.71 |
| At item *history* [5] | 100 | 12.63 |
| At item *did.plums* [5] | 20 | 2.53 |
| At item *will.tech* [7] | 212 | 26.77 |
| **Completed Survey** | **371** | **46.84** |
| **Final Analytical Sample [8]** | **371** | **46.84** |

[1]  Respondents who started the survey. Note that some failed multiple selection filters.

[2]  Respondents who reported taking the survey on something other than a computer, laptop, or tablet.

[3]  Respondents who reported residing in a state other than California.

[4]  Respondents who reported having been employed (themselves or their family members) in one of the following industries: Advertising or marketing research; Consumer electronics manufacturing, distribution, or sales; Legal services; Website design, hosting, or e-commerce.

[5]  Respondents who answered "Not sure" to having any of the presented items (*bicycle, boat, car, dog, graduate degree, TV set, smartphone, telegraph,* and *toothbrush*), answered "Do not have one" to the items *car* and *toothbrush*, or answered "Have at least one" to the item *telegraph*.

[6]  Respondents who reported having purchased French Mirabelle plums from their local grocery store in the last year.

[7]  Respondents who reported not having bought consumer electronics items online in the last one to two years and not planning to buy such items online in the next one to two years.

[8]  Data used in the analyses.

2024 © Claudiu V. Dimofte, PhD

**Appendix J**

**Equivalent True Discount 1a – Sample Demographics by Retention Status**

| Sample | Dropped ineligible[1] | Completed retained[2] |
|---|---|---|
| **Sample Size** | **421** | **371** |
| **Gender** | | |
| Male | 46.3% | 59.5% |
| Female | 42.3% | 40.3% |
| Other | .0% | .0% |
| Prefer not to respond | .5% | .3% |
| **Mean Age** | 54.93 | 50.95 |
| **Ethnicity** | | |
| Asian | 12.8% | 14.8% |
| Black | 6.9% | 9.4% |
| Hispanic | 10.9% | 16.7% |
| Native American | 2.6% | 1.9% |
| Pacific Islander | 1.9% | 1.1% |
| White | 60.6% | 62.0% |
| Other | 2.4% | 3.5% |
| **Marital Status** | | |
| Single (not in a relationship) | 41.1% | 41.9% |
| In a relationship (not married) | 10.7% | 14.9% |
| Married | 40.5% | 39.2% |
| Other | 7.7% | 4.1% |
| **Children** | | |
| No | 49.1% | 54.1% |
| Yes | 50.9% | 45.9% |
| **Education** | | |
| High-school or less | 15.5% | 14.3% |
| Some college/technical school | 27.2% | 25.1% |
| 2-year college | 12.8% | 10.3% |
| 4-year college | 29.6% | 35.9% |
| Graduate school degree | 14.9% | 14.3% |
| **Employment Status** | | |
| Student (full-time) | 5.1% | 7.3% |
| Unemployed (not a student) | 17.9% | 17.0% |
| Employed part-time | 15.5% | 12,4% |
| Employed full-time | 29.1% | 40.0% |
| Other | 32.5% | 23.2% |
| **Median Annual Household Income** | $50,000 | $66,500 |

[1] Respondents who started the survey but did not qualify.
[2] Respondents in the final analytical sample.

**Appendix K**

**Equivalent True Discount Studies 1a and 1b – Survey Items**

---

Start of Block: Start

intro Thank you for your interest in this marketing research study that addresses some of your personal perceptions about products in the marketplace. It should only take a few minutes to complete. In responding to the questions, please pay attention and read the information carefully before selecting the response that best reflects your thoughts and feelings. There are no right or wrong answers and your responses are completely anonymous.

Due to the nature of the stimuli you will be shown, we ask that you take this survey on a desktop computer, laptop, or tablet rather than a smartphone or similar mobile device.

Please click below to continue.

${e://Field/transaction_id}

---

Page Break

vision Do you normally wear glasses or contact lenses when you read?

○ Yes  (1)

○ No  (2)

---

Display This Question:
    If vision = Yes

puton If you normally wear glasses or contact lenses when you read, please use them while completing this survey.  Thank you.

End of Block: Start

Start of Block: Screening

Page Break

device What type of device are you using to answer these questions?

○ Desktop or Laptop  (1)

○ Tablet  (2)

○ Smart phone  (3)

○ Other  (4)

> Skip To: End of Block If device = Smart phone
> Skip To: End of Block If device = Other

---

Page Break ————————————————————————————

gender What is your gender?

○ Male  (1)

○ Female  (2)

○ Other  (3)

○ Prefer not to answer  (4)

---

[ * ]

age What is your age?

(please enter number below)

_____

---

Page Break ————————————————————————————

ethnicity What is your ethnicity?

(please check all that apply)

☐ Asian  (1)

☐ Black  (2)

☐ Hispanic  (3)

☐ Native American  (4)

☐ Pacific Islander  (5)

☐ White  (6)

☐ Other  (7) _____

---
Page Break

marital What is your marital status?

