SHEPPARD MULLIN RICHTER & HAMPTON LLP
P. CRAIG CARDON, Cal. Bar No. 168646
ccardon@sheppardmullin.com
BENJAMIN O. AIGBOBOH, Cal. Bar No. 268531
baigboboh@sheppardmullin.com
ALYSSA SONES, Cal. Bar No. 318359
asones@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:   310.228.3700
Facsimile:   310.228.3701

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
ABBY H. MEYER, Cal. Bar No. 294947
ameyer@sheppardmullin.com
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626-1993
Telephone:   714.513.5100
Facsimile:   714.513.5130

*Attorneys for Defendant*
LENOVO (UNITED STATES) INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| ANDREW AXELROD and ELIOT BURK, individually and on behalf all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LENOVO (UNITED STATES) INC., a Delaware corporation,<br><br>Defendant. | Case No. 4:21-cv-06770-JSW-RMI<br><br>[*Assigned to the Hon. Jeffrey S. White*]<br><br>**DEFENDANT'S MOTION UNDER FEDERAL RULES OF EVIDENCE 702 AND 403 TO EXCLUDE CLAUDIU V. DIMOFTE, PH.D.'S OPINIONS REGARDING CONSUMER BEHAVIOR (Dkt. 200-6)**<br><br>Hearing Date:   February 7, 2025<br>Hearing Time:   9:00 a.m.<br><br>Complaint Filed:   August 31, 2021<br>FAC Filed:   January 25, 2022<br>Trial Date:   None Set |

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 7, 2025 at 9:00 a.m., or as soon thereafter as counsel may be heard, in the United States District Court for the Northern District of California, Oakland Division, located at 1301 Clay Street, Oakland, California 94612, the Honorable Jeffrey S. White presiding, Defendant Lenovo (United States) Inc. ("Defendant") will and hereby does move the Court for an order excluding testimony from Plaintiffs Andrew Axelrod and Eliot Burk's ("Plaintiffs") expert, Claudiu V. Dimofte, Ph.D. ("Dimofte"), regarding consumer behavior pursuant to Federal Rule of Evidence 702.

Defendant's *Motion to Exclude Claudiu V. Dimofte, Ph.D.'s Opinions Regarding Consumer Behavior* ("*Motion*") is made on the grounds that that he fails to meet the standards required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). This *Motion* is based on this *Notice*, the accompanying *Memorandum of Points and Authorities*, the previously filed *Expert Report of Itamar Simonson* at Dkt. 222-001, the previously filed *Expert Report of Lorin Hitt* at Dkt. 222-003, the previously filed *Declaration of Abby H. Meyer* at Dkt. 222-004, and the *[Proposed] Order* submitted concurrently herewith, all pleadings, papers and other documentary materials in the Court's file for this action, all matters of which this Court may or must take judicial notice, and any other matters the Court may consider.

Dated:  October 4, 2024              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By     /s/ P. Craig Cardon
P. CRAIG CARDON
ABBY H. MEYER
BENJAMIN O. AIGBOBOH
ALYSSA SONES
*Attorneys for Defendant*
LENOVO (UNITED STATES) INC.

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................... 6
II. BACKGROUND FACTS ............................................................................................... 6
    A. Plaintiffs' Motion for Class Certification ........................................................... 6
    B. Prof. Dimofte's Report and Surveys ................................................................... 6
        1. The Consumer Perceptions Survey ......................................................... 7
        2. The Equivalent True Discount Survey ................................................... 8
        3. The Conjoint Survey .............................................................................. 9
III. LEGAL STANDARD ..................................................................................................... 9
IV. PROF. DIMOFTE'S OPINIONS AND SURVEYS SHOULD BE EXCLUDED ........ 10
    A. The Consumer Perception Survey ..................................................................... 12
        1. The Consumer Perception Survey Lacks Real-World Purchasing Conditions ............................................................................................. 12
        2. The Consumer Perception Survey Design Is Rife With Focalism Bias ....................................................................................................... 13
    B. The Equivalent True Discount Survey .............................................................. 15
        1. The Equivalent True Discount Survey Lacks Empirical Support and Scientific Validation ............................................................................. 15
        2. The True Discount's Survey Is Flawed By Design .............................. 16
    C. The Theoretically Proposed Conjoint Survey ................................................... 17
        1. The Proposed Conjoint Survey Would Ignore, and Fail to Isolate, Important Product Attributes ................................................................ 17
        2. The Proposed Conjoint Survey Entirely Lacks Necessary Details and Theoretical Foundations ................................................................ 18
V. CONCLUSION .............................................................................................................. 19

