UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREW AXELROD, et al.,
Plaintiffs,

v.

LENOVO (UNITED STATES) INC.,
Defendant.

Case No. 21-cv-06770-JSW

**CONDITIONALLY SEALED**

**ORDER GRANTING, IN PART, DAUBERT MOTIONS AND GRANTING, IN PART, MOTION FOR CLASS CERTIFICATION**

Re: Dkt. Nos. 200, 201-3, 224-225

Now before the Court for consideration are the motion for class certification filed by Plaintiffs, Andrew Axelrod ("Axelrod") and Eliot Burk ("Burk") (collectively "Plaintiffs"), and the motions to exclude the opinions and testimony of Plaintiffs' experts, filed by Defendant Lenovo (United States) Inc. ("Lenovo") ("*Daubert* motions"). The Court has considered the parties' papers, relevant legal authority, oral argument, and the record in this case, and HEREBY GRANTS, IN PART, the *Daubert* motions and GRANTS, IN PART, Plaintiffs' motion for class certification.

## BACKGROUND

Plaintiffs allege that Lenovo uses "false reference pricing" on its website to boost sales and to maximize profits. (Dkt. No. 19, First Amended Class Action Complaint ("FAC") ¶ 1.)[1] Lenovo uses an advertising format it calls "price stacks." (Dkt. No. 222-2, Declaration of Kevin Morey ("Morey Decl."), ¶ 13.) From June 2, 2017, through August 24, 2021, Lenovo used the

[1] Plaintiffs also allege that Lenovo misleads consumers by suggesting its sales are limited in time. (FAC ¶¶ 45-70.) Plaintiffs do not address that theory in their motion, and the Court limits its analysis to their false reference price theory. Plaintiffs also bring claims for breach of contract, breach of warranty, negligent misrepresentation, and intentional misrepresentation. Plaintiffs do not move for class certification on those claims.

phrase “Web Price” on the price stacks to identify what it contends was the regular price of a product (the “reference price”). From August 25, 2021, through August 12, 2022, Lenovo began to use a “strikethrough” over the reference price. When a price stack included a discounted price, Lenovo also included such terms as “save,” “savings of,” “you’re saving,” or “Save __%.” Examples of the price stacks are depicted below:

**August 24, 2021**




**August 27, 2021**




(FAC ¶ 28.)

Beginning on August 13, 2022, Lenovo began to use the phrase “Est. Value” on the price stacks, which includes an information icon (ⓘ).[2] When a visitor to Lenovo’s website clicks that icon, Lenovo displays the following text: “Estimated value is Lenovo’s estimate of Covered Product value based on industry data, including the prices at which Lenovo and/or third-party retailers and e-tailers have offered or valued the same or comparable [products]. Third-party data may not be based on actual sales.” (Morey Decl., ¶ 13.)

Although Lenovo changed how it displayed the reference price, Plaintiffs allege the substance of the price stacks: a reference price paired with a discount. Plaintiffs also allege that Lenovo’s use of false reference prices “is so deeply ingrained in its marketing strategy that often when Lenovo increases the sale price of a product, it also increases the regular price” to keep the

---

[2] Lenovo’s use of the “Est. Value” price stack is at issue in *Hermanson v. Lenovo Grp. Ltd.*, No. 23-cv-5890-JSW. (*See Hermanson*, Dkt. No. 1 (Complaint ¶¶ 97-109.) The Court stayed *Hermanson* pending resolution of this motion because of the potential overlap between the injunctive relief requested by the plaintiffs in the two cases. *Hermanson v. Lenovo Grp. Ltd.*, 2024 WL 4504535, at *1 (N.D. Cal. Oct. 15, 2024).

size of the discount consistent. (FAC ¶ 37.) Plaintiffs assert the reference price and the advertised savings are false because Lenovo rarely, if ever, sells the Class Products at the reference price.[3]

On September 15, 2019, Burk ordered a ThinkPad P52 Mobile Workstation laptop from Lenovo's website. (Dkt. No. 200-2, Declaration of Eliot Burk ("Burk Decl."), ¶ 2.) Burk attests that Lenovo offered the workstation "at a significant price reduction from a Web Price, which [he] understood to be the regular price." (*Id.* ¶ 3.) Burk attests that he relied on Lenovo's representations of a significant discount when he purchased the workstation. (*Id.*, ¶ 8.)