○ Single (not in a relationship)  (1)

○ In a relationship (not married)  (2)

○ Married  (3)

○ Other  (4) _____

---

kids
Do you have children?

○ No  (1)

○ Yes  (2)

---
Page Break

edu What is your highest completed education level?

○ High school or less  (1)

○ Some college/technical school  (2)

○ 2-yr college degree  (3)

○ 4-yr college degree  (4)

○ Graduate school degree  (5)

---
Page Break

employ What best describes your current employment status?

○ Student (full-time)  (1)

○ Unemployed (not a student)  (2)

○ Employed part-time  (3)

○ Employed full-time  (4)

○ Other  (5) _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break —————————————————————————————————————

**✳**

income What is your total annual household (i.e., not personal) income, before taxes?    (in U.S. dollars, please insert numbers only)

_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break —————————————————————————————————————

state Where do you currently reside?

▼ I do not reside in the United States (53) ... Wyoming (52)

*Skip To: End of Block If state != California*

Page Break —————————————————————————————————————

work Have you or any member of your household ever worked in the following industries?

(please check all that apply)

☐ Advertising or market research  (1)

☐ Animal care or veterinarian services  (2)

☐ Book publishing, distribution, or sales  (3)

☐ Clothing / shoe manufacturing, distribution, or sales  (4)

☐ Consumer electronics manufacturing, distribution, or sales  (5)

☐ Entertainment content production, distribution, or sales  (7)

☐ Food / beverage manufacturing, distribution, or sales  (8)

☐ Legal services  (9)

☐ Newspaper / magazine publishing, distribution, or sales  (10)

☐ Pet breeding, grooming, distribution, or sales  (11)

☐ Travel, tourism, or hospitality  (12)

☐ Website design, hosting, or e-commerce  (13)

☐ None of the above  (14)

*Skip To: End of Block If work = Advertising or market research*

*Skip To: End of Block If work = Consumer electronics manufacturing, distribution, or sales*

*Skip To: End of Block If work = Legal services*

*Skip To: End of Block If work = Website design, hosting, or e-commerce*

Page Break

history Please select carefully the option that best describes your status relative to having each of the following items:

|  | Do not have one (1) | Have at least one (2) | Not sure (3) |
|---|---|---|---|
| Bicycle (1) | ○ | ○ | ○ |
| Boat (2) | ○ | ○ | ○ |
| Car (3) | ○ | ○ | ○ |
| Dog (4) | ○ | ○ | ○ |
| Graduate degree (5) | ○ | ○ | ○ |
| Smartphone (6) | ○ | ○ | ○ |
| Telegraph (7) | ○ | ○ | ○ |
| Toothbrush (8) | ○ | ○ | ○ |
| TV set (9) | ○ | ○ | ○ |

*Skip To: End of Block If history = Bicycle [ Not sure ]*

*Skip To: End of Block If history = Boat [ Not sure ]*

*Skip To: End of Block If history = Car [ Not sure ]*

*Skip To: End of Block If history = Dog [ Not sure ]*

*Skip To: End of Block If history = Graduate degree [ Not sure ]*
*Skip To: End of Block If history = Smartphone [ Not sure ]*
*Skip To: End of Block If history = Telegraph [ Have at least one ]*
*Skip To: End of Block If history = Telegraph [ Not sure ]*
*Skip To: End of Block If history = Toothbrush [ Do not have one ]*
*Skip To: End of Block If history = Toothbrush [ Not sure ]*
*Skip To: End of Block If history = TV set [ Not sure ]*

---

Page Break

did.car In the last year or two, did you purchase or lease a new vehicle from a car dealership?

○ No  (1)

○ Yes  (2)

---

Page Break

did.shoe In the last year or two, did you purchase running shoes from a brick-and-mortar shoe store?

○ No  (1)

○ Yes  (2)

---

Page Break

did.plums In the last year or two, did you purchase French Mirabelle plums from a local grocery store?

○ No  (1)

○ Yes  (2)

*Skip To: End of Block If did.plums = Yes*

---

Page Break

did.tech In the last year or two, did you purchase a laptop, desktop, monitor, tablet, or similar items from an online retailer?

○ No  (1)

○ Yes  (2)

---

Page Break

Display This Question:

If did.tech = No

will.tech In the next year or two, do you plan to purchase a laptop, desktop, monitor, tablet, or similar items from an online retailer?

○ No (1)

○ Yes (2)

Skip To: End of Block If will.tech = No

Page Break ────────────────────────────────────

will.car In the next year or two, do you plan to purchase or lease a new vehicle from a car dealership?

○ No (1)

○ Yes (2)

Page Break ────────────────────────────────────

will.shoe In the next year or two, do you plan to purchase running shoes from a brick-and-mortar shoe store?

○ No (1)

○ Yes (2)

Page Break ────────────────────────────────────

will.plums In the next year or two, do you plan to purchase French Mirabelle plums from a local grocery store?

○ No (1)

○ Yes (2)

Page Break ────────────────────────────────────

shopStoresPast Which of the following online retailers have you shopped at in the last 24 months?