# TABLE OF AUTHORITIES

Page(s)

Federal Cases

*In re Autozone*
  2016 WL 4208200 .................................................................................................... 14

*Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*
  383 F.3d 110 (3d Cir. 2004) ..................................................................................... 11

*In re ConAgra Foods, Inc.*
  302 F.R.D. 537 (C.D. Cal. 2014) ............................................................................. 10

*Daubert v. Merrell Dow Pharms., Inc.*
  509 U.S. 579 (1993) ................................................................................................... 9

*Dukes v. Wal-Mart, Inc.*
  222 F.R.D. 189 (N.D. Cal. 2004) ............................................................................. 11

*Ellis v. Costco Wholesale Corp.*
  657 F.3d 970 (9th Cir. 2011) ..................................................................................... 9

*General Elec. Co. v. Joiner*
  522 U.S. 136 (1997) ................................................................................................. 12

*Gray v. Cty. of Riverside*
  2014 WL 5304915 (C.D. Cal. Sept. 2, 2014) ........................................................... 10

*H&R Block E. Enterprises, Inc. v. Intuit, Inc.*
  2013 WL 12129646 (W.D. Mo. Mar. 11, 2013) ...................................................... 14

*Hadley v. Kellogg Sales Co.*
  324 F. Supp. 3d 1084 (N.D. Cal. 2018) ................................................................... 18

*In re ConAgra Foods, Inc.*
  90 F. Supp. 3d at 949-50 .......................................................................................... 11

*In re KIND LLC "Healthy & All Natural" Litig.*
  627 F. Supp. 3d 269 (S.D.N.Y. 2022) ...................................................................... 13

*McMorrow v. Mondelez Int'l, Inc.*
  2021 WL 859137 (S.D. Cal. Mar. 8, 2021) ....................................................... 18, 19

*Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*
  2006 WL 2588002 (S.D.N.Y. Sept. 6, 2006) ........................................................... 14

*Scotts Co. v. United Indus. Corp.*
  315 F.3d 264 (4th Cir. 2002) ................................................................................... 14

*Smith v. Pac. Bell Tel. Co.*
662 F.Supp.2d 1199 (E.D. Cal. 2009) .......... 12

*THOIP v. Walt Disney Co.*
690 F.Supp.2d 218 (S.D.N.Y. 2010) .......... 12

*Valador, Inc. v. HTC Corp.*
242 F. Supp. 3d 448 (E.D. Va. 2017) .......... 14

*Zakaria v. Gerber Prod. Co.*
2017 WL 9512587 (C.D. Cal. Aug. 9, 2017),
*aff'd*, 755 F. App'x 623 (9th Cir. 2018) .......... 18

Federal: Statutes, Rules, Regulations, Constitutional Provisions

Federal Rules of Evidence
Rule 702 .......... 10

## I. INTRODUCTION

Plaintiffs Andrew Axelrod and Eliot Burk ("Plaintiffs") have submitted the expert report of Prof. Claudiu Dimofte ("Prof. Dimofte") to support their motion to certify damages and injunctive relief classes of Lenovo laptop purchasers. The Court should reject Prof. Dimofte's report and testimony in its entirety. His opinions are fundamentally unreliable, relying heavily on the results of two flawed surveys that lack empirical support. Prof. Dimofte employs a novel methodology that deviates significantly from established economic principles and research standards, aiming to evaluate the effects of Lenovo's pricing representations—such as Web Price, strike-through price, and Est. Value—on consumer behavior and perceived value.

Prof. Dimofte's surveys suffer from myriad methodological flaws that are untested in research, rife with unfounded assumptions and do not account for important marketplace realities. These shortcomings render his conclusions not only speculative but also unsubstantiated. For these and those detailed below, the Court should exclude Prof. Dimofte's report and testimony.

## II. BACKGROUND FACTS

### A. Plaintiffs' Motion for Class Certification

One June 5, 2024, Plaintiffs filed a *Motion for Class Certification* ("*Certification Motion*") seeking to certify the following classes:

> **Injunctive Relief Class**: All individuals who purchased two or fewer Class Products in a single transaction from Lenovo through the website lenovo.com/us/en primarily for personal or family purposes while in the State of California on any Class Day10 on or after June 2, 2017.
>
> **Damages Class**: All individuals who purchased two or fewer Class Products in a single transaction from Lenovo through the website lenovo.com/us/en primarily for personal or family purposes while in the State of California on any Class Day between June 2, 2018 and April 12, 2022 (inclusive).
>
> **Web Price Damages Subclass**: All members of the Damages Class who made their purchase between June 2, 2018 and August 24, 2022 (inclusive).