On January 1, 2021, Axelrod purchased a ThankPadX1 Carbon Gen 8 laptop from Lenovo's website. Axelrod also attests Lenovo advertised the workstation at a significant discount from the Web Price, which he understood to be the "regular price" of the laptop. (Dkt. No. 200-1, Declaration of Andrew Axelrod ("Axelrod Decl."), ¶¶ 2-3, 8-9.) Plaintiffs attest they would not have purchased these products if they had known the savings were false. (Axelrod Decl., ¶ 9; Burk Decl., ¶ 9.)

Based on these and other facts the Court will discuss as necessary, Plaintiffs contend that Lenovo false reference pricing violates California's Business and Professions Code section 17200, (the "UCL Claim"), section 17500 (the "FAL Claim"), and section 17501 ("Section 17501"). Plaintiffs also allege that this conduct violates California's Consumer Legal Remedies Act ("CLRA"), Civil Code sections 1750, *et seq.* (the "CLRA Claim").

Plaintiffs move to certify the following classes:

> All individuals who purchased two or fewer Class Products in a single transaction from Lenovo through the website *lenovo.com/us/en* primarily for personal or family purposes while in the State of California on any Class Day on or after June 2, 2017 (the "Injunctive Relief Class").[4]

---

[3] The Class Products are "any non-customizable laptop, desktop, workstation, or tablet offered for sale to the general public on Lenovo's website." (Dkt. No. 201-3, Plaintiffs' Mot. for Class Certification ("Cert. Mot.") at 2 n.1.)

[4] The term "Class Day" means "any day on which a Class Product was offered at a reduced price from an advertised reference price, where the product was offered at a price below the advertised reference price for the majority of the days that the product was available for sale on Lenovo's website during the preceding 90 days." (Cert. Mot. at 2 n.2.)

> All individuals who purchased two or fewer Class Products in a single transaction from Lenovo through the website *lenovo.com/us/en* primarily for personal or family purposes while in the State of California on any Class Day between June 2, 2018 and April 12, 2022 (inclusive) (the "Damages Class")
>
> All members of the Damages Class who made their purchase between June 2, 2018 and August 24, 2021 (inclusive) (the "Web Price Damages Subclass").

(Mot. at 2:7-16.)

## ANALYSIS

### A. The Court Grants, in Part, the *Daubert* Motions.

#### 1. Applicable Legal Standard.

In general, a court evaluates a challenge to expert testimony under the standards announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-90 (1993). "Under *Daubert*, 'the district court judge must ensure that all admitted expert testimony is both relevant and reliable.'" *Grodzitsky v. Am. Honda Motor Co., Inc.*, 957 F.3d 979, 985 (9th Cir. 2020) (quoting *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017)). The parties dispute whether the Court should conduct a full or a limited *Daubert* inquiry to resolve these motions. Resolution of that dispute "is a function of what aspect of" Federal Rule of Civil Procedure 23 a court is addressing and can depend on the timing of a class certification decision. *Lytle v. Nutramax Labs.*, 114 F.4th 1011, 1030 (9th Cir. 2024) (cleaned up).

For example, where discovery is closed and an expert's analysis is complete "there may be no reason for a district court to delay its assessment of ultimate admissibility at trial." *Id.* at 1031. If "an expert's model has yet to be fully developed, a district court is limited at class certification to making a predictive judgment about how likely it is the expert's analysis will eventually bear fruit." *Id.* A court may exclude expert testimony submitted in support of class certification if the testimony does not comply with Rule 702 or with the standards set forth in *Daubert*. *See Grodzitsky*, 957 F.3d at 985. Conversely, a court could find that expert testimony satisfies Rule 702 and *Daubert* but conclude the testimony fails to satisfy the moving party's burden to show a class should be certified. *Lytle*, 114 F.4th at 1032; *see also Vizcarra v. Unilever U.S., Inc.*, 339

United States District Court
Northern District of California

F.R.D. 530, 542 (N.D. Cal. 2021) ("*Unilever I*").

The focus of a court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. To conduct that analysis, a court may consider "whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable." *Wendell*, 858 F.3d at 1232 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995)).