☐ amazon.com (Amazon)  (1)

☐ apple.com (Apple)  (2)

☐ acer.com (Acer)  (3)

☐ asus.com (Asus)  (4)

☐ bestbuy.com (Best Buy)  (5)

☐ dell.com (Dell)  (6)

☐ hp.com (HP)  (7)

☐ lenovo.com (Lenovo)  (8)

☐ microsoft.com (Microsoft)  (9)

☐ newegg.com (Newegg)  (10)

☐ officedepot.com (Office Depot)  (11)

☐ staples.com (Staples)  (12)

☐ tigerdirect.com (Tiger Direct)  (13)

☐ None  (14)

**End of Block: Screening**

**Start of Block: Ineligible**

ineligible Unfortunately, you are not eligible for this survey.

Thank you nonetheless for your interest.

Please click below to continue.

**End of Block: Ineligible**

**Start of Block: Eligible**

eligible You are eligible to participate in this survey - thank you for your interest.

Please click below to continue.

---

Page Break

welcome You are one of many consumers across the U.S. taking this survey and you have been assigned to answer questions about the following industry: Consumer electronics manufacturing, distribution, or sales.

The survey will involve products that are sold on the website of an online retailer in the U.S.

We just want your first impressions of what you see here, so please spend as much time as you would spend if you saw these items on a seller's website. Different respondents in this survey will be reviewing different products that they might find on a retailer's website.

Once again, there are no right or wrong answers but we do ask that you be truthful and pay attention in order to be retained in the study and paid.

Please click below to continue.

---

Page Break

End of Block: Eligible

---

Start of Block: Focal

focal For these next questions, we want you to imagine that you are shopping on Lenovo's website, where the retailer sells a variety of laptops, desktops, monitors, tablets, and similar items, including Lenovo's ${e://Field/itemcat}.
Imagine that while shopping there, you find ${e://Field/item} that you really like and think it would be a great choice for yourself or someone you know...

End of Block: Focal

---

Start of Block: Workstation - W

| Display This Question: |
| --- |
| If price = 1 |

work1

---

*Display This Question:*

  *If price = 2*

work2

---

*Display This Question:*

  *If price = 3*

work3

---

*Display This Question:*

  *If price = 4*

work4

---

*Display This Question:*

  *If price = 5*

work5

---

*Display This Question:*

  *If price = 6*

work6

---

pbwork Assume that you like ${e://Field/item} and think it would be a great choice for yourself or someone you know; what is the probability (in percentage terms) that you would buy it?

0  10  20  30  40  50  60  70  80  90  100

| Please indicate on the scale the probability that you would purchase () | |
|---|---|

---

relevwork Is ${e://Field/item} one that you would actually consider purchasing for yourself or someone you know?

◯ Definitely not  (1)

◯ Probably not  (2)

◯ Possibly not  (3)

◯ Not sure  (4)

2024 © Claudiu V. Dimofte, PhD

○ Possibly yes  (5)

○ Probably yes  (6)

○ Definitely yes  (7)

**End of Block: Workstation - W**

**Start of Block: Follow-ups**

X→

w.discount How important is a price reduction (i.e., a promotion or discount) in determining the likelihood that you purchase a product like the ones you just saw?

○ Not important at all  (1)

○ Slightly important  (2)

○ Somewhat important  (3)

○ Moderately important  (4)

○ Quite important  (5)

○ Very important  (6)

○ Extremely important  (7)

○ Do not know / no opinion  (8)

------------------------------------

Page Break ————————————————————————

check If you can recall the online retailer that featured the products you just saw, please indicate it below.

○ Apple  (1)

○ Dell  (2)

○ HP  (3)

○ Lenovo  (4)

○ Do not know / Cannot remember  (5)

------------------------------------

Page Break ————————————————————————

assess If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior?

| | Definitely not (1) | (2) | (3) | (4) | (5) | (6) | Definitely yes (7) | No opinion (8) |
|---|---|---|---|---|---|---|---|---|
| Acceptable (knew1) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Misleading (knew2) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Truthful (knew3) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Unacceptable (knew.4) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Unethical (knew.5) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Excusable (knew.6) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Deceptive (knew.7) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Appropriate (knew.8) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

effect If you knew that an online retailer was displaying artificially inflated regular prices, would that behavior influence your decision to purchase a product on the retailer's website?

○ Definitely not  (1)

○ Probably not  (2)

○ Possibly not  (3)

○ Not sure  (4)

○ Possibly yes  (5)

○ Probably yes  (6)

○ Definitely yes  (7)

○ Do not know / no opinion  (8)

---

Page Break ———————————————————————————

**End of Block: Follow-ups**

**Start of Block: Finals**

ease1 Please rate how easy or difficult it was for you to understand the questions regarding the products you viewed in this survey.

○ Very easy  (1)

○ Easy  (2)

○ Somewhat easy  (3)

○ Neither easy nor difficult  (4)

○ Somewhat difficult  (5)

○ Difficult  (6)

○ Very difficult  (7)

---

Page Break ———————————————————————————

ease2 Did you have difficulty viewing the product images and product specifications in this survey?