(Dkt. 200.) Included with the *Certification Motion* is the Dimofte Report. (Dkt. No. 200-6.)

### B. Prof. Dimofte's Report and Surveys

Plaintiffs attempt to support their Certification Motion with the expert report of Claudiu Dimofte, a marketing professor and research fellow at the Fowler College of Business at San

Diego State University.  (*See* Dkt. 200-6, ¶ 5.)  Prof. Dimofte was engaged to provide an expert opinion on the methods available for assessing economic damages on a class-wide basis, as well as to illustrate a methodological approach for quantifying those damages within a damages model following class certification.  (*See* Dkt. 200-6, ¶ 4.)  Prof. Dimofte's opinions are based on two surveys he conducted referred to as the "Consumer Perceptions Survey" and the "Equivalent True Discount Survey."  (*See id.*, ¶¶19-29.)  He also includes a "Proposed Conjoint Survey" as another possible methodology for quantifying damages.  (*Id.,* ¶¶ 117-131.)

### 1.    The Consumer Perceptions Survey

Prof. Dimofte conducted a "Consumer Perceptions Survey" to evaluate how consumers interpret representations of "save" or "savings" to conclude whether Lenovo's alleged deceptive conduct could impact the welfare of the relevant consumer population and influence their purchasing behavior.  (Dkt. 200-6, ¶ 30.)  Respondents were given the following imaginary assumptions and asked the following questions (Dkt. 200-6, pp. 58-59):

> "[Question number - focal2340] "For the next questions, we want you to imagine that you are shopping at the website of online retailer that sells a variety of laptops, desktop computers, monitors, tablets, and similar items. Imagine that while shopping there, you find a laptop that you really like and think it would be a great choice for yourself or someone you know.
>
> Please look at your shopping cart in this scenario and answer the subsequent related questions.
>
> 2340.1b.  Looking at your shopping cart, what is the price you will pay for the laptop, before taxes? (please enter numbers only)
>
> 2340.2b.  Was there a price reduction applied to the laptop?
>
> 2340.3b.  How large is the price reduction, in dollar terms? (please enter numbers only)
>
> 2340.4b.  What was the laptop price before the price reduction was applied? (please enter numbers only)

Right after answering these questions, respondents were asked the question that Prof. Dimofte relied on:

> "How important is a price reduction (i.e., dollars off) in determining your likelihood of purchasing a laptop like the one you just saw?
>
> o Not important at all (1)
>
> o Slightly important (2)
>
> o Somewhat important (3)
>
> o Moderately important (4)
>
> o Quite important (5)
>
> o Very important (6)
>
> o Extremely important (7)
>
> o Do not know / no opinion (8)"

The Consumer Perception Survey was based on the assumptions that consumers who visited Lenovo's website, www.lenovo.com/us/en (the "Website") could not visit any other website (e.g., to compare prices), could not compare the one product shown to them to the same or similar products offered at other stores/websites, could not compare the product shown to them to other brands, cannot compare different feature configurations, could not read product reviews, and could not consider any other information that was not displayed on the one webpage shown to the survey respondents. Based on the Consumer Perceptions Survey, Prof. Dimofte concluded that buyers in the online consumer electronics market were responsive to the presence of the "savings" they were promised, which were interpreted as meaningful price reductions, and unduly increased the purchase likelihood for these products.

### 2.  The Equivalent True Discount Survey

Prof. Dimofte conducted the Equivalent True Discount Survey to measure and quantify the alleged "negative" impact of Lenovo's conduct on the consumer population. The True Discount Survey aimed to quantify the "increase in consumers' purchase likelihood that results from false price reductions." (Dkt. 200-6, ¶ 69.) The Equivalent True Discount Survey was based on a single Lenovo exemplar product, the ThinkPad P16v Intel (16") Mobile Workstation (SKU

21FC001YUS) ("the Exemplar Product"). (Dkt. 200-6, Table 2, n. 55, and Table 4.) The survey included an image and description of the Exemplar Product, along with a reference price and corresponding discount level (a "stimulus") and then asked respondents to report their purchase likelihood from zero to 100. (Dkt. 200-6, ¶¶ 75 (Survey 1A), 100 (Survey 1B).) Prof. Dimofte conducted two versions of the survey, called 1A and 1B, to study how different ways of showing a price (either as a "web price" or strike-through) influenced respondents' interest in the Exemplar Product. The study aimed to determine an "equivalent true discount" by comparing the product appeal induced by an allegedly false reference price and discount against a purported "true" reference price with varying discounts. Prof. Dimfote concluded that a 20 percent discount, applied to a "true" reference price of $1,729.00, matched the product appeal of the product offered at an allegedly inflated price of $2,929.00 with a 41 percent discount.