**2. The Court Grants, in Part, the Motion to Exclude the Opinions and Testimony of Claudiu V. Dimofte, Ph.D. ("Dr. Dimofte").**

Dr. Dimofte designed and conducted a consumer perception survey and two "equivalent true discount" surveys for Plaintiffs. The latter two surveys address damages, but he also opines that "a conjoint analysis is well-suited to the facts of this case and can be used to measure and quantify the impact that false price reductions have on consumer choice." (Dkt. No. 200-6, Unredacted Dimofte Report ("Dimofte Rep."), ¶ 22.)

**a. The Court denies the motion to exclude evidence of the consumer perception survey.**

Dr. Dimofte designed the consumer perception survey to assess: (1) whether Lenovo's alleged conduct is harmful, and is perceived as harmful, to the relevant consumer population; and (2) to assess how consumers interpret representations of "save" or "savings." (Dimofte Rep., ¶ 30.) Dr. Dimofte randomly presented respondents with a laptop using one of six price stacks drawn from Lenovo's website (the "stimulus"). He then asked respondents to type in the pre-tax price reflected in the stimulus to assess whether they perceived a price reduction had been applied to the laptop. (*Id.* ¶¶ 44-51.)[5]

If the participant perceived a price reduction, Dr. Dimofte asked them: "to type in how large (in dollar terms) the price reduction was, and … to type in what the laptop price was before

[5] The full survey is included as Exhibit F to Dr. Dimofte's report. The screen shots used price stacks with Web Price, the strikethrough price, and Est. Value.

the price reduction was applied (*i.e.*, the perceived reference price)." (*Id.* ¶ 51 & n.39.) Dr. Dimofte also asked respondents to rate the importance they placed on the price discounts on a scale of 1 (not important at all) to 7 (extremely important). The survey also gave respondents the opportunity to respond to this question with "do not know/no opinion." (*Id.* ¶ 52.)

Dr. Dimofte states that 63.2% of the participants correctly identified the pre-tax price, that 91.5% of participants perceived a price reduction was applied, 87.2% correctly identified the savings, and 91.3% identified the reference price using the Web Price or strike-through price. (*Id.* ¶¶ 60-63.) Dr. Dimofte opined these results:

> highlight that buyers in the online consumer electronics market are responsive to the presence of the savings they are promised, which are interpreted as meaningful price reductions, irrespective of the manner in which the baseline price is displayed. Therefore, an online retailer that artificially inflates its reference prices to create false perceptions of savings unduly increased the purchase likelihood for these products.

(*Id.* ¶ 68.)

Lenovo argues that Dr. Dimofte's results are not reliable because they do not account for the likelihood that consumers will comparison shop, relying on *THIOP v. Walt Disney Co.,* 690 F. Supp. 2d 218 (S.D.N.Y. 2018). In *THIOP,* a trademark case, the parties' experts disputed the proper type of survey to measure the likelihood of "forward confusion," *i.e.,* that consumers would believe the defendant's infringing product was produced by the plaintiff. *Id.* at 221-27, 232. The plaintiff's expert used a "sequential array" where respondents were shown plaintiff's products first and then were shown defendant's products. The defendant's expert argued that where a consumer would not encounter the products side by side, a single exposure survey was the proper method to use. *Id.* at 236. The court reasoned that "[w]hen ascertaining whether a survey methodology sufficiently simulates marketplace conditions, the focal point must be the specific products tested by the survey." *Id.* at 236-37. The court excluded the survey, in part, because that evidence showed the plaintiff's survey "did not sufficiently approximate the manner in which consumers encountered the parties' products in the marketplace *Id.* at 236; *see also id.* at 236-38.

Here, Dr. Dimofte used price stacks from Lenovo's website and conducted the survey online, which replicates how consumers would encounter Lenovo's products. In addition,

Plaintiffs assert that the Class Products are sold exclusively on Lenovo's website. The Court concludes Lenovo's argument about comparison shopping goes to the weight to be afforded to Dr. Dimofte's opinions and, at this stage, does not render his opinions and testimony wholly unreliable.