○ No difficulty at all  (1)

○   (2)

○   (3)

○ Some difficulty  (4)

○   (5)

○   (6)

○ Extreme difficulty  (7)

Page Break ———————————————————————————————

aware1 Are you aware of any current litigation involving an online electronics retailer?

○ No  (1)

○ Yes  (2)

Page Break ———————————————————————————————

**Display This Question:**
    *If aware1 = Yes*

what1 Please briefly describe your knowledge about the litigation involving the online electronics retailer.

○ (please type answer below)  (1)
    _____

○ Cannot remember  (2)

Page Break ———————————————————————————————

b.ever1 Have you heard of Lenovo or lenovo.com before today?

○ No  (1)

○ Yes  (2)

Page Break ———————————————————————————————

**Display This Question:**

*If b.ever1 = Yes*

b.ever2 Have you ever had any interaction with Lenovo or lenovo.com?

○ No  (1)

○ Yes  (2)

Page Break ―――――――――――――――――――――――――――――――――――――

**Display This Question:**

*If b.ever2 = Yes*

b.what2 Please briefly describe what your interaction with Lenovo or lenovo.com involved.

○ (please type answer below)  (1)

　　　_____

○ Cannot remember  (2)

Page Break ―――――――――――――――――――――――――――――――――――――

**Display This Question:**

*If b.ever1 = Yes*

b.ever3 Have you ever purchased electronics from Lenovo or lenovo.com?

○ No  (1)

○ Yes  (2)

Page Break ―――――――――――――――――――――――――――――――――――――

**Display This Question:**

*If b.ever1 = Yes*

b.aware2 Are you aware of any current litigation involving Lenovo or lenovo.com?

○ No  (1)

○ Yes  (2)

Page Break ―――――――――――――――――――――――――――――――――――――

2024 © Claudiu V. Dimofte, PhD

Display This Question:

    If b.aware2 = Yes

b.what3 Please briefly describe your knowledge about the litigation involving Lenovo or lenovo.com.

○ (please type answer below)  (1)

_____

○ Cannot remember  (2)

Page Break —————————————————————————————————

End of Block: Finals

Start of Block: End

thx Thank you for your participation.

Please click below to submit your data.

End of Block: End

**Appendix L**

**Images Used in Equivalent True Discount Study 1a**

2024 © Claudiu V. Dimofte, PhD



# ThinkPad P16v Intel (16")
# Mobile Workstation

Part Number: 21FC001YUS

Web Price:
## $2,979.00

Ships FREE Next Business Day

 **ADD TO CART**

**Processor**
13th Generation Intel® Core™
i7-13700H Processor (E-cores up to
3.70 GHz P-cores up to 5.00 GHz)

**Operating System**
Windows 11 Pro 64

**Graphic Card**
NVIDIA RTX™ A500 Laptop GPU
4GB GDDR6

**Memory**
16 GB DDR5-5200MHz (SODIMM)
- (2 x 8 GB)

**Storage**
512 GB SSD M.2 2280 PCIe
Gen4 Performance TLC Opal



# ThinkPad P16v Intel (16")
# Mobile Workstation

Part Number: 21FC001YUS

Web Price:                 $2,979.00

**After eCoupon:**

# $1,729.00

Savings:                   $1,250.00

Use eCoupon:
**SPRINGSALE**

Ships FREE Next Business Day

 **ADD TO CART**

**Processor**
13th Generation Intel® Core™
i7-13700H Processor (E-cores up to
3.70 GHz P-cores up to 5.00 GHz)

**Operating System**
Windows 11 Pro 64

**Graphic Card**
NVIDIA RTX™ A500 Laptop GPU
4GB GDDR6

**Memory**
16 GB DDR5-5200MHz (SODIMM)
- (2 x 8 GB)

**Storage**
512 GB SSD M.2 2280 PCIe
Gen4 Performance TLC Opal



# ThinkPad P16v Intel (16")
# Mobile Workstation

Part Number: 21FC001YUS

Web Price:                    $1,729.00
**After eCoupon:**
# $1,039.00
Savings:                          $690.00

Use eCoupon:
**SPRINGSALE**

Ships FREE Next Business Day

 **ADD TO CART**

**Processor**
13th Generation Intel® Core™
i7-13700H Processor (E-cores up to
3.70 GHz P-cores up to 5.00 GHz)

**Operating System**
Windows 11 Pro 64

**Graphic Card**
NVIDIA RTX™ A500 Laptop GPU
4GB GDDR6

**Memory**
16 GB DDR5-5200MHz (SODIMM)
- (2 x 8 GB)

**Storage**
512 GB SSD M.2 2280 PCIe
Gen4 Performance TLC Opal



# ThinkPad P16v Intel (16")
# Mobile Workstation

Part Number: 21FC001YUS

Web Price:                    $1,729.00
**After eCoupon:**
# $1,209.00
Savings:                      $520.00