### 3. The Conjoint Survey

Prof. Dimofte proposes a conjoint survey ("Conjoint Survey") as an "alternative assessment of consumer response to pricing" which he contends "will be used to measure and quantify damages based on either a price premium theory or a willingness-to-pay theory." (Dkt. 200-6, ¶¶ 22, 117-131.) In the proposed Conjoint Survey, respondents would evaluate hypothetical products based on four attributes: operating system, processor, random access memory (RAM), and a comprehensive price attribute that would include a posted reference price, a dollar discount, a percentage discount, and an offer price. (*Id.*) Following the survey, he plans to use a hierarchical Bayesian model via Sawtooth Software to calculate part-worth utilities, reflecting the significance of different attribute levels on consumer preferences. (*Id.*) To further this analysis, Prof. Dimofte suggests conducting a market simulation analysis to explore various real-world product configurations, specifically focusing on substituting false reference prices with accurate ones. (*Id.*) The outcomes of this analysis are expected to enable the estimation of price premiums and impacts on consumer willingness-to-pay related to purported false price reductions.

### III. LEGAL STANDARD

Courts evaluating motions for class certification apply *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993) to expert testimony. *See Ellis v. Costco Wholesale Corp.,* 657 F.3d 970,

982 (9th Cir. 2011); *In re ConAgra Foods, Inc.,* 302 F.R.D. 537, 549 (C.D. Cal. 2014). Under *Daubert*, "[a] trial judge has a 'gatekeeping' obligation with respect to opinion testimony of experts." *Gray v. Cty. of Riverside,* 2014 WL 5304915, at *16 (C.D. Cal. Sept. 2, 2014) (quoting *Daubert*, 509 U.S. at 589). "[T]he trial judge must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." The court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. (quoting *Daubert*, 509 U.S. at 543). Under Federal Rule of Evidence 702, courts may admit expert testimony if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;"

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *ConAgra Foods, Inc.,* 302 F.R.D. at 549 (citation and quotation marks omitted).

## IV. **PROF. DIMOFTE'S OPINIONS AND SURVEYS SHOULD BE EXCLUDED**

Plaintiffs contend that Prof. Dimofte's testimony serves two purposes: (1) it establishes that consumers interpret the savings representations—whether displayed as a Web Price, strike-through price, or Est. Value—as significant price reductions that substantially increase the likelihood of purchase; and (2) it offers a framework for quantifying the economic harm suffered by consumers who purchased products on the Website that they would not have otherwise purchased but for the allegedly deceptive pricing practices. (Certification Motion, pp. 7, 13.) Prof. Dimofte's testimony fails to accomplish either of these objectives.

None of Prof. Dimofte's conclusions are based on sufficient facts or data. Based solely on the "data" extracted from his Consumer Perceptions Survey, Prof. Dimofte concludes that "the alleged deceptive conduct of Lenovo can indeed negatively impact the welfare of the relevant

1  consumer population and that this population perceives such conduct negatively." (Dkt. 200-6,
2  ¶ 26.)  He similarly concludes that "[t]he negative impact on consumers can be measured and
3  quantified" based solely on his True Discount Survey.  (*Id.*, ¶ 27.)  Finally, he concludes that
4  "[t]he negative impact on consumers can also be measured and quantified using a choice-based
5  conjoint analysis," based on no tests or data at all.  (*Id.*, ¶ 28.)  As set out in the expert reports of
6  Prof. Itamar Simonson (Expert Report of Itamar Simonson ("Simonson")) and Lorin Hitt (Expert
7  Report of Lorin Hitt ("Hitt")), Prof. Dimofte's methodology is fundamentally flawed because his
8  surveys did not replicate at all how consumers would actually encounter purchasing laptops in the
9  marketplace.  (*See* Dkt. 222-001, ¶ 16; Dkt. 222-003, ¶¶ 26-28.)  The construction of his surveys
10 are predicated on unrealistic assumptions about consumer behavior and access to information,
11 which deviates from accepted survey methodologies.  (*Id.*)