Lenovo also argues that Dr. Dimofte's consumer perception survey suffers from focalism bias and demand effects. The Court finds those objections also go to the weight of his opinions rather than admissibility. *See, e.g., Unilever I*, 339 F.R.D. at 542 (finding criticisms of "survey design, methodologies, and reliability [went] to the weight to be given to [the] opinions, and not their admissibility").

**b. The Court grants the motion to exclude evidence of the equivalent true discount surveys.**

Dr. Dimofte designed and conducted the equivalent true discount surveys "to demonstrate how the increase in consumers' purchase likelihood that results from false price reductions can be measured and quantified" and to show that "economic damages can be reliably measured and quantified."[6] (Dimofte Rep. ¶¶ 69, 96.) In these surveys, the stimuli were one of two screen shots drawn from Lenovo's website. In one screen shot, the product was on sale. In the other, it was not. The screen shots also featured the reference price and any applicable promotions or savings. (*Id.* ¶ 71.) Respondents were randomly exposed to only one of six price points:

> a price (p1) that did not feature a discount (and was the artificially inflated Lenovo reference price), a price (p2) that featured a specific discount resulting from the comparison between p1 and the artificially inflated Lenovo reference price [either a Web Price or a strikethrough price], as well as four prices (p3, p4, p5, and p6) that featured decreasing discounts (in equal increments) using the true reference price [*i.e.,* the one at which the item most commonly sold] in the sale price.

(Dimofte Rep. ¶ 75 & n.52; *see also id.* Table 1.)

Dr. Dimofte then asked respondents to rate the probability they would purchase the product on a scale of 0% to 100%. (*Id.* ¶¶ 75, 99-100.)

---

[6] Dr. Dimofte only used one product in these surveys, but stated he would conduct studies using additional products later in the litigation. (Dimofte Rep. ¶ 70.)

> The study identified the equivalent true discount based on a true reference price that would be required to induce the same product appeal as the false sale discount. This would occur when the purchase probability associated with an equivalent true discount based on a true reference price would be statistically no different from that associated with the false discount based on a false reference price.

(*Id.* ¶ 77; *see also id.* ¶ 110.)

Dr. Dimofte opined that the results from the two equivalent true discount surveys showed "the use of sale pricing produced a clear increase in purchase probability compared to the use of non-sale pricing." (*Id.* ¶¶ 87, 104.) For example, "[t]he use of a sale with an inflated regular price (*i.e.*, $1,729.00 with a presumed 41% discount off $2,929.00) produced a statistically similar purchase probability to that associated with the use of a true sale at 20% off a true reference price of $1729.00[.]" (*Id.* ¶¶ 88, 105.)

According to Lenovo's expert, Dr. Itamar Simonson, the concept of equivalent true discount "has no scientific support, and it has not been supported by any scientific peer-reviewed studies or publications." (Dkt. No. 222-1, Unredacted Expert Report of Dr. Itamar Simonson ("Simonson Rep."), ¶ 57.)[7] Plaintiffs respond that Dr. Dimofte's equivalent true discount survey employs the "contingent valuation" method. A contingent valuation usually is "designed to elicit respondents' willingness-to-pay for a good or a service based on the respondent's stated behavior in a hypothetical situation, rather than their actual behavior in a real situation." (Dkt. No. 238-1, Reply Declaration of Dr. Loren Hitt ("Hitt Reply Decl."), ¶ 11; *see also id.* ¶ 11, nn. 15, 16.) Courts have that method reliable when used to calculate price premium damages. *See, e.g., Vizcarra v. Unilever U.S., Inc.*, No. 20-cv-2777-YGR, 2023 WL 2364736, at *17-18 (N.D. Cal. Feb. 24, 2023) ("*Unilever II*"); *cf. Svenson v. Google, Inc.*, No. 13-cv-4080-BLF, 2016 WL 8943301, at *5-6 (N.D. Cal. Dec. 21, 2016) (finding method generally reliable but excluding opinions because expert admitted he did not include a material question on the survey).

[7] The Court also has not located any opinions that have evaluated the merits of such a theory, but Plaintiffs' damages expert, Christian Tregillis, addressed the theory in a declaration filed in *Carvalho v. HP, Inc.*, No. 21-cv-8015-PCP. (*See Carvalho*, Dkt. No. 85-3.)