Use eCoupon:
**SPRINGSALE**

Ships FREE Next Business Day

 **ADD TO CART**

**Processor**
13th Generation Intel® Core™
i7-13700H Processor (E-cores up to
3.70 GHz P-cores up to 5.00 GHz)

**Operating System**
Windows 11 Pro 64

**Graphic Card**
NVIDIA RTX™ A500 Laptop GPU
4GB GDDR6

**Memory**
16 GB DDR5-5200MHz (SODIMM)
- (2 x 8 GB)

**Storage**
512 GB SSD M.2 2280 PCIe
Gen4 Performance TLC Opal



# ThinkPad P16v Intel (16")
# Mobile Workstation

Part Number:  21FC001YUS

Web Price:                    $1,729.00
**After eCoupon:**
# $1,379.00
Savings:                        $350.00

Use eCoupon:
**SPRINGSALE**

Ships FREE Next Business Day

 **ADD TO CART**

**Processor**
13th Generation Intel® Core™
i7-13700H Processor (E-cores up to
3.70 GHz P-cores up to 5.00 GHz)

**Operating System**
Windows 11 Pro 64

**Graphic Card**
NVIDIA RTX™ A500 Laptop GPU
4GB GDDR6

**Memory**
16 GB DDR5-5200MHz (SODIMM)
- (2 x 8 GB)

**Storage**
512 GB SSD M.2 2280 PCIe
Gen4 Performance TLC Opal



# ThinkPad P16v Intel (16")
# Mobile Workstation

Part Number: 21FC001YUS

Web Price: $1,729.00

**After eCoupon:**

# $1,559.00

Savings: $170.00

Use eCoupon:
**SPRINGSALE**

Ships FREE Next Business Day

 **ADD TO CART**

**Processor**
13th Generation Intel® Core™
i7-13700H Processor (E-cores up to
3.70 GHz P-cores up to 5.00 GHz)

**Operating System**
Windows 11 Pro 64

**Graphic Card**
NVIDIA RTX™ A500 Laptop GPU
4GB GDDR6

**Memory**
16 GB DDR5-5200MHz (SODIMM)
- (2 x 8 GB)

**Storage**
512 GB SSD M.2 2280 PCIe
Gen4 Performance TLC Opal

## Appendix M

## Equivalent True Discount Study 1a – Response Distributions for Main Quantitative Items

How important is a price reduction (i.e., a promotion or discount) in determining the likelihood that you purchase a product like the ones you just saw?

|  | N | % |
|---|---|---|
| Not important at all | 4 | 1.1% |
| Slightly important | 15 | 4.0% |
| Somewhat important | 38 | 10.2% |
| Moderately important | 49 | 13.2% |
| Quite important | 64 | 17.3% |
| Very important | 94 | 25.3% |
| Extremely important | 102 | 27.5% |
| Do not know / no opinion | 2 | .5% |
| Missing | 3 | .8% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? - Acceptable

|  | N | % |
|---|---|---|
| Definitely not | 172 | 46.4% |
| 2 | 44 | 11.9% |
| 3 | 25 | 6.7% |
| 4 | 38 | 10.2% |
| 5 | 21 | 5.7% |
| 6 | 20 | 5.4% |
| Definitely yes | 37 | 10.0% |
| No opinion | 11 | 3% |
| Missing | 3 | .8% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? - Misleading

|  | N | % |
|---|---|---|
| Definitely not | 30 | 8.1% |
| 2 | 17 | 4.6% |
| 3 | 18 | 4.9% |
| 4 | 22 | 5.9% |
| 5 | 23 | 6.2% |
| 6 | 42 | 11.3% |
| Definitely yes | 203 | 54.7% |
| No opinion | 13 | 3.5% |
| Missing | 3 | .8% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? - Truthful

|  | N | % |
|---|---|---|
| Definitely not | 184 | 49.6% |
| 2 | 45 | 12.1% |
| 3 | 20 | 5.4% |
| 4 | 29 | 7.8% |
| 5 | 20 | 5.4% |
| 6 | 20 | 5.4% |
| Definitely yes | 32 | 8.6% |
| No opinion | 18 | 4.9% |
| Missing | 3 | .8% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? – Unacceptable

|  | N | % |
|---|---|---|
| Definitely not | 35 | 9.4% |
| 2 | 22 | 5.9% |
| 3 | 18 | 4.9% |
| 4 | 24 | 6.5% |
| 5 | 19 | 5.1% |
| 6 | 54 | 14.6% |
| Definitely yes | 184 | 49.6% |
| No opinion | 12 | 3.2% |
| Missing | 3 | .8% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? – Unethical

|  | N | % |
|---|---|---|
| Definitely not | 34 | 9.2% |
| 2 | 21 | 5.7% |
| 3 | 18 | 4.9% |
| 4 | 26 | 7.0% |
| 5 | 28 | 7.5% |
| 6 | 40 | 10.8% |
| Definitely yes | 186 | 50.1% |
| No opinion | 15 | 4.0% |
| Missing | 3 | .8% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? - Excusable