12         The fundamental biases underlying the surveys similarly undercut any value they can
13 provide.  Respondents were presented with unusual questions that exhibited clear flaws, including
14 demand effects and focalism, and produced the answers that support Plaintiffs' claims.
15 Methodological problems that call into question the reliability of the survey justify exclusion. *See,*
16 *e.g., In re ConAgra Foods, Inc.,* 90 F. Supp. 3d at 949-50  (excluding survey where
17 methodological problems indicated it was not "conducted  according to accepted principles and
18 reliable") (internal quotations omitted); *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d
19 110, 121 (3d Cir. 2004) (excluding survey because the "methodology was fundamentally flawed,"
20 and  rejecting contention that flawed methodology went to the weight, rather than the
21 admissibility).  Additionally, surveys are subject to exclusion where the participants could tell the
22 purpose for which the survey was administered due to bias in the questions.  *Dukes v. Wal-Mart,*
23 *Inc.*, 222 F.R.D. 189 (N.D. Cal. 2004).  The combination of these biases and the failure to
24 approximate reality, make the Consumer Perception and Equivalent True Value surveys a
25 meaningless exercise with unreliable findings.  Accordingly, Prof. Dimofte's opinions and surveys
26 should be excluded.
27 / / /
28 / / /

### A. The Consumer Perception Survey

Prof. Dimofte's testimony is unreliable because it draws conclusions that his survey results fail to support. Therefore, there is "too great an analytical gap between the data and the opinion proffered" for his testimony to be admissible. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

#### 1. The Consumer Perception Survey Lacks Real-World Purchasing Conditions

The Consumer Perception Survey creates an unrealistic baseline that does not reflect real-world consumers making purchasing decisions and fails to account for the reality of online shopping for personal computers. (Dkt. 222-003, ¶ 28; Dkt. 222-001, ¶¶ 31-38.) A survey that accurately emulates the real-world shopping environment—taking into account factors such as consumers' ability to easily compare products and prices across different vendors—is essential for developing a reliable consumer perception survey. (*Id.*) By failing to accurately represent realistic purchase conditions, the Consumer Perception Survey provides survey outcomes reflecting consumer behavior in a biased vacuum that inherently fails to reflect how consumers would behave in the real-world circumstances in which putative class members purchased the at-issue products. *See THOIP v. Walt Disney Co.*, 690 F.Supp.2d 218, 241 (S.D.N.Y. 2010) (excluding survey because it "failed to replicate actual marketplace conditions in which consumers encountered the products at issue" and therefore it was "not a reliable indicator of consumer confusion"). If the basis for an expert's opinion is clearly unreliable, it may be disregarded. *Smith v. Pac. Bell Tel. Co.*, 662 F.Supp.2d 1199, 1226 (E.D. Cal. 2009).

The Perception Survey showed respondents one laptop, the "Order sub-total," "Ecoupon," and "Estimated total." (Dkt. 222-001, ¶ 46; Dkt. 200-6, Appx. G.) Respondents were not allowed to visit other websites, see other brands and products, read reviews, or obtain information about prices and products in any other way. (*Id.*) As a result, the only comparison they could make was between the "Order sub-total" and the "Estimated Total." (*Id.*) The Perception Survey operates on the flawed assumption that consumers are naïve and unaware of common marketing tactics, such as the use of reference prices. (*Id.*) Additionally, respondents were prompted to answer

1  leading questions that focused solely on a single product and its associated discount. (*Id.*, ¶ 48.)
2  This design effectively ensured that the discount would be perceived as "important."  Moreover,
3  respondents were led to answer leading questions based solely on the one product and associated
4  discount shown to them.  (*Id.*)  As recognized by Hitt and Simonson, in today's digital age,
5  consumers have unprecedented access to a wealth of information about products and prices,
6  fundamentally altering how they assess value and make purchasing decisions. (Dkt. 222-003, ¶ 71;
7  Dkt. 222-001, ¶ 46.)  Consumers do not limit their evaluations to one product, one price, or a
8  single displayed discount on a single website.  (*Id.*)  Instead, consumers leverage available
9  information to compare products and prices based on their absolute values, independent of
10 traditional marketing strategies.

In deposition, Prof. Dimofte acknowledged the fact that consumers engage in product comparison during the purchase process and "will likely visit multiple sellers" when browsing and trying to learn about available products:

> Q: Professor Dimofte, based on your knowledge of consumer behavior, would you expect a typical, let's say a laptop purchaser, to just visit just one website when making their purchase?
>
> A: I think I talked about this earlier.  It depends on the state of readiness of the consumer when it comes to purchase.  If they are still browsing and trying to learn about products in the category, they will likely visit multiple sellers.  If they know what they are looking for, they may just go straight to one supplier.