United States District Court
Northern District of California

However, Plaintiffs did not argue Dr. Dimofte used the contingent valuation method in their opening brief. Dr. Dimofte did not describe the equivalent true discount surveys as contingent valuations in his report. Given his experience, if Dr. Dimofte had conducted a contingent valuation, or even a variant thereof, he could have clarified that during his deposition. He did not. Instead, he testified was "not sure if this type of study had been done" in scholarly research. He also testified he was not sure whether anyone other than himself had done such a study in a litigation context. (Dimofte Tr. at 129:25-130:12.)

The Court concludes that Plaintiffs have not met their burden to show Dr. Dimofte's equivalent true discount surveys are the product of reliable principles or methods under *Daubert*.

**c. The Court grants the motion to exclude evidence of a conjoint analysis.**

Finally, Dr. Dimofte opined that a conjoint analysis could be used to evaluate damages, which courts have concluded can be a reliable methodology. *Vizcarra I*, 339 F.R.D. at 553. It is undisputed that Dr. Dimofte has not yet designed a conjoint analysis, but that is not dispositive. *See, e.g., Lytle*, 114 F.3d at 1019. The Court concludes his proposal for a conjoint analysis is not developed enough for the Court to evaluate whether it would be a reliable method in this case. (Dimofte Rep., ¶¶ 28-29, 117-134.)

For the reasons set forth above, the Court GRANTS, IN PART, Lenovo's motion to exclude Dr. Dimofte's opinions. The Court will consider the evidence relating to the consumer behavior survey to resolve Plaintiffs' motion. It will not consider the equivalent true discount surveys or the proposed conjoint analysis.

**3. The Court Grants, in Part, the Motion to Exclude Mr. Tregillis's Opinions and Testimony.**

Plaintiffs retained Mr. Tregillis to develop a damages methodology. (Dkt. No. 201-5, Unredacted Declaration of Christian Tregillis ("Tregillis Decl."), ¶ 7.) Mr. Tregillis provided background information about reference pricing in paragraphs 12 through 15 of his declaration that the Court finds reliable and has considered to resolve Plaintiffs' motion. However, a material component of Mr. Tregillis's damages analysis depended on Dr. Dimofte's equivalent true discount surveys. (*See, e.g., id.* ¶¶ 19-20, 22, 35.) Because the Court has excluded those surveys,

it GRANTS, IN PART, Lenovo's motion. The Court will not consider Mr. Tregillis's opinions on damages to resolve Plaintiffs' motion.

**B. The Court Grants, in Part, Plaintiffs' Motion for Class Certification.**

Class certification is governed by Federal Rule of Civil Procedure 23. Plaintiffs must establish by a preponderance of the evidence that they meet each of Rule 23(a)'s requirements and at least one or more of the requirements in Rule 23(b). *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664-65 (9th Cir. 2022). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("*Dukes*"). Plaintiffs "must be prepared to" to put forth evidence to satisfy these factors, and the Court must conduct a "rigorous analysis" of the Rule 23 factors. *Id.* at 351. "Merits questions may be considered to the extent - but only to the extent - that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

The decision to grant or deny class certification is within the Court's discretion. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). "Class certification is not immutable, and class representative status could be withdrawn or modified if at any time the representatives could no longer protect the interests of the class." *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) (citing *Soc. Servs. Union, Local 535 v. County of Santa Clara*, 609 F.2d 944, 948-49 (9th Cir. 1979)).

**1. Plaintiffs Have Met Their Burden to Satisfy the Rule 23(a) Factors.**

**a. The proposed classes are sufficiently numerous.**

Under Rule 23(a), the Court may certify the classes only if they are so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Lenovo does not dispute numerosity. Plaintiffs attest that there were over 1,000 transactions in California related to the laptop model that Axelrod purchased. (Rozenblatt Decl., ¶ 15.) The Court concludes the classes are sufficiently numerous. *See, e.g., Breeden v. Benchmark Lending Grp., Inc.*, 229 F.R.D. 623, 628-29 (N.D. Cal. 2005) (finding joinder was impractical where there were over 236 members in the putative class).

**b. Plaintiffs have met their burden to show adequacy.**

Rule 23(a)(4) requires a showing that the named plaintiffs and counsel will fairly and adequately protect the interests of the class. Plaintiffs can satisfy this factor by showing they and their counsel "have no conflicts of interest with other class members" and that they and their counsel will "act vigorously" on behalf of the classes. *Senne v. Kan. City Royals Baseball Corp.*, 315 F.R.D. 523, 569-70 (N.D. Cal. 2016) (cleaned up).