|  | N | % |
|---|---|---|
| Definitely not | 163 | 43.9% |
| 2 | 44 | 11.9% |
| 3 | 30 | 8.1% |
| 4 | 36 | 9.7% |
| 5 | 27 | 7.3% |
| 6 | 17 | 4.6% |
| Definitely yes | 32 | 8.6% |
| No opinion | 19 | 5.1% |
| Missing | 3 | .8% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? – Deceptive

|  | N | % |
|---|---|---|
| Definitely not | 27 | 7.3% |
| 2 | 16 | 4.3% |
| 3 | 12 | 3.2% |
| 4 | 17 | 4.6% |
| 5 | 30 | 8.1% |
| 6 | 38 | 10.2% |
| Definitely yes | 214 | 57.7% |
| No opinion | 14 | 3.8% |
| Missing | 3 | .8% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? - Appropriate

|  | N | % |
|---|---|---|
| Definitely not | 176 | 47.4% |
| 2 | 43 | 11.6% |
| 3 | 21 | 5.7% |
| 4 | 34 | 9.2% |
| 5 | 25 | 6.7% |
| 6 | 26 | 7.0% |
| Definitely yes | 30 | 8.1% |
| No opinion | 13 | 3.5% |
| Missing | 3 | .8% |

If you knew that an online retailer was displaying artificially inflated regular prices, would that behavior influence your decision to purchase a product on the retailer's website?

|  | N | % |
|---|---|---|
| Definitely not | 41 | 11.1% |
| Probably not | 19 | 5.1% |
| Possibly not | 13 | 3.5% |
| Not sure | 30 | 8.1% |
| Possibly yes | 34 | 9.2% |
| Probably yes | 46 | 12.41% |
| Definitely yes | 180 | 48.5% |
| Do not know / no opinion | 5 | 1.3% |
| Missing | 3 | .8% |

## Appendix N

### Equivalent True Discount Study 1b – Response Statistics

| | N | % |
|---|---|---|
| **Full Prospective Sample [1]** | **745** | **100.00** |
| **Screened out of Survey** | **377** | **50.60** |
| At item *device* [2] | 51 | 6.84 |
| At item *state* [3] | 14 | 1.88 |
| At item *employment* [4] | 79 | 10.60 |
| At item *history* [5] | 97 | 13.02 |
| At item *did.plums* [5] | 31 | 4.16 |
| At item *will.tech* [7] | 270 | 36.24 |
| **Completed Survey** | **368** | **49.40** |
| **Final Analytical Sample [8]** | **368** | **49.40** |

[1]  Respondents who started the survey. Note that some failed multiple selection filters.

[2]  Respondents who reported taking the survey on something other than a computer, laptop, or tablet.

[3]  Respondents who reported residing in a state other than California.

[4]  Respondents who reported having been employed (themselves or their family members) in one of the following industries: Advertising or marketing research; Consumer electronics manufacturing, distribution, or sales; Legal services; Website design, hosting, or e-commerce.

[5]  Respondents who answered "Not sure" to having any of the presented items (*bicycle, boat, car, dog, graduate degree, TV set, smartphone, telegraph,* and *toothbrush*), answered "Do not have one" to the items *car* and *toothbrush*, or answered "Have at least one" to the item *telegrap*h.

[6]  Respondents who reported having purchased French Mirabelle plums from their local grocery store in the last year.

[7]  Respondents who reported not having bought consumer electronics items online in the last one to two years and not planning to buy such items online in the next one to two years.

[8]  Data used in the analyses.

2024 © Claudiu V. Dimofte, PhD

## Appendix O

### Equivalent True Discount Study 1b – Sample Demographics by Retention Status

| Sample | Dropped ineligible[1] | Completed retained[2] |
|---|---|---|
| **Sample Size** | **377** | **368** |
| **Gender** | | |
| Male | 56.1% | 51.1% |
| Female | 43.9% | 48.9% |
| Other | .0% | .0% |
| Prefer not to respond | .0% | .0% |
| **Mean Age** | 52.54 | 49.90 |
| **Ethnicity** | | |
| Asian | 10.3% | 13.0% |
| Black | 11.1% | 9.5% |
| Hispanic | 9.3% | 16.6% |
| Native American | 1.3% | 1.4% |
| Pacific Islander | 1.1% | .0% |
| White | 59.2% | 67.9% |
| Other | 1.6% | 1.1% |
| **Marital Status** | | |
| Single (not in a relationship) | 34.4% | 46.5% |
| In a relationship (not married) | 10.7% | 9.8% |
| Married | 49.1% | 40.2% |
| Other | 5.8% | 3.5% |
| **Children** | | |
| No | 42.9% | 45.9% |
| Yes | 57.1% | 54.1% |
| **Education** | | |
| High-school or less | 12.0% | 7.6% |
| Some college/technical school | 23.9% | 27.2% |
| 2-year college | 8.9% | 13.3% |
| 4-year college | 35.3% | 38.0% |
| Graduate school degree | 19.9% | 13.9% |
| **Employment Status** | | |
| Student (full-time) | 3.4% | 4.3% |
| Unemployed (not a student) | 17.2% | 16.8% |
| Employed part-time | 16.6% | 15.8% |
| Employed full-time | 36.5% | 44.3% |
| Other | 26.4% | 18.8% |
| **Median Annual Household Income** | $65,000 | $61,000 |

[1] Respondents who started the survey but did not qualify.
[2] Respondents in the final analytical sample.