(Dkt. 222-004, ¶ 17, Ex. G ("Dimofte Tr.") at 47:11-21.)  This admission is fatal.  This is a false advertising case premised on consumers' interpretation and their impact on purchase likelihood. The Consumer Perception Survey's failure to replicate behavior in the real-world renders it unreliable.

### 2. The Consumer Perception Survey Design Is Rife With Focalism Bias

"A survey cannot assist the trier of fact where it poses a "leading question in that it suggests its own answer." *In re KIND LLC "Healthy & All Natural" Litig.,* 627 F. Supp. 3d 269, 297 (S.D.N.Y. 2022) (citing U*niversal City Studios, Inc. v. Nintendo Co.,* 746 F.2d 112, 118 (2d

Cir. 1984); *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 269 (4th Cir. 2002) (holding that when survey questions are leading and suggestive, this "weaken[s] the relevance and credibility of the survey evidence to the point that it sheds no light on the critical question in [the] case"); *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 465 (E.D. Va. 2017) (excluding "unreliable" survey with "improperly suggestive" questions that "creat[ed] 'demand effects' or 'cues' from which a respondent can 'infer the purpose of the survey and identify the answer'"); *In re Autozone*, 2016 WL 4208200, at *17 (excluding expert survey, in part, because of response bias). The Perception Survey's leading, closed ended questions artificially limited the survey's ability to understand how consumers view or approach a purchasing decision. Thus, the Perception Survey and opinions are unreliable. *See e.g., H&R Block E. Enterprises, Inc. v. Intuit, Inc.*, 2013 WL 12129646, at *4 (W.D. Mo. Mar. 11, 2013) (close-ended questions upon which the survey expert relied "are leading and/or create an improper demand effect, and therefore, the questions on the survey are improper under the law"); *Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.,* 2006 WL 2588002, at *23 (S.D.N.Y. Sept. 6, 2006) (ruling "the survey should have provided respondents with all possible options to any question").

The Consumer Perception Survey is inadmissible for any purpose due to its inherent bias, which steered respondents toward selecting answers that align with the Plaintiffs' preferences. "Focalism" is a form of cognitive bias in which the decision of an individual or survey respondent is influenced by an "anchor" or piece of information that is top-of-mind at the time the decision is made and is "well known to lead to biased survey results." (Dkt. 222-001, ¶ 51.) The survey's design compelled respondents to concentrate solely on the price and discount of the products, effectively revealing its true purpose and the expected responses of the survey's designer. (*Id.*, ¶ 28.) As analyzed by Simonson, respondents to the Consumer Perception Survey were led to consider just one characteristic of the one product shown to them, namely, the discount. (*Id.*, ¶¶ 51-53.) For example, the questions asked about the price, the price reduction applied, the amount of the price reduction, and the price before the reduction was applied. Thus, respondents necessarily focused on the role of a price reduction. Prof. Simonson found the focalism bias in the Consumer Perception Survey to be "extreme" further undermining the credibility of the results.

1  (*Id.*, ¶ 53.)  Therefore, Prof. Dimfote's testimony and the Consumer Perception Survey should be
2  excluded.

### B. The Equivalent True Discount Survey

Prof. Dimofte offers the Equivalent True Discount Survey to quantify the increase in consumers' purchase likelihood that results from false price reductions—a methodology he made from whole cloth and that lacks the backing of any economic or empirical research (from Prof. Dimofte or anyone else).  (Dkt. 200-6 ¶ 69; Dimofte Tr. at 129:4-132:2.)  The Equivalent True Discount Survey, much like the Consumer Perception Survey, is fundamentally flawed and disconnected from the consumer decision-making process observed in real-world scenarios.  These flaws include the failure, by design, to clearly show how inflated reference prices materially influence consumer buying decisions, the failure to account for consumer dynamics in the marketplace for computers, and the unfounded assumption that the "real discount" is always at least 10 percent, without justification.  Moreover, as Prof. Dimofte acknowledges, the 20 percent "true discount" is specific to a set of transaction conditions (product, posted reference price, "true" reference price, and offer price), such that this approach would require a separate and independent survey for each set of conditions, rendering it unreliable and subject to exclusion.