Lenovo argues that Axelrod has credibility issues that prevent him from serving as adequate class representative. The adequacy requirement is satisfied as long as one of the named class representatives is adequate, and Lenovo does not challenge Burk's adequacy. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009). There is nothing in the record to show Burk has conflicts with other class members. Through his declaration, Burk demonstrates that he has acted and will continue to act vigorously on behalf of the class. (Burk Decl., ¶¶ 3-6.)

To determine class counsel's adequacy, the Court must consider the work counsel have done in the action, their experience in similar actions, their knowledge of applicable law, and the resources they are able to commit. Fed. R. Civ. P. 23(g). The Court also may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," including counsel's "reputation built upon past practice" and "counsel's competence displayed by present performance." *Abikar v. Bristol Bay Native Corp.*, No. 17-cv-1036, 2018 WL 6738017, at *13 (S.D. Cal. Dec. 21, 2018). Lenovo does not challenge counsel's adequacy. The Court has reviewed the declarations submitted by Mr. Padgett and Mr. Rozenblatt and concludes counsel will provide adequate representation. (Dkt. Nos. 200-3, Declaration of Cody R. Padgett; Rozenblatt Decl., ¶¶ 2-3.)

**c. Plaintiffs have met their burden to show typicality.**

Typicality requires Plaintiffs to show that their claims or defenses "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same

course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (cleaned up). Claims are typical when they are "reasonably coextensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. 338; *see also Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (Typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.") (cleaned up).

Lenovo argues Plaintiffs only saw the Web Price price stack, which makes them atypical of putative class members who did. To support that argument, Lenovo relies on *Astiana v. Kashi Company*, 291 F.R.D. 493, 502-03 (S.D. Cal. 2013). However, the court in *Astiana* reasoned that failing to show a common understanding of the representation at issue impacted predominance, not typicality. *Id.* at 507-09. Lenovo also relies on several out-of-district cases that the Court does not find persuasive on this issue. In *Valdez v. Air Line Pilots Association*, the court did state that exposure to different misrepresentations might not satisfy the typicality requirement for a claim sounding in fraud, but the court found the putative class members were exposed to the same representations. 2:16-cv-02256-JPM-dkv, 2017 U.S. Dist. LEXIS 9263, at *12-15 (W.D. Tenn. Jan 9, 2017). In *Dilley v. Academic Credit, LLC*, the court concluded the plaintiff was not typical because there was no evidence that he saw or relied on *any* of the alleged misrepresentations. No. 2:07CV301DAK, 2008 WL 4527053, at *5 (D. Utah Sept. 29, 2008); *see also Hillis v. Equifax Consumer Servs.*, 237 F.R.D. 491, 499 (N.D. Ga. 2006) (same and cited with approval in *Dilley*). That is not the case here.

Plaintiffs' theory of liability is that all of Lenovo's price stacks mislead consumers into believing that Lenovo offered the Class Products at a significant discount. Plaintiffs also show that even when Lenovo changed the format of the price stacks, the basic information remained the same: the reference price coupled with the purported discount. (FAC ¶¶ 24-28; Rozenblatt Decl., ¶¶ 4-6, Exs. 1-3.) Plaintiffs also allege, based on information drawn from Lenovo's website, that Lenovo adjusted the reference prices to maintain a proportional discount. (FAC ¶ 37.) The Court concludes the change from Web Price to strikethrough prices does not make Plaintiffs atypical of

other class members.

Lenovo also argues that Plaintiffs are not typical because they purchased their laptops within the applicable statute of limitations but have defined the classes to include individuals whose claims may be time barred. Class certification is not appropriate "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation[.]" *Hanon,* 976 F.2d at 508 (cleaned up). Neither Axelrod nor Burk would have a strong interest in litigating a statute of limitations defense, but the Court can modify the class definition to address that issue.