2024 © Claudiu V. Dimofte, PhD

**Appendix P**

**Images Used in Equivalent True Discount Study 1b**



## ThinkPad P16v Intel (16") Mobile Workstation

# $2,979.00

**Add to Cart**

Ships FREE Next Business Day

Part Number: 21FC001YUS

### Key Details

- Processor : 13th Generation Intel® Core™ i7-13700H Processor (E-cores up to 3.70 GHz P-cores up to 5.00 GHz)
- Operating System : Windows 11 Pro 64
- Graphic Card : NVIDIA RTX™ A500 Laptop GPU 4GB GDDR6
- Memory : 16 GB DDR5-5200MHz (SODIMM) - (2 x 8 GB)
- Storage : 512 GB SSD M.2 2280 PCIe Gen4 Performance TLC Opal

2024 © Claudiu V. Dimofte, PhD



### ThinkPad P16v Intel (16″) Mobile Workstation

~~$2,979.00~~

Save $1,250.00    **41% off**

# $1,729.00

Use eCoupon **SPRINGSALE**

**Add to Cart**

Ships FREE Next Business Day

Part Number: 21FC001YUS

### Key Details

- Processor : 13th Generation Intel® Core™ i7-13700H Processor (E-cores up to 3.70 GHz P-cores up to 5.00 GHz)
- Operating System : Windows 11 Pro 64
- Graphic Card : NVIDIA RTX™ A500 Laptop GPU 4GB GDDR6
- Memory : 16 GB DDR5-5200MHz (SODIMM) - (2 x 8 GB)
- Storage : 512 GB SSD M.2 2280 PCIe Gen4 Performance TLC Opal



### ThinkPad P16v Intel (16″) Mobile Workstation

~~$1,729.00~~

Save $690.00    **40% off**

# $1,039.00

Use eCoupon **SPRINGSALE**

**Add to Cart**

Ships FREE Next Business Day

Part Number: 21FC001YUS

### Key Details

- Processor : 13th Generation Intel® Core™ i7-13700H Processor (E-cores up to 3.70 GHz P-cores up to 5.00 GHz)
- Operating System : Windows 11 Pro 64
- Graphic Card : NVIDIA RTX™ A500 Laptop GPU 4GB GDDR6
- Memory : 16 GB DDR5-5200MHz (SODIMM) - (2 x 8 GB)
- Storage : 512 GB SSD M.2 2280 PCIe Gen4 Performance TLC Opal



### ThinkPad P16v Intel (16")
### Mobile Workstation

~~$1,729.00~~
Save $520.00   **30% off**

# $1,209.00

Use eCoupon **SPRINGSALE**

**Add to Cart**

Ships FREE Next Business Day

Part Number: 21FC001YUS

### Key Details

- Processor : 13th Generation Intel® Core™ i7-13700H Processor (E-cores up to 3.70 GHz P-cores up to 5.00 GHz)
- Operating System : Windows 11 Pro 64
- Graphic Card : NVIDIA RTX™ A500 Laptop GPU 4GB GDDR6
- Memory : 16 GB DDR5-5200MHz (SODIMM) - (2 x 8 GB)
- Storage : 512 GB SSD M.2 2280 PCIe Gen4 Performance TLC Opal



## ThinkPad P16v Intel (16″) Mobile Workstation

~~$1,729.00~~

Save $350.00   **20% off**

# $1,379.00

Use eCoupon **SPRINGSALE**

**Add to Cart**

Ships FREE Next Business Day

Part Number: 21FC001YUS

### Key Details

- Processor : 13th Generation Intel® Core™ i7-13700H Processor (E-cores up to 3.70 GHz P-cores up to 5.00 GHz)
- Operating System : Windows 11 Pro 64
- Graphic Card : NVIDIA RTX™ A500 Laptop GPU 4GB GDDR6
- Memory : 16 GB DDR5-5200MHz (SODIMM) - (2 x 8 GB)
- Storage : 512 GB SSD M.2 2280 PCIe Gen4 Performance TLC Opal



## ThinkPad P16v Intel (16") Mobile Workstation

~~$1,729.00~~

Save $170.00   **10% off**

# $1,559.00

Use eCoupon **SPRINGSALE**

**Add to Cart**

Ships FREE Next Business Day

Part Number: 21FC001YUS

### Key Details

- Processor : 13th Generation Intel® Core™ i7-13700H Processor (E-cores up to 3.70 GHz P-cores up to 5.00 GHz)
- Operating System : Windows 11 Pro 64
- Graphic Card : NVIDIA RTX™ A500 Laptop GPU 4GB GDDR6
- Memory : 16 GB DDR5-5200MHz (SODIMM) - (2 x 8 GB)
- Storage : 512 GB SSD M.2 2280 PCIe Gen4 Performance TLC Opal