#### 1. The Equivalent True Discount Survey Lacks Empirical Support and Scientific Validation

Prof. Dimofte's attempt to establish a "true discount" based on the survey's findings lacks empirical support.  No peer-reviewed study or scientific publication validates the concept of a "true discount," as proposed by Prof. Dimofte.  (Dkt. 222-001, ¶ 24; Dimofte Tr. 129:4-132:2.)  The notion that product appeal and purchasing decisions are determined solely or primarily by a discount is overly simplistic. (Dkt. 222-001, ¶ 24.)  It ignores the complex interplay of factors that influence consumer behavior, including product characteristics, individual preferences, and available alternatives.  (*Id.*)  The survey's approach to calculating a "true discount" is arbitrary and grossly overestimates the impact of discounts on product appeal.  Prof. Dimofte's calculation fails to consider the comprehensive context in which consumers evaluate and make purchasing

1  decisions, thereby inflating the significance of the discount in isolation. (Dkt. 222-001, ¶ 57; Dkt. 222-003, ¶ 81.)

Moreover, the survey's design which restricts the "true discount" to a minimum of 10 percent by only presenting discounts at or above this threshold, artificially constrains the range of possible outcomes. (Dkt. 222-003, ¶¶ 93-95.) Prof. Dimofte fails to justify the selection of discount values used in the survey, which crucially influences the survey's findings by precluding any possibility of identifying a true discount rate lower than 10 percent. This arbitrary limitation significantly impacts the credibility and applicability of the survey's conclusions, as it does not accurately reflect or explore the full spectrum of consumer behavior and discount responsiveness. (*Id.* ¶¶ 96-98.) For these reasons, the Court should exclude the True Discount Survey.

### 2. The True Discount's Survey Is Flawed By Design

The Equivalent True Discount Survey, by its design, fails to accurately estimate the impact of posted reference prices on consumer behavior. (Dkt. 222-003, ¶¶ 78-82.) First, it does not isolate the effect of reference prices on purchase likelihoods, as it lacks survey stimuli where the reference price is the sole variable. (*Id.*) Second, the survey provides no evidence of how individual behavior would vary under different purchasing scenarios. (*Id.*) Third, it does not demonstrate how actual consumer behavior is affected by posted reference prices in real-world shopping environments. (*Id.*)

The survey's methodology is overly simplistic and unrealistic. By restricting respondents to consider only a single product with one price and one discount, without the opportunity to compare across multiple platforms, brands, or stores, it fails to reflect the complexity of consumer decision-making. Furthermore, the absence of a realistic range of information available to consumers, which would naturally influence their decisions, undermines the reliability of its conclusions. For instance, the survey could have included relevant information that consumers typically encounter and weigh during their decision-making process.

Moreover, the survey's methodology fails to isolate the impact of reference prices, as no pair of stimuli differs solely by the reference price. (Dkt. 222-003, ¶¶ 78-82.) This limitation makes it impossible to determine the specific effect of reference prices on purchase likelihood.

1  (*Id.*)  Additionally, each respondent is exposed to only a single stimulus, which prevents any assessment of how an individual's purchase likelihood might vary across different pricing scenarios.

4  Furthermore, the survey relies on respondents' self-reported behavior in hypothetical situations without providing any incentive for accurate reporting, rendering this approach methodologically weak for understanding actual consumer behavior.  (*Id.*, ¶ 90.)  As a result, Prof. Dimofte's conclusion that reference price reductions significantly influence purchasing behavior cannot be substantiated by the findings of the True Discount Survey. These fundamental design issues fail to capture the complexity of consumer decision-making and highlight the need for a more nuanced analysis of individual consumer responses to varying pricing strategies.

### C. The Theoretically Proposed Conjoint Survey

Prof. Dimofte's not-yet-designed Conjoint Survey, as described in general terms in his Report, would be incapable of providing an estimate of the effect of Lenovo's alleged deceptive conduct on consumers' willingness to pay or a price premium associated with such conduct.  The same critical flaws identified in the Consumer Perception and Equivalent True Value Surveys—such as biased question framing and an unrealistic simplification of purchasing decisions—are evident in the theoretically proposed Conjoint Survey.  The proposal fails to explain how Prof. Dimofte would incorporate critical elements involved in consumers' decision-making process, including their proclivity to engage in comparison research across multiple platforms, such as websites, stores, and review sources.  (Dkt. 222-003, ¶ 115.)  This limitation confirms that the survey Prof. Dimofte says he could design, in theory, at a later date, would nevertheless be incapable of deriving meaningful insights into the value consumers place on discounts, making it inadequate for application in a damages model in this case.