Lenovo argues that Axelrod is not typical of other class members because he purchased his computer for business purposes. Axelrod testified that he used the Lenovo laptop for a business he was starting but also testified that he purchased the laptop because he had a work-issued computer that he did not want to use for personal reasons. (Dkt. No. 222-4, Declaration of Abby Meyer, ¶ 2; Dkt. No. 222-5, Meyer Decl., Ex. A (Axelrod Depo. at 20:24-21:6, 73:5-23.) Axelrod's testimony does not clearly show he used his laptop "primarily" for business purposes.

With the modification to the class definition, the Court concludes Plaintiffs have met their burden to show typicality.

**d. Plaintiffs have met their burden to show commonality.**

Commonality requires that there be "questions of fact and law common to the class." Fed. R. Civ. P. 23(a)(2). Although the Court must conduct a rigorous analysis to ensure Plaintiffs meet their burden, the Ninth Circuit construes Rule 23(a)'s commonality factor permissively. *See, e.g., Hanlon*, 150 F.3d at 1019. A common contention need not be one that "will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459. Rather, a common question is one "of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350 (cleaned up). In "contrast, an individual question is one where members of a proposed class will need to present evidence that varies from member to member." *Olean*, 31 F.4th at 663. "[F]or purposes of Rule 23(a)(2)[,] even a single common question will do." *Dukes*, 564 U.S. at 359; see also *Hanlon*, 150 F.3d at 1020 ("The existence of shared legal issues with

divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.").

One common question central to Plaintiffs' claims under Section 17200, Section 17500, and the CLRA is whether Lenovo's advertising is misleading to a reasonable consumer. *See, e.g., Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). That question can satisfy the commonality requirement when putative class members have been exposed to the same representations. *See, e.g., Broomfield v. Craft Brew Alliance*, No. 17-cv-01027-BLF, 2018 WL 4952519, at 5 (N.D. Cal. Sept. 25, 2018); *Kumar v. Salov N. Am. Corp.*, No. 14-cv-2411-YGR, 2016 WL 3844334, at * (N.D. Cal. July 15, 2016); *Jones v. ConAgra Foods, Inc.*, No. 12-cv-01633-CR, 2014 WL 2702726, at *5-6 (N.D. Cal. June 13, 2014). As discussed above, Plaintiffs have shown that the substance of Lenovo's price stacks was consistent during the relevant period, even though the format changed. Thus, Plaintiffs have demonstrated the absent class members would have been exposed to the same or substantially similar representations.

Lenovo argues that Plaintiffs do not have common evidence of how a reasonable consumer would understand the representations contained in Lenovo's price stacks, citing *Unilever I*, 339 F.R.D. 530. In that case, the plaintiff offered an expert who did not test consumer understanding of the relevant term, and the court excluded his testimony. *Id.* at 541-42. The court reasoned that because the representation at issue had no fixed meaning and was not misleading as a matter of law, the lack of expert testimony prevented a finding of commonality. *Id.* at 546-48. The Court finds the representations at issue here are factually distinguishable from the representation at issue in *Unilever I.* In addition, many of the cases cited in *Unilever I* addressed the lack of common evidence in the predominance analysis. *See, e.g., Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 612 (N.D. Cal. 2018); *Kumar*, 2016 WL 3844334, at *8-*9; *Jones*, 2014 WL 2702726, at *16-*17; *Badella v. Deniro Mktg., LLC*, No. 10-cv-3908-CRB, 2011 WL 5358400, at *9 (N.D. Cal. Nov. 4, 2011). Finally, Mr. Tregillis cited research on reference pricing that shows "consumers' willingness to buy products increases when the products have a high but believable advertised reference price and a lower offer price." (Tregillis Decl., ¶ 12; *see also id.* ¶¶ 13-15.) The Court concludes Lenovo's arguments address whether there is a "fatal similarity" that would

United States District Court
Northern District of California

prevent Plaintiffs from prevailing on the UCL, FAL, and CLRA claims. *Tyson Foods*, 577 U.S. at 457.

The Court also concludes Plaintiffs meet their burden to show commonality on the Section 17501 claim. The parties dispute about whether the Class Products are exclusive or non-exclusive. That is a common question that would drive the answer to whether and how often Lenovo offered the Class Products at "prevailing market prices," as that term is defined in Section 17501. (*See, e.g.,* Rozenblatt Decl., ¶¶ 11, 14, Ex. 7 (Deposition of Stephen St. Amant at 267:9-11 (discussing pricing policy)) and Ex. 10 (Lenovo Supp. Resp. to Interrogatory 20 at 39:24-28 (discussing products sold in channels other than Lenovo's website).)