## Appendix Q

## Equivalent True Discount Study 1b – Response Distributions for Main Quantitative Items

How important is a price reduction (i.e., a promotion or discount) in determining the likelihood that you purchase a product like the ones you just saw?

|  | N | % |
|---|---|---|
| Not important at all | 8 | 2.2% |
| Slightly important | 17 | 4.6% |
| Somewhat important | 35 | 9.5% |
| Moderately important | 52 | 14.1% |
| Quite important | 61 | 16.6% |
| Very important | 87 | 23.6% |
| Extremely important | 104 | 28.3% |
| Do not know / no opinion | 2 | .5% |
| Missing | 2 | .5% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? - Acceptable

|  | N | % |
|---|---|---|
| Definitely not | 167 | 45.4% |
| 2 | 41 | 11.1% |
| 3 | 33 | 9.0% |
| 4 | 28 | 7.6% |
| 5 | 20 | 5.4% |
| 6 | 29 | 7.9% |
| Definitely yes | 40 | 10.9% |
| No opinion | 8 | 2.2% |
| Missing | 2 | .5% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? - Misleading

|  | N | % |
|---|---|---|
| Definitely not | 46 | 12.5% |
| 2 | 13 | 3.5% |
| 3 | 18 | 4.9% |
| 4 | 11 | 3.0% |
| 5 | 28 | 7.6% |
| 6 | 52 | 14.1% |
| Definitely yes | 187 | 50.8% |
| No opinion | 11 | 3.0% |
| Missing | 2 | .5% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? - Truthful

|  | N | % |
|---|---|---|
| Definitely not | 184 | 50.0% |
| 2 | 36 | 9.8% |
| 3 | 31 | 8.4% |
| 4 | 22 | 6.0% |
| 5 | 17 | 4.6% |
| 6 | 27 | 7.3% |
| Definitely yes | 37 | 10.1% |
| No opinion | 12 | 3.3% |
| Missing | 2 | .5% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? - Unacceptable

|  | N | % |
|---|---|---|
| Definitely not | 54 | 14.7% |
| 2 | 19 | 5.2% |
| 3 | 18 | 4.9% |
| 4 | 27 | 7.3% |
| 5 | 30 | 8.2% |
| 6 | 47 | 12.8% |
| Definitely yes | 161 | 43.8% |
| No opinion | 10 | 2,7% |
| Missing | 2 | .5% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? - Unethical

|  | N | % |
|---|---|---|
| Definitely not | 45 | 12.2% |
| 2 | 20 | 5.4% |
| 3 | 18 | 4.9% |
| 4 | 23 | 6.3% |
| 5 | 30 | 8.2% |
| 6 | 50 | 13.6% |
| Definitely yes | 165 | 44.8% |
| No opinion | 15 | 4.1% |
| Missing | 2 | .5% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? – Excusable

|  | N | % |
|---|---|---|
| Definitely not | 165 | 44.8% |
| 2 | 40 | 10.9% |
| 3 | 35 | 9.5% |
| 4 | 36 | 9.8% |
| 5 | 24 | 6.5% |
| 6 | 28 | 7.6% |
| Definitely yes | 20 | 5.4% |
| No opinion | 18 | 4.9% |
| Missing | 2 | .5% |

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? - Deceptive

|  | N | % |
|---|---|---|
| Definitely not | 40 | 10.9% |
| 2 | 10 | 2.7% |
| 3 | 19 | 5.2% |
| 4 | 15 | 4.1% |
| 5 | 32 | 8.7% |
| 6 | 54 | 14.7% |
| Definitely yes | 185 | 50.3% |
| No opinion | 11 | 3.0% |
| Missing | 2 | .5% |

2024 © Claudiu V. Dimofte, PhD

If an online retailer displayed artificially inflated regular prices for the sales it offered on its website (e.g., offering 40% off an inflated regular price of $1,000), how would you view the retailer's behavior? – Appropriate

|  | N | % |
|---|---|---|
| Definitely not | 168 | 45.7% |
| 2 | 42 | 11.4% |
| 3 | 34 | 9.2% |
| 4 | 26 | 7.1% |
| 5 | 25 | 6.8% |
| 6 | 26 | 7.1% |
| Definitely yes | 36 | 9.8% |
| No opinion | 9 | 2.4% |
| Missing | 2 | .5% |

If you knew that an online retailer was displaying artificially inflated regular prices, would that behavior influence your decision to purchase a product on the retailer's website?

|  | N | % |
|---|---|---|
| Definitely not | 34 | 9.2% |
| Probably not | 16 | 4.3% |
| Possibly not | 11 | 3.0% |
| Not sure | 24 | 6.5% |
| Possibly yes | 30 | 8.2% |
| Probably yes | 69 | 18.8% |
| Definitely yes | 180 | 48.9% |
| Do not know / no opinion | 2 | .5% |
| Missing | 2 | .5% |