#### 1. The Proposed Conjoint Survey Would Ignore, and Fail to Isolate, Important Product Attributes

The Conjoint Survey proposes to present respondents with a single price attribute that subsumes both the posted reference price and offer price. (Dkt. 222-003, ¶ 108.)  In a typical conjoint survey, to compare how much changes in an attribute affect willingness-to-pay,

respondents are presented with multiple choice tasks with a set of products with different features and prices. (*Id.*, ¶¶ 109-110.) For instance, a consumer would complete 10 to 20 choice tasks, each including three product options, where the products are described by five unique attributes and a price. (*Id.*) Adjusting the attributes and prices enables the determination of how each non-price attribute and the price attribute influence a consumer. (*Id.*) The critical piece is that the relevant attributes and prices are separated; otherwise, it is impossible to compute the relevant impact of a change in features in dollar terms. (*Id.*, ¶ 111.) As Prof. Hitt explains, in Prof. Dimfote's proposed Conjoint Survey, the reference price (the attribute being studied) and the actual price are bundled into a single feature, making it impossible to conduct the necessary analysis. (*Id.*) Prof. Dimofte does not discuss how to circumvent the problems imposed by his unconventional price attribute. Such an approach renders the proposed Conjoint Analysis irrelevant and unreliable.

### 2. The Proposed Conjoint Survey Entirely Lacks Necessary Details and Theoretical Foundations

Prof. Dimofte indicates that he will conduct a "market simulation" to "test multiple real-world product configuration possibilities" in order to calculate the price premium associated with Lenovo's alleged conduct. (Dkt. 222-003, ¶ 122.) One reason courts consider using conjoint analyses to inform class-wide damages models is their promise, in theory, to isolate the impact of particular variables on consumer decision-making behavior. *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018) (evaluating conjoint analysis proposed to "isolate the monetary value that consumers in the cereal market (as it existed over the class period) attached to the alleged affirmative misrepresentations"). But they only are accepted if they "adequately account for supply-side factors" by "reflect[ing] actual market prices that prevailed during the class period" and "the actual quantities of products sold during the class period." *Id.* (collecting cases holding that "in cases where price premia are the relevant measure of damages, courts have repeatedly rejected conjoint analyses that only measure demand-side willingness-to-pay"); *see also Zakaria v. Gerber Prod. Co.*, 2017 WL 9512587, at *10 (C.D. Cal. Aug. 9, 2017), *aff'd*, 755 F. App'x 623 (9th Cir. 2018) (rejecting conjoint analysis supporting price premium model that

1  used "hypothetical prices" that "[did] not directly correlate to actual market prices for the product
2  at issue"). *Cf. McMorrow v. Mondelez Int'l, Inc.*, 2021 WL 859137, at *4 (S.D. Cal. Mar. 8,
3  2021) (conjoint analysis not excluded because it incorporated "actual retail pricing data" to mirror
4  supply-side market value). Here, Prof. Dimofte provides no specifics on how he would
5  accommodate supply side characteristics, which undermines computing a but-for market price.
6  (Dkt. 222-003, ¶ 39.) No conjoint analysis can support a price premium damages model in this
7  case without adequately considering supply-side factors.

8  Moreover, the hypothetical survey lacks crucial details and clarity. Prof. Dimofte does not
9  specify how he would select alternative products for inclusion in the simulations or whether
10 participants could opt not to purchase any product, both of which are essential for simulating
11 realistic market scenarios. (*Id.*, ¶ 126.) Furthermore, the number of simulations necessary to
12 accurately calculate the price premium for specific conduct remains undefined, raising questions
13 about the feasibility and reliability of his methodology given the complexity of factors such as
14 reference and offer prices. (*Id.*, ¶ 126.) Additionally, Prof. Dimofte has not detailed how he
15 would practically implement these simulations, including the integration of unique price attributes
16 and the determination of price premiums. (*Id.*, ¶ 128.) This omission of key procedural elements
17 casts doubt on the validity and executability of his proposed market simulation.

18 Given the severe limitations of the proposed Conjoint Survey to the realities of consumer
19 decision-making, reliance on such a survey would provide a misleading and inaccurate
20 representation of consumer behaviors and preferences in this case. The survey's fundamental
21 methodological shortcomings, coupled with its inability to reflect the comprehensive decision-
22 making landscape, invalidate its findings and conclusions, and must therefore be excluded.

23 **V.   CONCLUSION**

24 For all of the foregoing reasons, Lenovo respectfully requests that the Court grant its
25 Motion.

Dated: October 4, 2024

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By   */s/ P. Craig Cardon*
P. CRAIG CARDON
ABBY H. MEYER
BENJAMIN O. AIGBOBOH
ALYSSA SONES
*Attorneys for Defendant*
LENOVO (UNITED STATES) INC.