The Court concludes Plaintiffs have satisfied the Rule 23(a) factors.

**2. Plaintiffs Have Met Their Burden on Rule 23(b)(2) but not Rule 23(b)(3).**

**a. Rule 23(b)(2).**

Plaintiffs move to certify a class under Rule 23(b)(2), which provides for class certification where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Lenovo argues Plaintiffs admitted their claim for injunctive relief was moot after Lenovo changed to the Est. Value price stack. (*See* Meyer Decl., ¶ 13, Ex. C.) The Court has not found counsel's statement amounts to a legal admission and will not do so here. Lenovo also argues Plaintiffs have not shown a "common policy" that impacted the putative class, but Plaintiffs have shown that the substance of the price stacks and, in some instances, the size of the putative discounts remained consistent.

Finally, Lenovo argues Plaintiffs lack standing to seek injunctive relief, which requires them to show they have "suffered or [are] threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that [they] will again be wronged in a similar way." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (cleaned up). Plaintiffs can make that showing if it is plausible that they are "unable to rely on the product's advertising or labeling in the future and so will not purchase the product although [they] would like to." *Davidson v. Kimberly Clark Corp.*, 889 F.3d 956, 969-70 (9th Cir. 2018).

Axelrod and Burk attest that they would like to purchase Lenovo products if they could trust that Lenovo's pricing is not deceptive. (Axelrod Decl., ¶ 10; Burk Decl., ¶ 10.) Lenovo argues their deposition testimony is inconsistent with their declarations. The Court is not persuaded. Axelrod testified that although he did not have plans to do so "at this time," he "definitely would" purchase another product at Lenovo.com if he "could be assured the price is not deceptive." (Meyer Decl., ¶ 2, Ex. A (Axelrod Depo. 76:12-77:18).) Burk also testified that he would like to purchase a product from Lenovo.com when he needed a new laptop but could not provide an estimate when that would occur. (*Id.*, ¶ 14, Ex. D (Burk Depo. at 268:4-11).)

The Court concludes Plaintiffs have met their burden under Rule 23(b)(2).

**b. Rule 23(b)(3).**

Plaintiffs also move to certify damages classes under Rule 23(b)(3), which permits class certification if "questions of law or fact common to class members predominate over any questions affecting only individual members, and … a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In general, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). However, Plaintiffs must be able to show "their damages stemmed from the defendant's actions that created the legal liability." *Id.*; *see generally Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

In addition to the arguments raised in connection with commonality, Lenovo argues that Plaintiffs have not put forth a damages model that would satisfy *Comcast*. The Court has excluded evidence of the equivalent true discount surveys, which are critical to Plaintiffs' damage model. Plaintiffs also did not provide sufficient evidence of their proposed conjoint analysis. The Court concludes Plaintiffs have not met their burden under *Comcast* to show they are entitled to relief under Rule 23(b)(3).

**CONCLUSION**

For the reasons set forth above, the Court GRANTS, IN PART, Lenovo's motion to exclude Dr. Dimofte's opinions, GRANTS, IN PART, Lenovo's motion to exclude Mr. Tregillis' opinions, and GRANTS, IN PART, Plaintiffs' motion for class certification. The Court certifies

the following classes under Rule 23(b)(2):

> **The UCL Class**: All individuals who purchased two or fewer Class Products in a single transaction from Lenovo through the website lenovo.com/us/en primarily for personal or family purposes while in the State of California on any Class Day on or after August 13, 2017.
>
> **The FAL and CLRA Classes**: All individuals who purchased two or fewer Class Products in a single transaction from Lenovo through the website lenovo.com/us/en primarily for personal or family purposes while in the State of California on any Class Day on or after August 31, 2018.

The Court ORDERS the parties to appear for a further case management conference on June 27, 2025 at 9:00 a.m. The parties shall file an updated joint case management conference statement by June 20, 2025.

**IT IS SO ORDERED**.

Dated: May 7, 2025

JEFFREY S. WHITE
United States District Judge

United States District Court
Northern District of California